UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RONALD WATSON,              .    Case No. 2:17-cv-01049-MMB
                           .
        Plaintiff,         .
                           .
     v.                    .    U.S. Courthouse
                           .    601 Market Street
                           .    Philadelphia, PA 19106
LLOYD INDUSTRIES, INC.,    .
                           .
        Defendant.         .
                           .
                           .    November 13, 2018
. . . . . . . . . . . . . ..    9:19 a.m.


                    TRIAL (DAY 1)
          BEFORE HONORABLE MICHAEL M. BAYLSON
          SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        SAMUEL A. DION, ESQ.
                          DION & GOLDBERGER
                          1845 Walnut Street, Suite 1199
                          Philadelphia, PA 19103

For Defendant:            KEITH J. COHEN, ESQ.
                          LAW OFFICES OF KEITH J. COHEN
                          585 Skippack Pike, Suite 200
                          Blue Bell, PA 19422

Audio Operator:           JANICE LUTZ

Transcribed by:           DONNA MORRIS, TAMI S. MAYES,
                          ANTOINETTE FRANKS, & KELLI RAY
                          Court TranscriberS
                          Lawrence Court Transcription & Video
                          P.O. Box 530790
                          DeBary, FL 32753
                          833-800-LCTV


         Proceedings recorded by electronic sound
    recording, transcript produced by transcription service.

I N D E X

PAGE

PRELIMINARY JURY INSTRUCTIONS                          6

OPENING STATEMENT:
        BY MR. DION                                   13
        BY MR. COHEN                                  16

WITNESSES FOR THE PLAINTIFF:

        WILLIAM P. LLOYD
                DIRECT EXAMINATION BY MR. DION        21
                CROSS EXAMINATION BY MR. COHEN        53
                REDIRECT EXAMINATION BY MR. DION      59
                RECROSS EXAMINATION BY MR. COHEN      60

        SHAUN MATHIS
                DIRECT EXAMINATION BY MR. DION        66
                CROSS EXAMINATION BY MR. COHEN        79
                REDIRECT EXAMINATION BY MR. DION      88

        FRED BRAKER
                DIRECT EXAMINATION BY MR. DION       103
                CROSS-EXAMINATION BY MR. COHEN       114

        DASHON MARTIN
                DIRECT EXAMINATION BY MR. DION       121
                CROSS-EXAMINATION BY MR. COHEN       140
                REDIRECT EXAMINATION BY MR. DION     164
                RECROSS EXAMINATION BY MR. COHEN     167

        ZENETTA RUFFIN
                DIRECT EXAMINATION BY MR. DION       173
                CROSS EXAMINATION BY MR. COHEN       180

STATE RESTS                                          183

WITNESSES ON BEHALF OF THE DEFENSE:

        THOMAS PRENDERGAST
                DIRECT EXAMINATION BY MR. COHEN      184
                CROSS EXAMINATION BY MR. DION        196

        WILLIAM LLOYD
                Direct Examination by Mr. Cohen      205

Cross Examination by Mr. Dion                    208


I N D E X (CONTINUED)

DEFENSE RESTS                                     210

WITNESSES ON BEHALF OF THE PLAINTIFF (REBUTTAL):

     RONALD WATSON (Recalled)
          Direct Examination by Mr. Dion         211
          Cross Examination by Mr. Cohen         213


EXHIBITS
                                          ID.     EVD.

**EXHIBITS FOR THE PLAINTIFF:**

Ex. 21 = collective bargaining agreement         183
Ex. 20 = list of employees                       183
Ex. 15 = letter                                  183
Ex. 16 = letter                                  183
Ex. 8 = list of terminated employees             183


**EXHIBITS FOR THE DEFENSE:**

Ex. D1 - D24 received                            210

1      (Call to Order of the Court.)

2            JUDGE MICHAEL M. BAYLSON:  Hey, good morning.

3            MR. SAMUEL A. DION:  Good morning, Your Honor.

4            MR. KEITH J. COHEN:  Good morning, Your Honor.

5            THE COURT:  Okay.  Good morning.  Okay.  We're here

6  for the beginning of the trial in Watson vs. Lloyd Industries.

7  I want to advise you that one juror who we had selected

8  disclosed afterwards that she is a resident of New Jersey.

9            Ms. Lutz, what juror number is that?

10           THE CLERK:  Yeah, she's -- lives in the Middle

11 District of --

12           THE COURT:  Oh, lives in the Middle District.  I'm

13 sorry.

14           MR. COHEN:  Oh.

15           THE COURT:  What juror number is she?

16           THE CLERK:  Juror Number 5.

17           THE COURT:  Five.  So she's ineligible to be on the

18 jury.

19           MR. COHEN:  Okay.

20           THE COURT:  So I'm going to excuse her.  She's maybe

21 coming up here.  All right.  Are we ready to begin?

22           MR. COHEN:  Yes.

23           THE COURT:  All right.  How long do you want for your

24 opening, Mr. Dion?

25           MR. DION:  I think it'll only be ten minutes at the

1  most, Your Honor.

2       THE COURT:  All right.  So both sides get ten

3  minutes.  You going to open now or wait?

4       MR. COHEN:  Yes.  We'll open at this point.

5       THE COURT:  Okay.

6       MR. COHEN:  Your Honor, I have a binder for you.

7       THE COURT:  Okay.  Thanks.  Hand it up.

8       All right.  Bring the jury in, please.

9       MR. DION:  Your Honor, we wanted to get our exhibit

10 set up, so we could do the exhibits on the monitor.

11      THE COURT:  Well, they can continue working on it,

12 but I'd like you to -- I'd like to start with the openings.

13      MR. DION:  Okay.

14      THE COURT:  All right.  Yeah, bring the jury in.

15      These are just the Defense exhibits?

16      MR. COHEN:  Yes, Your Honor.

17      THE COURT:  All right.

18      THE CLERK:  The Plaintiff's are on the bench.

19      THE COURT:  Oh, yeah, I have them.

20      THE CLERK:  Okay.

21      THE COURT:  Okay.  Thank you.

22      (Pause)

23      THE COURT:  The first thing is, I do an introductory

24 charge to the jury.  And, Mr. Dion, your -- essentially, can

25 continue working on that.

1     (Pause)

2     MR. DION: I'm sorry, Your Honor. You were saying?

3 Did I miss something?

4     THE COURT: Sorry?

5     MR. DION: I didn't know if I missed something

6 because I was -- okay.

7     THE COURT: Okay.

8     MR. DION: All right.

9     (Pause)

10     (The jury entered the courtroom.)

11     PRELIMINARY JURY INSTRUCTIONS

12     THE COURT: All right. Ladies and gentlemen of the

13 jury, good morning.

14     THE JURORS: Good morning.

15     THE COURT: I hope you had a nice weekend. I'm

16 aware, as you can see, that one of your jurors is missing,

17 number -- juror number 5. It turned out, after we adjourned,

18 that juror number 5 doesn't live in the Eastern District of

19 Pennsylvania. That is -- Pennsylvania is -- the state of

20 Pennsylvania is divided into three separate federal judicial

21 districts, and we're in the Eastern -- it's called Eastern

22 District, and this is, basically, if you drew a line from

23 Lancaster around -- around Lancaster, Redding, and Easton,

24 that's basically the Eastern. And juror number 5 lives outside

25 this district, so she can't sit on the jury. But we can

proceed with just seven of you. Okay? She may be coming in
here and we'll excuse her. I've advised counsel of this
situation. So that's why we're -- we have one empty seat.
Okay? But we're going to proceed with seven jurors.

Now, the first thing is a very brief introductory
charge by me about how the case will proceed. And following
that, we will then have the opening statements by counsel, and
then we'll start with the evidence. When the evidence is done,
then counsel will get up again and they will make a closing
argument, and then I will give you the charge on the law.
That's basically how the case proceeds.

The opening statement that counsel will give you now
will be limited to about ten minutes each. And that's an
opportunity for them to describe what they intend to prove.
Now, the speech by counsel is not evidence. The evidence comes
only from the witness stand. But the -- one reason that we let
them give an opening address is that I can only have one
witness at a time. So the opening address allows them to talk
about how they intend to prove the case witness by witness and
just so you have like a roadmap of what they intend to do.
Okay?

Now, when the witnesses take the stand, the party
that called the witness gets to start and that is what we call
direct examination. And the party can either call their own
witness or they can call a witness who is employed by the

defendant.  Then there's cross-examination, and then there's
redirect examination, and then there may be recross-
examination.  When that's done, then the witnesses can -- has
completed their testimony and then we call the next witness.
And we continue that until a party has finished calling all the
witnesses that they have.  And while a witness is on the stand,
the lawyer may introduce exhibits that will be shown to you on
your computer screen.  And you'll have paper copies of those
exhibits when you deliberate.

Now, at the end of the -- now, the plaintiff goes
first.  The plaintiff is the party that brought the complaint.
And the plaintiff has the burden of proof.  And the plaintiff
goes first in presenting testimony.  Then when the plaintiff is
done, the defendant presents testimony.  And then, as I said,
they have the closing arguments, and then the trial [sic].

Now, while a witness is on the stand, one lawyer or
the other may object to certain questions or may object to
certain exhibits.  That is their obligation to object.  Please
do not hold it against any lawyer or any -- or the clients --
the client or the lawyer because the lawyer objects.  It's
their duty to object when they think something is improper.
The objections are addressed to me as the judge and I will rule
on them promptly.  If I sustain the objection, that means that
the question or exhibit was improper and the lawyer must
proceed with a different question.  And if I sustain the

objection, that means the lawyer who asked the question or offered the exhibit has to retract that and ask a new question. Okay?  If I tell you to ignore something that was stated from the witness stand, you have to follow that instruction.  But otherwise, you are to consider the testimony that comes from the witness stand as the facts concerning the case.

Now, the issue in this case is the plaintiff claims that he was terminated from his job working for the defendant because of his race.  And I will give you instructions about the legal principles that you must use in deciding the case after all the evidence is in.  Okay?

Now, it's important that you hear the testimony.  If for any reason you haven't heard what a witness said, just raise your hand and I will have the witness repeat it so that you have heard everything that the witness has to say.  The facts come from the witness stand.  The questions of lawyers are not evidence.  The evidence is what the witness says.  Okay?

And an important part of every trial is what we call credibility.  Credibility is a fancy word for believability. Believability means how -- not -- not just whether the witness is telling the truth, but how much weight you give to the testimony of the witness.  Okay?  Now, obviously if a juror feels that a witness is lying, the juror is entitled to disregard the testimony of that witness.  But you may have

1  situations where witnesses testify about the same incident, but

2  testify about it differently.

3          And usually I use this as an example.  It has nothing

4  to do with this case.  Let's say you have a right angle

5  collision at a -- with a traffic light.  Okay?  And then a

6  lawsuit develops out of that.  And the driver of each car says

7  the other driver went through the -- went through a red light.

8  Okay?  And there happen to be two pedestrians on either side of

9  the intersection who were eyewitnesses and they testify

10 differently themselves.  So the jury in that case has four

11 different versions of what happened.  None of -- then the

12 jurors say none of these people are lying, they just saw it

13 differently or their recollection may be different or their

14 powers of observation may be different.  Maybe one of them was

15 distracted, one of them had a better point of view.  In that

16 case, the jury has to decide themselves who -- which -- whose

17 testimony deserves the most weight in determining what the case

18 should be, along with the burden of proof.  That's an example

19 by what I mean about credibility.  So it's important that you

20 listen carefully to all the testimony that you have.

21         You've been given badges that say you're a juror.  I

22 request that you wear the badges while you are in the

23 courthouse.  The badge is a sign to other people who work here

24 that -- and the lawyers, that you're on a jury.  The etiquette

25 in the courtroom is that people don't talk to jurors.  So if

1  you're in the elevator or you're outside and somebody doesn't

2  say hello to you or good morning, that's -- they're not being

3  rude, they are observing the etiquette of the courthouse that

4  people here don't talk to jurors.  If anyone were to try to

5  talk to you, which I very strongly doubt would ever happen,

6  please immediately report that to Ms. Lutz or myself.  Okay?

7       You've been given notepads.  You are welcome to make

8  notes as the testimony develops.  Some jurors make a lot of

9  notes, some jurors don't make any notes.  It's entirely up to

10 you.  You may want to write down something that you think may

11 be important.  And you'll have the notes with you when you

12 deliberate.  But the notes are not evidence.  They're not to be

13 used to persuade other jurors.  They're just for your own

14 ability to refresh your recollection and -- that you've written

15 down something during the testimony.  The one thing I urge you

16 not to do is to try and write down everything, because if you

17 write down everything, then you can't observe the witnesses.

18 And it's very important in deciding credibility that you

19 observe the witnesses and their ability to recall what happened

20 and whether you think they are being truthful in their

21 testimony and whether their testimony deserves weight when you

22 get to deliberate.

23       The last thing I want to say right now is that you

24 should keep an open mind during the testimony.  This will not

25 be a long trial, but it's an important case for both parties.

1 And when you go into the jury room in recess or for after lunch

2 and you come back, please do not discuss the case. Okay? And

3 there is a very important reason for that. You may have -- as

4 you sit here, each of you may have different views as you hear

5 each witness. But you need to wait until all the testimony is

6 over and the arguments are over and I give you the charge

7 before you make any final determination about the case. That's

8 very important that you keep an open mind.

9 So if one of you were to go in the jury room in the

10 first recess, which we'll take, you know, sometime this

11 morning, you'll -- you say, well, you know, I believe X or I

12 don't believe Y, or something like that, you know, you may --

13 that may be how you feel, but different -- one of your fellow

14 jurors may feel differently or the other juror may have an open

15 mind and you're sort of indicating at the very beginning of the

16 case how you feel about it and that is not proper.

17 So that's why I instruct you not to talk about the

18 case. And I can tell you that if you don't talk about the case

19 now, your deliberations will go much smoother when it gets time

20 to deliberate. Okay? That's when you extend your views and

21 you discuss the case. And if you start doing that ahead of

22 time, when it comes time to deliberate, you might find it

23 difficult to reach a unanimous verdict, because your verdict

24 must be unanimous.

25 Okay. I am done. The close -- the opening, we'll

1 now have -- Mr. Dion is going to give his opening and then

2 Defense counsel.

3        Go ahead.

4                    OPENING STATEMENT

5        MR. DION:  Thank you, Your Honor.

6        Good morning, jurors.  My name is Sam Dion and I

7 represent Mr. Watson, seated over here, Ronald Watson.  He's

8 filing his claim against the defendant, Lloyd Industries,

9 Incorporated.  The gentleman seated next to his attorney there

10 is William Lloyd.  He's the CEO of Lloyd Industries.

11        As the judge told you, this is a race discrimination

12 case.  Mr. Watson is claiming that he was fired in large part

13 due to his race and that it was a determinative factor in the

14 -- in the reason for his termination.

15        And we're going to try to finish this trial within

16 two days.  And as a result, you're going to hear a lot of

17 testimony in a short amount of time.  So I know that it's hard

18 to -- I think you're going to be -- going to be focused on the

19 testimony because it's going to be very compelling and -- but

20 please try an effort -- make an effort to soak everything in.

21        And, you know, we may take some of the witnesses out

22 of order in their testimony to ensure that we go efficiently

23 today and so you may be surprised that I'm actually going to

24 call Mr. Lloyd, himself, up on what's called -- as on cross

25 first in the plaintiff's case.  So we're doing that just to

ensure that subpoenaed witnesses can get in and out quickly.

So basically I'm just going to give you a short synopsis of what I intend to prove in this case and what Mr. -- sorry, what Mr. Watson intends to prove. So basically the most important fact that we -- that we're going to prove is that Lloyd Industries, which employs 60 to 65 people in Montgomeryville, Pennsylvania, their Montgomeryville plant, at the time in question they only had three African-American or black employees out of 60 or 65 people. And what you'll see from the testimony, very quickly, is that in October 2015, after the new plant manager, Thomas Prendergast, was brought in to work there, within a four month period he terminated two of the African-American employees and one of them is going to be testifying today. His name is Shaun Mathis. The other one was forced to quit because his hours were cut severely. So after that, there were no black employees working at Lloyd Industries.

So you're going to hear testimony, maybe even when I put on my case, when I question Mr. Lloyd, that all kinds of reasons are going to be given for Mr. Watson's termination. And most interestingly, you're going to hear that there is a seniority policy at the plant, because there's a collective bargaining agreement. And so there's no question that Mr. Watson had seniority over at least five other workers that were hired, including one worker that was hired by Mr. Prendergast,

1 the person that was brought in to manage the plant.

2       And you'll hear the testimony. We believe it's going

3 to prove that there was no good reason to let these gentlemen

4 go or to force them to quit. And we believe the evidence will

5 show that. And you'll hear other witnesses come in. One

6 witness, Fred Braker, is the -- he's the union rep. And you'll

7 see, he's not exactly, quote, unquote, on Mr. Watson's side

8 from his testimony because he decided not to go forward with

9 Mr. Watson's union grievance. But in the end, you'll see from

10 his testimony that he's going to have to concede that Mr.

11 Watson was -- had seniority over others at the plant.

12       You'll also hear the testimony of Zenetta Ruffin.

13 That's Mr. Watson's wife. So Zenetta is going to come in and

14 she's going to give some supporting testimony for Mr. Watson

15 and help him to establish the type of injuries that he

16 sustained in this matter. You'll hear that her testimony is

17 going to be quite compelling. Mr. Watson was out of work for

18 about two and a half years following his termination and it was

19 a very rough time for them. And Zenetta, being a nurse over at

20 hospital, University of Pennsylvania, she was able to get them

21 through the rough time with her income, luckily. And -- but

22 you'll hear her testimony. She'll probably be the last person

23 to testify in the case. And hopefully we'll get all this

24 testimony in later today.

25       So I thank you for your time and serving your duty as

1  jurors and look forward to talking to you at the closing

2  argument tomorrow, hopefully.  All right.  Thank you.

3          THE COURT:  Mr. Cohen.

4                    OPENING STATEMENT

5          MR. COHEN:  Thank you, Your Honor.  May I please the

6  Court, counsel?

7          Ladies and gentlemen of the jury, my name is Keith

8  Cohen.  I'm an attorney and I have the privilege of

9  representing Lloyd Industries with regard to the claims that

10 are being made by Plaintiff, Ronald Watson.

11         This is the part of the case where we kind of give

12 you the trailer, the coming attractions in the -- the roadmap

13 of what we -- or the parties are looking to pursue in the case

14 or develop in the case.  My client, as the defendant, as the

15 judge told you, is -- there's the issue of burden of proof.  My

16 client does not have the burden of proof.  My client is not

17 responsible for disproving the claims of Mr. Watson.  Mr.

18 Watson, in this case, has the burden of proof to prove each and

19 every element of his case.

20         You're going to hear a lot of different versions and

21 stories about what took place at Lloyd Industries and it's

22 going to be up to you as the jury to be the judge of the facts,

23 to determine what facts are true and what facts are not true.

24 This is a really simple case.  It's really not that

25 complicated.  And it involves -- my client, Lloyd Industries,

is a company that has been in business for 35 years in
Montgomeryville, Pennsylvania, Montgomery County, and it's --
it manufactures fire dampeners and HVAC products. The company
has 65 employees in the Montgomeryville plant where Mr. Watson
worked. The thing to understand about this company, it's like
the United Nations. You're going to hear about the roster of
employees there from all different backgrounds and races. Mr.
Dion mentioned that there are few African-American or black
employees there. And there's one basic reason for that. They
don't apply for the jobs there. And, you know, you can't hire
an African-American employee if they don't apply to work there.

So the evidence in this case is going to support the
fact that Tom Prendergast, who was the plant manager, laid off
Mr. Watson for one basic reason, there was no work to do.
There was no work in the division that he was working in. And,
frankly, he was not a great employee. And more importantly,
when he was told of the layoff, and you're going to hear this
evidence, it's undeniable, he acted in a belligerent manner, to
make it that they wouldn't want him to remain there, even if he
asked to, because of his attitude.

Now, the reason he was laid off was a business
decision. And business decisions, when running a business, are
critical to keep your business going. If you don't have work
and you have to let people go, you let them go. That's just a
fact of life. You're going to hear about the kind of work that

1 Mr. Watson has done over the years.  He's held, in the last 15

2 years, countless jobs, from a metal extractor to a maintenance

3 -- home maintenance laborer, to a shipping and receiving clerk,

4 to a machine operator, to a forklift operator, to a material --

5 lots of different jobs.  And I'm sure in those other jobs, as

6 he'll testify, he's been laid off in those jobs as well.

7          But understand that Mr. Watson was not laid off for

8 anything related to his race, due to the fact that he was

9 African-American.  It had nothing to do with it.  And the fact

10 of the matter is, he made a complaint, filed a grievance with

11 the union.  The union -- in the grievance -- his grievance had

12 to do with seniority.  You're going to hear Fred Braker, who's

13 going to come in and testify, yeah, he came to me and we filed

14 a grievance against Lloyd Industries.  That grievance had to do

15 that he had seniority in that department, which turned out not

16 to be accurate, and, in fact, the union, which is there to

17 protect their union members, said, no, there's no claim.

18          And there's -- you're going to see an e-mail from

19 Fred Braker to Tom Prendergast saying, we've looked into this,

20 no violation of this collective bargaining agreement on the

21 part of Lloyd Industries.  He then goes to the Human Relations

22 Commission, files a complaint there, they do an investigation,

23 and there's no finding.  They give him the right, because

24 that's what they're supposed to do, file a lawsuit, and he

25 files a lawsuit, and here we are in this case today.

1          The evidence in this case is going to show that Lloyd

2   Industries made a business decision to let Mr. Watson go that

3   had nothing, absolutely nothing, to do with his race, nothing

4   to do with his background, and that there was no discriminatory

5   purpose in it and that it was simply a business decision.

6          The evidence is going to -- the witnesses on behalf

7   of the defendant are going to be William Lloyd, who is the CEO,

8   Thomas Prendergast, who is the plant manager, and Eileen

9   Lindsay, who is the officer manager, who basically provided all

10  the information to the Human Relations Commission.  And we'll

11  come in and, if necessary, and tell you about this.  There may

12  be -- depending on how today goes, we may not even need to put

13  her testimony on.

14         But keep in mind, as you sit here and listen to the

15  evidence, use your personal experience and intuition to see

16  what makes sense to you, what can you believe and what can you

17  not believe, because you're going to hear two different

18  stories, and you're going to have to say, well, does that make

19  sense in light of all of this evidence?

20         Now, we thank you for taking the time from your busy

21  lives to sit as a jury.  Now, we're in this impressive

22  courtroom with a very experienced judge and counsel, but the

23  civil justice system in this country does not work.

24         THE COURT:  Mr. Cohen, you can save that for your

25  closing argument.

1          MR. COHEN:  Closing -- okay.

2          THE COURT:  This is only what you intend to prove.

3          MR. COHEN:  All right.  All right.

4          But it's important that you understand how important

5    your role is.  That's the whole point I'm making here.

6          THE COURT:  All right.

7          MR. COHEN:  We can't resolve this dispute without

8    your effort to sit and listen to the facts.  And we ask that,

9    you know, you, you know, carefully review the facts as they

10   come in, and again, use your experience and understand that

11   we're going to try to make this case as interesting and as

12   quick as possible.  Thank you.

13         THE COURT:  Okay.  All right.

14         Mr. Dion, call your first witness.

15         MR. DION:  Plaintiff calls William Lloyd to the

16   stand.

17         THE COURT:  Okay.  So, ladies and gentlemen, the

18   first witness being called by the Plaintiff is Mr. Lloyd and

19   this is a perfectly appropriate -- one party can call a witness

20   employed by the other party.

21         One -- come on up here, Mr. Lloyd.

22         We take a mid-morning break usually around 10:30 or

23   so and -- but if any of you need to use the bathroom before

24   that, just raise your hand, and I'll inquire, and if necessary,

25   we can take a recess at any time.  And today we're going to

1  break for lunch a little before 12:00 noon.  Okay?

2            All right.  Please swear him in.

3            MR. DION:  Your Honor, may I just approach the

4  witness to bring him the copies of transcript of deposition?

5            THE COURT:  Yeah.  But let him -- first he's going to

6  be sworn.

7            MR. DION:  Oh, yeah.

8            THE CLERK:  Please raise your right hand.

9          WILLIAM P. LLOYD, PLAINTIFF'S WITNESS, SWORN

10           MR. WILLIAM LLOYD:  I do.

11           THE CLERK:  Thank you.  Please state your full name

12 for the record.

13           THE WITNESS:  William P. Lloyd.

14           THE COURT:  Okay.

15           All right.  Go ahead, Mr. Dion.

16                     DIRECT EXAMINATION

17 BY MR. DION:

18 Q    Okay.  Mr. Lloyd, you're the founder and CEO of Lloyd

19 Industries, is that correct?

20 A    Yes, that's correct.

21 Q    And the company manufactures fire protective systems for

22 HVAC?

23 A    Correct.

24 Q    Can you just explain to the jury a little more about what

25 that is?

1 A    Whenever duct work passes through a fire partition, you

2 have to have a fire damper there so in case of a fire it

3 doesn't spread through the building through the duct system.

4 Simple stuff.

5 Q    And you operate a manufacturing plant in Montgomeryville,

6 Pennsylvania that employs about 60 to 65 people, correct?

7 A    Correct.

8 Q    The employees on the factory floor, they're members of

9 Local 19 Union?

10 A    Some are.  Um-hum.

11 Q    At what point do the people become union members?

12 A    I give them the choice to become union members.  I tell

13 them what the --

14 Q    Okay.

15 A    -- pros and cons are.

16 Q    And your company engaged in a collective bargaining

17 agreement with Local 19, is that correct?

18 A    Correct.

19           MR. DION:  Can we put Exhibit P21 on the screen?

20           THE COURT:  21?

21           MR. DION:  Yeah, P21.

22           Put it up on the whole screen.

23           THE CLERK:  Can the jury see that?

24           MR. DION:  I'm sorry?

25           THE CLERK:  Can the jury see that?

1       MR. DION:  Yeah.  Is it up on their screens?  Yes,
2  please, we'd like the jury to see.
3           THE COURT:  All right.  Any objection?
4           MR. COHEN:  No objection, Your Honor.
5           THE COURT:  Go ahead.  Yes.
6       Can -- if we start talking about an exhibit, and
7  you're not seeing it, raise your hand.  But -- okay.  But
8  sometimes this -- this is an electronic courtroom, ladies and
9  gentlemen, so before we had these, we have to pass documents
10 around for the jurors and so forth, so this expedites it.  And
11 so you can share the computer screen and look at it.
12       But, go ahead.
13 BY MR. DION:
14 Q    All right.  So is this a copy of the collective bargaining
15 agreement that was in effect during Mr. Watson's employment?
16 A    Yes.
17 Q    And you entered into this agreement September 1st, 2014,
18 is that correct?
19 A    Correct.
20          MR. COHEN:  Your Honor, if I may -- well, objection.
21 I don't know that Mr. Lloyd's had a chance to review the whole
22 agreement.
23          THE COURT:  Well, are you familiar with the document?
24          MR. COHEN:  I only see page 1.
25          THE WITNESS:  I am familiar with the document, yes.

1                  THE COURT:  What?

2                  THE WITNESS:  Yes, I am familiar.

3                  THE COURT:  He's familiar with it.

4                  MR. COHEN:  Okay.

5                  THE COURT:  Go ahead.  Overruled.

6                  MR. COHEN:  Okay.

7                  THE COURT:  Go ahead.

8   BY MR. DION:

9   Q    All right.  And you reviewed the agreement prior to

10  signing it, is that correct?

11  A    Sure.

12  Q    Do you have a complete --

13                 THE COURT:  Talk closer --

14                 THE WITNESS:  I'm sorry.

15                 THE COURT:  -- to the microphone, please.

16                 THE WITNESS:  Yes.

17  BY MR. DION:

18  Q    Do you have an understanding of how seniority was

19  determined in the agreement?

20  A    Yes.

21  Q    If you could turn to -- I think it's page 8 of the

22  agreement.  That's the seniority clause.

23  A    Um-hum.

24  Q    Article 10, correct?

25  A    Correct.

1              MR. DION:  Can we put the -- okay.  Good.

2    BY MR. DION:

3    Q    So the Section A, the seniority clause, it states the

4    principle of plant-wide seniority, providing the employee to be

5    retained can be -- can perform the remaining work, shall be

6    applied to layoffs, correct?

7    A    Correct.

8    Q    Okay.  Now, can you just explain to the jury what that

9    means?

10   A    That means that a person that's been hired before other

11   people have the right to stay at the company before we lay

12   people off that have lower seniority.

13   Q    And if they can do the job of the person with the lower --

14   A    Absolutely.

15   Q    -- seniority, would that be correct?

16   A    Yeah.

17   Q    Okay.

18   A    And if they're a good worker.

19   Q    Okay.  But the basic principle is, is that the last one

20   hired is the first one out, that be the basic?

21   A    Yes.  It's --

22   Q    Starting point?

23   A    Correct.

24   Q    Okay.  Now, you were the person that interviewed and hired

25   Mr. Watson, is that correct?

1  A    Correct.

2  Q    And he was hired December 1st, 2014, is that correct?

3  A    I assume.

4  Q    After the drafting of this agreement, correct?

5  A    Correct.

6  Q    All right.  Now, when he was hired, there was a

7  probationary period that he had to go through, would that be

8  correct?

9  A    Ninety days.  Correct.

10 Q    Okay.  He made it through okay, correct?

11 A    Sure.

12 Q    Okay.  Now, am I correct that your company categorized Mr.

13 Watson's job as a machine operator/assembler?

14 A    Punch press operator.

15 Q    Okay.  Well, you remember being deposed on April 13,

16 2018 --

17 A    Correct.

18 Q    -- here at my office?  Yeah?

19 A    Um-hum.

20 Q    Okay.  Can you turn to page 6?

21        THE COURT:  Ladies and gentlemen of the jury, the

22 references to a deposition -- a deposition is a frequent

23 occasion in legal cases.  It refers to the fact that after a

24 complaint is filed, but before the trial takes place, each

25 party is allowed to take testimony, it's usually in a lawyers

1  office, of witnesses with knowledge about the case.  We call

2  that pretrial discovery.  So that's what Mr. Dion is referring

3  to.  The testimony is taken under oath, with a court reporter

4  present, and the testimony can be used in the trial as Mr. Dion

5  is doing at this time.

6             Go ahead.

7             MR. DION:  Thanks, Your Honor.

8  BY MR. DION:

9  Q    Okay.  So if you go down to line 18, I asked, now you know

10 your records show that he is put down as a machine

11 operator/assembler, correct?  And what was your answer?

12 A    It looks like punch press operator.

13 Q    Line 21, to my question on line 18.

14 A    Okay.  Line 21 is, correct.  Um-hum.

15 Q    Right.  And so you know that he's in your records as a

16 machine operator/assembler, is that correct?

17 A    Correct.

18 Q    Right.  So just to clarify, punch press operator is a

19 machine operator, correct?

20 A    Yeah, about the same.

21 Q    Because a punch press is a machine?

22 A    Correct.

23 Q    Right.  So all this differentiation between titles is not

24 really that important here, correct?

25 A    It's not.

1  Q    But most significantly, it was slash assembler, right?  So

2  assembler is a different type of job, am I correct?

3  A    Not really.

4  Q    Well, there are people that are hired just as assemblers,

5  am I correct?

6  A    Correct.

7  Q    Okay.  So what do the assemblers do?

8  A    Well, a punch press operator might be able to put two

9  parts together, which means makes it an assembly.  So they

10 might put one part in and it rivets another part into it, so

11 there's an assembly for you.  And then assemblers actually make

12 the dampers on the damper line.

13 Q    Okay.  So the people that are just assemblers, they

14 assemble away from a machine?  They don't use a machine to

15 assemble, would that be correct?

16 A    No.

17 Q    Okay.  But it can go either way?

18 A    Correct.

19 Q    All right.  Now -- so Mr. Watson, he was -- he was

20 categorized as both, machine operator and assembler, correct?

21 A    Correct.

22 Q    All right.  Do you have any doubt that 40 percent of the

23 time he was doing assembly work?

24 A    I really don't know that.

25 Q    Right.  Because you didn't actually see him do the

1 assembly work, correct?

2 A    Correct.

3 Q    Right.  Is that because you weren't out on the factory

4 floor when he was doing it?

5 A    I'm not on the factory floor all the time.

6 Q    And there are managers below you that can assign him to do

7 assembly work, is that correct?

8 A    Correct.

9 Q    Now, Cam Nguyen (Phonetic), he was an assembler back in

10 2015, is that correct?

11 A    Don't know.

12         MR. DION:  All right.  Let's bring up  P20, please.

13         THE COURT:  What number?

14         MR. DION:  Your Honor, P20.  Sorry.

15         THE COURT:  All right.  Go ahead.

16 BY MR. DION:

17 Q    All right.  So I have -- have you had a chance to review

18 P20 before we came to court today?

19 A    Briefly.

20 Q    All right.  Well, your office actually produced P20,

21 without all these highlighting forms on there.  Were you the

22 person that drafted P20?

23 A    No.

24         THE CLERK:  Can the jury see this?

25         THE WITNESS:  No.

1    MR. DION:  Yes.  We want to show that to the jury.

2  I'm sorry.

3    THE COURT:  Yeah.  Yeah.

4    MR. DION:  Okay.

5    THE COURT:  Okay.  Show it to the jury.

6    MR. DION:  All right.

7    THE COURT:  All right.  When there's no objection,

8  just say, you know, show it to the jury.

9    MR. DION:  Yeah.  Is there --

10    MR. COHEN:  Yeah.  I'm not objecting to it.

11    THE COURT:  All right.  Go ahead.

12    MR. COHEN:  So you can show it to the jury.  I --

13    MR. DION:  Right.  I think we have a standing no

14  objection on these --

15    THE COURT:  Yeah.  Right.  Okay.

16    MR. DION:  -- items.

17    THE COURT:  Well, the jury has it now.  Go ahead.

18    MR. DION:  Sorry, Your Honor.

19  BY MR. DION:

20  Q    Okay.  And do you have any reason to doubt the

21  truthfulness of this exhibit, since it was produced from your

22  company?

23  A    I do not.

24  Q    Okay.  Now, if you look at -- down at the bottom, you'll

25  see Ronald Watson is highlighted in blue, correct?

1  A    Correct.

2  Q    All right.  And his hire date is put down as December 4th,

3  2014, correct?

4  A    Correct.

5  Q    And he's categorized as a machine operator/assembler,

6  correct?

7  A    Correct.

8  Q    And then his race is noted to be black or African-

9  American.  Do you see that?

10  A    I do.

11  Q    Okay.  Now, the -- I just asked you about Cam Nguyen.

12  Does this refresh your memory that he was an assembler -- hired

13  as an assembler on May 27th, 2015?  He's at the top -- the top,

14  highlighted here.

15  A    Yeah, I see that.  I might know this gentleman, I might

16  not.

17  Q    Cam Nguyen?

18  A    Yeah.

19  Q    Is he the gentleman that took over your shipping and

20  receiving or something, Cam Nguyen?

21  A    I really couldn't answer honestly about that.  I -- we

22  have a lot of nicknames for people and I don't know their real

23  names, some people.

24  Q    All right.  So Tam Van Huynh (Phonetic) is the second

25  yellow highlighted person from the top.  He was hired February

1  25th, 2015, is that correct?

2  A    Correct.

3  Q    And his position is assembler and he's Asian, correct?

4  A    Correct.

5  Q    All right.  Steve Malloy (Phonetic), assembler, hired June

6  29th, 2015, white, correct?

7  A    Correct.

8  Q    And then we have Shaun Mathis, who was hired as an

9  assembler May 27th, 2015, black, African-American; correct?

10 A    I see that.

11 Q    And Dulup Patteran (Phonetic) and Mike Tren (Phonetic)

12 follow, correct?  They were both hired --

13 A    Sure.  Um-hum.

14 Q    -- in 2015?

15 A    Correct.

16 Q    All right.  So you agree with me that all these persons

17 were hired -- all the persons in yellow were hired after Mr.

18 Watson, correct?

19 A    Correct.

20 Q    So Mr. Malloy, he's a gentleman with a handlebar mustache,

21 correct?

22 A    Correct.

23 Q    And he was brought in by Mr. Prendergast?

24 A    I don't remember that.

25 Q    You don't recollect hiring him directly yourself then?

1  A    I don't remember, sir.

2  Q    Okay.  Well, Mr. Prendergast, he came into the company

3  June 6th, 2015, is that correct?

4  A    Could be.

5  Q    Okay.  And he was the new plant manager at that time?

6  A    Correct.

7  Q    And you entrusted him with terminating employees, if need

8  be?

9  A    Correct.

10 Q    And after he was hired, on this list -- actually, Mr.

11 Prendergast is on here.  He's three lines under Mr. Patteran.

12 He was hired June 8th, 2015.  I correct myself.  He's white,

13 correct?

14 A    Correct.

15 Q    All right.  And the only person on this list who was

16 hired, after Mr. Prendergast was hired as the plant manager,

17 was Steve Malloy, correct, because he was hired June 29th,

18 2015?

19 A    Correct.

20 Q    And Steve Malloy is white, correct?

21 A    Correct.

22 Q    Now, at the deposition, when I deposed you, you said you

23 didn't remember Shaun Mathis, is that correct?

24 A    Still don't.

25 Q    But you remember all the other individuals?

1  A    Yes.

2  Q    Now, do you agree that Mr. Watson had seniority over the

3  individuals highlighted in yellow?

4  A    Yes.

5  Q    And he could perform assembly work, isn't that correct?

6  A    Poorly.

7  Q    He could perform assembly work, is that correct?

8  A    Poorly.

9  Q    But you didn't observe him do assembly work, correct?

10  A    I observed him working, yes, sir, once in a while.  Sure.

11  I go back in the factory.

12  Q    Now, do you agree that the starting pay for an assembler

13  in your plant is about the same as a machine operator?

14  A    Yes.

15  Q    And June 8th, 2015 -- I'm sorry.  Mr. Prendergast took

16  over the helm from Dino Sanna (Phonetic), is that correct?

17  A    Correct.

18  Q    So as we said, part of the duties that you entrusted in

19  Prendergast was to make decisions for layoffs as well, would

20  that be correct?

21  A    Sure.

22  Q    Now, October 29th, 2015, Mr. Prendergast made the decision

23  to layoff Mr. Watson, is that correct?

24  A    Correct.

25  Q    And the purported reason for the layoff was a lull in

1  production -- lull in production?

2  A    Right.  We got slow and I started to buy parts from China.

3  Q    Okay.  So what happened when you had the lull in

4  production, you had to get rid of who?

5  A    We laid some people off.  I don't know exactly who it was,

6  but we laid some people off.

7  Q    Okay.  Am I correct that you laid off at that time two

8  people?

9  A    Could be.

10  Q    Okay.  And this decision was made by Mr. Prendergast on

11  who to layoff, correct?

12  A    Him and I both, I'm sure.  Um-hum.

13  Q    Well, at least with the case with Mr. Watson, he did make

14  the decision with Mr. Watson, am I correct?

15  A    You're correct.

16  Q    Okay.  Now -- so the two people that were laid off because

17  of this lull in production were Mr. Watson, and who was the

18  other person, do you recollect?

19  A    I don't.

20  Q    Do you recollect Shawn Broadnax?

21  A    I remember Shawn, sure.

22  Q    Okay.  What's his race?

23  A    Black.

24  Q    Okay.  So the two people that you decided to layoff

25  because of the lull in production were both African-American or

1 black, correct?

2 A    Correct.

3        MR. DION:  Could we put Exhibit P15 on the screen for

4      the witness and the jury?

5 BY MR. DION:

6    Q    So you're familiar with Exhibit P15?

7        THE COURT:  All right.  You --

8        MR. DION:  I'm sorry.

9        THE COURT:  Can jury see it?  All right.  Show it to

10 the jury.  Go ahead.

11        MR. COHEN:  No objection, Your Honor.  If you want

12 me --

13        THE COURT:  Go ahead.

14        MR. DION:  Right.  We have a standing --

15        MR. COHEN:  Yeah.  I know -- we've agreed to these

16 exhibits, so I'm not going to object to them.

17        THE COURT:  Right.  I understand.

18        MR. COHEN:  So we can move this along.

19 BY MR. DION:

20 Q    So this is a letter signed by Thomas Prendergast, correct?

21 A    Correct.

22 Q    And he's saying, my decision to layoff Ronald Watson was

23 due to a slowdown of production in his department, correct?

24 A    Correct.

25 Q    Okay.  So you do agree that he made the decision?

1  A    Okay.

2  Q    All right.  Now, Exhibit P16, in fact --

3          MR. DION:  Let's put it up on the screen.

4          No objection, correct?

5          MR. COHEN:  (No Verbal Response.)

6          MR. DION:  Can the jury see it now?

7          MR. COHEN:  What are you on, P16?

8          MR. DION:  Yes, P16.

9          MR. COHEN:  Okay.

10 BY MR. DION:

11 Q    In this letter, you say that you fully entrust -- well, in

12 so many words.  Let's read it just so it's clear.  You signed

13 this letter, correct?

14 A    Correct.

15 Q    And you say, Mr. Ronald Watson was released from his

16 position due to a lull in production.  It is to the discretion

17 of the plant manager to layoff employees whose departments are

18 lacking work, correct?

19 A    Correct.

20 Q    As owner of the company, I trust and support the plant

21 manager when these decisions are made as he is in charge of

22 monitoring each department and employee carefully, correct?

23 A    Correct.

24 Q    Okay.  Now, do you agree with me that since he was

25 entrusted with this power, that he also made the decision to

1  terminate Mr. Broadnax?

2  A    Could be.  Yes, sir.

3  Q    And were you aware that another employee by the name of

4  Shaun Mathis had left employment about that same time in

5  October 2015?

6  A    Like I said, I don't remember Shaun Mathis.

7  Q    Well -- so it's likely that any reason why he left would

8  be -- or -- would be due to any interaction with Mr.

9  Prendergast rather than yourself, correct?

10 A    I don't know that.

11 Q    Now, do you -- I'm going to show you P20 -- refer to P20

12 again.  And you agree that Mr. Mathis is put down as African-

13 American, correct?

14 A    Correct.

15 Q    All right.

16        MR. DION:  Now, let's refer over to Exhibit P9.  I'm

17 sorry, P8.  Sorry about that.  Got it.  Can we swoop that

18 around so the jury can read --

19        THE CLERK:  I just need --

20        MR. DION:  All right.

21 BY MR. DION:

22 Q    Okay.  Take a look at P8.  This was another exhibit that

23 was produced by your office, I believe.  Are you familiar with

24 it?

25 A    Yes.

1 Q    Okay.  And this exhibit is interesting.  It lists people

2 that were terminated and the reason for their termination and

3 also provides their race, is that correct?

4 A    Correct.

5 Q    So when we look at this list, which is in alphabetical

6 order, we go to the line Shawn Broadnax, third person down,

7 lists him as terminated October 30th, 2015, is that correct?

8 It's a little hard to read.

9 A    Correct.  I see it.  Um-hum.

10 Q    Okay.  So October 30th.  And again, it gives the reason

11 his layoff.  And if you can read that, the last line there,

12 supporting documents, what does it say there?

13 A    Supporting document, laid off, and not due to anything

14 other than lack of work.

15 Q    Right.  Okay.  Now -- so he was terminated October 30th.

16 And if we look further down the list, go down to Shaun Mathis,

17 he had -- he's put down as resigning on his own terms on

18 October 26, 2015, is that correct?

19 A    I see that.

20 Q    Four days before, is that correct, yes?

21 A    Correct.

22 Q    Okay.  And then we go down to the last African-American on

23 the list, Ronald Watson.  He was terminated on October 29th,

24 the day before Mr. Broadnax, correct?

25 A    Correct.

1  Q    And that was three days after Mr. Mathis quit his job,

2  correct?

3  A    Correct.

4  Q    And so were there any other persons fired within that

5  month?

6  A    None of these people were fired.

7  Q    Right.  There's a lot of resignations?

8  A    And quit.

9  Q    Right.

10 A    Laid off.

11 Q    Okay.  But no -- no one was laid off, quit, or was fired

12 within the same month as these three African-American

13 gentlemen, correct?

14 A    I assume that.  Yes.  Correct.

15 Q    And Steve Malloy, the person who was hired by Mr.

16 Prendergast, he had the least seniority of anybody -- anyone in

17 the -- you don't need to look at P8 anymore on this.

18 A    I thought Steve was up there.

19 Q    Sorry about that.

20 A    Okay.

21 Q    Steve Malloy, he had the least seniority of anyone?

22 A    I don't know that.

23 Q    Well, he was the last person --

24 A    Hired.

25 Q    -- hired, correct?

1  A    Okay.

2  Q    Okay.  Now -- and he only had four months experience as an

3  assembler at the end of -- by the end of October 2015?

4  A    Could be correct.  Sure.

5  Q    Okay.  Did you have an opportunity to observe his work as

6  an assembler?

7  A    Yes.

8  Q    So you do recollect that?

9  A    I know Steve.  Sure.

10  Q    And --

11  A    Different departments.

12  Q    Did you notice that he was ever late to work?

13  A    No, I didn't.

14  Q    Now, when I asked you at Mr. Watson's deposition why Mr.

15  Watson was terminated in October 2017 rather than the workers

16  with lower seniority, you said, he was a poor worker, he had an

17  alcohol problem, and he was laid off, and then you also said

18  that you started to procure parts from China, which were part

19  of the workload in his area, correct?

20  A    Correct.

21  Q    So you gave like about four different reasons, right?

22  A    Correct.

23  Q    Okay.  If he was such a poor worker, why didn't you just

24  fire him because he was a poor worker?

25  A    We give an opportunity to lay people off so they go

1  collect unemployment.

2  Q    Right.

3  A    We don't like to fire anybody.

4  Q    So you think you're being nice --

5  A    Yes.

6  Q    -- by laying them off?

7  A    Correct.

8  Q    Now -- well, how about this alcohol problem?  Do you

9  always let people in the plant -- they -- you know, don't you

10 think that that would pose a danger to people in the plant to

11 have somebody with an alcohol problem working heavy machinery?

12 A    Yeah, it's a problem.  Sure.

13 Q    And so you knew -- or I can't say knew, you claim that Mr.

14 Watson had this alcohol problem pretty much the whole time he

15 was employed, correct?

16 A    That I don't remember.  No, sir.

17 Q    All right.  I'll put you over to his transcript there.  To

18 transcripts.  Page 27, I believe, of your transcript.  Oh,

19 yeah, sorry, page 28.  So I asked you, on page 28, line 4, how

20 long did this go on that he had alcohol on his breath?  And

21 what was your answer?

22 A    A long time.

23 Q    And I asked, the whole time he was working there?  And

24 what did you answer?

25 A    Possibly.

1  Q    So for a long time, you left him working a 90 ton press

2  with an alcohol problem?

3  A    Well, going to the bar for lunch is not an alcohol problem

4  all the time, sir.  I don't -- you know, to smell alcohol on

5  somebody's breath, he might not have been, you know, visibly

6  intoxicated, let's put it that way.

7  Q    Sir, so you're saying -- you're claiming that Mr. Watson

8  would leave work and go to a bar and then come back to work?

9  A    Correct.

10 Q    Now, isn't the policy of the company that you leave the

11 premises, you got to clock out?

12 A    Correct.

13 Q    Well, are you telling me that his time sheet showed that

14 he clocked out?

15 A    I don't know that.

16 Q    If they don't show that, then are you going to maintain

17 this position that he was leaving work to go to a bar and come

18 back?

19 A    Absolutely.

20 Q    Now, so again, you're telling me that you allowed a person

21 who came back from lunch with alcohol on his breath to work a

22 90-ton press machine?

23        MR. COHEN:  Objection; it's been asked and answered.

24        THE COURT:  Yeah.

25        MR. DION:  Well, I don't think I asked about the

1  lunch, Your Honor.

2            THE COURT:  Well, rephrase the question.

3            MR. DION:  Okay.

4  BY MR. DION:

5  Q    All right.  So let me just ask a question.  So are you

6  saying that he only had the alcohol on his breath when he came

7  back from lunch?

8  A    What I remember, yes.

9  Q    Okay.  And -- and so after lunch you would still let him

10  use the 90-ton press?

11  A    Correct.

12  Q    Okay.  And you agree that that would pose a danger to

13  possibly himself or others?

14  A    The press is pretty safe.  It's a palm-up press.

15  Q    Well, weren't there instances where people put -- set the

16  die wrong on the press and they would blow up and shrapnel

17  would go all over the place?

18  A    That can happen, yes.

19  Q    Right.  You of all people, you know that, as -- at least

20  as of May 2015 that those OSHA regulations are that you got to

21  maintain a safe work environment, correct?

22  A    Correct.

23  Q    And so from -- throughout his whole employment, you just

24  allowed Mr. Prendergast to make a decision to terminate -- to

25  lay him off, never terminated him, because he was a danger to

1  the work place, correct?

2  A    Correct.

3  Q    Can I ask you why you would do that?

4  A    The press is very safe.  It has to be operated by palm

5  buttons.  If he was visibly drunk, which if I would see that, I

6  would certainly send him home or take some kind of reprimand to

7  him, sure.  Absolutely.  But to have alcohol on your breath to

8  be visibly drunk are two different things.

9  Q    Okay.  Well, I believe you testified at your deposition

10 that he had a drinking problem and that he came to work drunk,

11 did you not?

12 A    I never --

13         MR. COHEN:  Objection.

14         THE WITNESS:  -- said that.

15         MR. COHEN:  Withdrawn.

16 BY MR. DION:

17 Q    On page 27 I asked you, "Do you remember in particular

18 what was wrong with his performance?"  This is on line 13.  And

19 what --

20 A    Okay.

21 Q    -- was your answer?

22 A    "It was slow."

23 Q    The rest?

24 A    "Like I said, he had an alcohol problem, missing a lot of

25 work, leaving work early, constantly."  Uh-huh.

1  Q   And then when I asked you what made you think he had an

2  alcohol problem, you said that you could smell it on his

3  breath, correct?

4  A   Correct.

5  Q   So you contend that -- so let me just get this straight.

6  So it comes to laying him off end of October 2015.  If he can

7  do Steve Malloy's assembling job, then he stays, correct?

8  Because you fired him under the presumption that he -- that

9  there was a low-in-production as to his specific machine,

10 correct?

11 A   His department was slow because I was procuring parts from

12 China, correct.

13 Q   Okay.  So because of that, you felt -- or someone felt,

14 Mr. Prendergast felt, that he could be let go, correct?

15 A   Laid off, correct.

16 Q   Laid off.  And so because of the seniority rules, though,

17 he should then push out Mr. Malloy, who was the lowest in

18 seniority instead in the assembly job, correct?

19 A   No.

20 Q   And why is that?

21 A   Because Steve was on another job.  He wasn't a punch-press

22 operator.

23 Q   So it's your contention that Mr. Watson could not do a

24 simple assembly job?

25 A   Correct.

1  Q    And you agree -- you say that you never witnessed him do

2  assembly work, correct?

3  A    Who, Malloy or --

4  Q    Mr. Watson.  Sorry.

5  A    No, he never did assembly.  A punch-press operator.

6  Q    You agree that Mr. Watson did assembly work when his -- in

7  the downtime with his machine; is that correct?

8  A    I don't remember that.

9  Q    Is that what usually happens in your plant?  If there's

10 some downtime in a using a machine, then the -- to make use of

11 the person's time, they're put on assembly work?

12 A    Not all the time, no.

13 Q    Right.  Now, there was assembly work in his area of his --

14 of the plant, correct?

15 A    No.  Like I said, I was procuring parts from China at the

16 time.

17 Q    Now, you agree with me that assembly work is rather easy

18 to -- to learn?

19 A    It could be.

20 Q    The average time to learn a specific assembly task would

21 be maybe an hour or so?

22 A    Certain departments.

23 Q    Right.  And as this collective bargaining agreement

24 states, the seniority goes plant wide, correct?

25 A    Correct.

1 Q    So why are you saying that there was no assembly in his

2 department; therefore, he can't do the -- the assembly work

3 that Mr. Malloy is doing?

4 A    It's different type of assembly work.

5 Q    But it's easy to learn, correct?

6 A    I would say some of it is easier to learn, sure.

7 Q    Right.  Basically, you're snapping together two metal

8 pieces?

9 A    At some point.

10 Q    Okay.  And they -- you don't need necessarily to weld them

11 together?  They're just -- they kind of fit together, correct?

12 A    Some departments, sure.

13 Q    Okay.  How about in Malloy's department?

14 A    In Malloy's depart -- in Malloy's department, there was a

15 lot of different type of assembly work.  Okay?  You're playing

16 with semantics, so, no.  Assembly is a broad base, sir.

17 Q    Okay.  So are you saying that Mr. Watson can't do assembly

18 work at all, or are you just saying that he couldn't do

19 Mr. Malloy's assembly work?

20 A    He couldn't do Mr. Malloy's assembly work.

21 Q    Why?

22 A    Because he was a punch-press operator.

23 Q    Can he do assembly work, sir?  Is -- you're telling me

24 that the only thing he can do in the line is a punch-press

25 operator?

1   A    Yes.

2   Q    Now, how about Shawn Broadnax?  Do you know anything about

3   his layoff?

4   A    No.

5   Q    But, again, he was laid off because it was slow, right?

6   A    Correct.

7   Q    He had a lot of seniority, right?

8   A    Correct.

9   Q    He worked for you for a lot of years?

10  A    Yes.

11  Q    When did he first start working for the company, do you

12  recollect?

13  A    I don't remember.

14  Q    And he was brought back in April of 2014, correct,

15  approximately?

16  A    Yeah, he was arrested.  We brought him back out of jail.

17  Uh-huh.

18  Q    Okay.  That is -- that is nice.  And you hired him in

19  April 2014, correct?

20  A    Well, I'll agree to that.

21  Q    Okay.  Was there any interruption in his employment

22  between April 2014 and when he was terminated -- or laid off?

23  I'm sorry.  Laid off.

24  A    Was there any interruption in what?

25  Q    Was there any interruption in his employment from the time

1  he was hired in April 2014 to the time of his layoff in October

2  2015?

3  A    No.

4  Q    So despite that he had all this seniority, he was also let

5  go by Mr. Prendergast, correct?

6  A    Correct.

7  Q    Now, wasn't he doing assembly work?

8  A    That was a fire and smoke department, sir.

9  Q    Okay.  He was doing assembly work in the fire and smoke

10  department, right?

11  A    Correct.

12  Q    Is it the same thing, the only thing he can do is assembly

13  of fire and smoke?  Is that the --

14  A    If that department got slow, that's where we laid people

15  off.

16  Q    That department got slow, too?

17  A    Correct.

18  Q    Well, at your deposition you said that he was laid off

19  because he wouldn't shut up, he was talking and walking all

20  over the factory, and he wasn't the same since he got out of

21  jail.

22  A    That is correct, also.

23  Q    But he was laid off due to low production, correct?

24  A    Correct.

25  Q    Now, Mr. Watson's machine, the one that didn't need to be

1  used anymore, you got somebody else in to work it after he

2  left, correct?

3  A    I moved one of my shippers over there part time --

4  Q    Tom Malone.

5  A    Sure, Tom Malone.

6  Q    A white guy?

7  A    Yes.

8  Q    And you put him there because he was having some trouble

9  getting around?  He had some physical --

10  A    His heart was --

11  Q    -- medical problems?

12  A    Correct.

13  Q    Okay.  And you said -- and one of the reasons you gave at

14  the deposition for letting Mr. Watson go is that you needed to

15  clear some space for Mr. Malone, right?  That was another

16  reason you gave?

17  A    I might have, yeah.

18  Q    So he was moved over to the press room?

19  A    Tommy, part time.  Part time shipper, part time press

20  operator.  Uh-huh.

21  Q    Is he still there?

22  A    Correct.

23  Q    Is he still working press room?

24  A    Part time, sure.

25  Q    Okay.  Now, is there somebody working in the press room

1  full time now?

2  A    Yes.

3  Q    So you're back to not getting parts from China now?

4  A    Excuse me.  We -- we get parts from China, but the large

5  press makes other things for us like access door lids --

6  Q    Uh-huh.

7  A    -- cam latches, sash latches, things like that, that are

8  progressive dies, altogether different than pick and pull.

9  Q    Well, isn't the large press -- oh, large press was the one

10  that -- that Mr. Watson operated?

11  A    No, large press is --

12  Q    Okay.

13  A    -- 200 tons.

14  Q    Two-hundred tons.  Right.  Okay.  Got you.  That's --

15  what's that guy's name?  Bruno or some --

16  A    Eddie.

17  Q    Andy?

18  A    Eddie.

19  Q    Eddie?  Okay.  I got that wrong.  Okay.  Now, why didn't

20  you extend the same courtesy to Mr. Watson?  Maybe you could

21  displace another worker for him and let him take over another

22  spot?  Why -- why just lay him off?

23  A    Just a business decision, sir.

24  Q    All right.  Thanks.

25            MR. DION:  I have no more questions, Your Honor.

1           THE COURT:  Okay.  Well, Mr. Cohen, my policy is, if

2   you want to question Mr. Lloyd now, you can, but then you can't

3   repeat it again when -- after the Plaintiff rests.

4           MR. COHEN:  I'd just like -- thank you, Your Honor.

5   I'd like to do some redirect, and just limit it to -- and then

6   I could -- I was going to ask him a few questions on -- in my

7   case, but I can do it here.

8           THE COURT:  All right.  Okay.  But you --

9           MR. COHEN:  I'm not long winded, Your Honor.

10          THE COURT:  Just you get no repetitions.

11          MR. COHEN:  Understood.

12          THE COURT:  Okay.

13          MR. COHEN:  Understood.  It doesn't do anybody any

14  good.  Okay.

15          Could you pull up P2?

16          MR. DION:  Oh, yeah, sure.

17          MR. COHEN:  Please.

18          MR. DION:  Okay.

19      (Attorneys confer.)

20                      CROSS-EXAMINATION

21  BY MR. COHEN:

22  Q   Mr. Lloyd, I have P3 in front of you.  It looks to be the

23  -- do you recognize this document?

24  A   Yes.

25  Q   And what is the document, sir?

1  A    It's an employment application.

2  Q    And whose employment application is that?

3  A    For Lloyd Industries.

4  Q    And whose the -- whose partial information is there?

5  A    Ronald Watson.

6  Q    Okay.  And in the second portion it says, "Employment

7  Desired."  And what did he fill out?

8  A    Punch-press operator.

9  Q    Okay.  Mr. Lloyd, you were asked a number of questions

10 about the collective bargaining agreement between the local

11 union, the sheet worker's union, and Lloyd Industries.  And

12 Article 10 references, A, the principle of plant rights, and

13 you are providing the employee to be retained can perform the

14 remaining work shall be applied to layoffs.  Who makes the

15 decision as to the employee to be retained can perform the

16 work?  Who makes that call?

17 A    The plant manager and myself.

18 Q    Okay.  So the company does?

19 A    Sure.

20 Q    Your company?  And is that your understanding of the

21 collective bargaining agreement?

22 A    Yes.

23 Q    And with regard to all the questions that you were asked

24 by Mr. Dion with respect to seniority and the opportunity for

25 Mr. Watson to be placed in another position within the company,

1  was a decision made by Lloyd Industries that he couldn't

2  perform these other jobs?

3  A    Correct.

4  Q    And in your recollection, how would you describe

5  Mr. Watson as an employee during the 11 months he was working

6  there?

7  A    Started off okay, and then deteriorated.  Absolutely.

8  Q    How would you grade him as an employee, poor or --

9  A    Poor.

10 Q    Okay.  Would -- did that factor into the decision on the

11 part of Mr. Prendergast and -- and you or, in this case, it was

12 Tom Prendergast, in whether Mr. Watson would be placed in a

13 different or another position within the company?

14 A    Yes.

15 Q    Okay.  And with respect to what's been marked as P8 --

16        MR. COHEN:  If we -- could you pull up -- could you

17 pull up P8, please?  Thank you.

18 BY MR. COHEN:

19 Q    I'm going to ask you some questions about this document,

20 P8.  It looks -- it's labeled voluntarily/involuntary

21 terminated employees, 11/1/14 to 9/1/16.  What's the purpose of

22 this document?

23 A    I believe the Court asked for this document.

24 Q    Okay.  And in looking at the document, about three-

25 quarters of the way down, there were a number -- it looks like

1  a number of employees, one of which was Albert Schlower

2  (Phonetic) laid off.  8/27/14 looks like his hire date, and he

3  was laid off on 2/13/15.  Can you read his -- his race?

4  A    His race was white.

5  Q    Okay.

6  A    White.

7  Q    White.  Thank you.  And underneath that there's Richard

8  Smith, who looks like he was in housekeeping.  What was his

9  race?

10 A    White, also.

11 Q    Okay.  And in looking at this document, many of the

12 employees that either resigned or were laid off were -- looks

13 like the majority were white.  Is that your reading of the

14 document?

15 A    Yes.

16 Q    Okay.  There was some questions asked about the fact that

17 at the Lloyd Industries Montgomeryville location, there were

18 only a few African-American or black employees.  Can you tell

19 the jury why that is?

20 A    They don't apply for a job.

21 Q    Okay.  Is there any policy at Lloyd Industries not to seek

22 African-American or black employees?

23 A    No.  Seek black employees?

24 Q    Okay.  How does Lloyd Industries find employees to hire?

25 A    Well, most of the time it goes by we ask, if they have any

1  friends to come to work.  We put ads in Indeed and Zip and we

2  had them in the Inquirer this week.  Nobody shows up for work.

3  Q    Okay.

4  A    Nobody even applies.

5  Q    All right.  With regard to Lloyd Industries, do you have

6  another plant as well?  Do you have a plant in Florida?

7  A    I have two more -- yeah, one more factory in Florida and

8  one in --

9  Q    Okay.

10  A    -- Hong Kong.

11  Q    And do you hire African-American or black employees at the

12  Florida plant?

13  A    Yes.

14  Q    And can you tell the jury what the percentage of

15  African-American or black employees are down there?

16  A    About 80 percent.

17  Q    Okay.  And you testified that you did not terminate

18  Mr. Watson based on his work ethic or alcohol issue.  And is

19  that a policy of Lloyd Industries?  Do you keep employees on

20  and not fire them for cause so they can collect unemployment?

21  A    Correct.

22  Q    In this particular case, did Mr. Watson collect

23  unemployment?

24  A    Yes, he did.

25  Q    There was some questions about Shawn Broadnax and the fact

1  that he was laid off, I believe, on October 30th, 2015.  Do you

2  know why he was laid off?

3  A    Lack of work in that department.

4  Q    Okay.  And was that caused by the fact -- or affected by

5  the fact that Mr. Watson was laid off as well?  Did that affect

6  the work that Mr. Broadnax could do because Mr. Watson was not

7  working there anymore?

8  A    The company got slow companywide.

9  Q    Okay.  Would the fact that -- by the way, did -- did Shawn

10 Broadnax receive unemployment to your knowledge?

11 A    Did he collect unemployment?

12 Q    Correct.  Yeah.

13 A    I believe so, yeah.

14 Q    Okay.  Did he file a claim against Lloyd Industries?

15 A    No, he didn't.

16 Q    With regard to Shaun Mathis, you said that you don't know

17 Shaun Mathis.

18 A    I don't remember him.

19 Q    Have -- has Shaun Mathis filed a claim against Lloyd

20 Industries?

21 A    No.

22 Q    If Mr. Watson was an excellent, an outstanding employee,

23 would he have been -- would you have attempted to keep him at

24 the company?

25 A    He'd still be working for me.

1  Q    Thank you.

2           MR. COHEN:  I don't have any further questions, Your

3  Honor.

4           THE COURT:  All right.  Thank you.  Any redirect?

5           MR. DION:  Yeah, Your Honor.  Yes, just briefly.

6                       REDIRECT EXAMINATION

7  BY MR. DION:

8  Q    Yeah, just to confirm, Mr. Watson was never given any

9  write-ups or counseling, correct?

10 A    Correct.

11 Q    And so there's no actual record of his alleged poor

12 performance; would that be correct?

13 A    Correct.

14 Q    And his performance was never formally evaluated in

15 writing; am I correct?

16 A    Not at all.

17 Q    Now, your Florida plant is not managed by Mr. Prendergast;

18 is that correct?

19 A    Correct.

20 Q    Now -- okay.

21          MR. DION:  I have no questions.  Thanks, Your Honor.

22          THE COURT:  Any recross?

23          MR. COHEN:  Just one quick question.

24                       RECROSS EXAMINATION

25 BY MR. COHEN:

1 Q    Mr. Lloyd, what -- is it a policy of Lloyd Industries not

2 to write-up employees?

3 A    Yes, it is.

4 Q    Why -- why do you have that policy?

5 A    It seems like there's vengeance being done on the company.

6 When we did this years ago, there would be rivets found in

7 gears.  They would break the key off the forklift.  They broke

8 all the pipes in the bathroom when we wrote somebody up.  We're

9 not sure who did it, but now we have to just stop doing that,

10 and it stopped.

11 Q    When did Lloyd Industries stop writing up or disciplining

12 employees?

13 A    Many years ago.

14 Q    Okay.  Thank you.

15         THE COURT:  Okay.  All right.  That -- ladies and

16 gentlemen, that completes the testimony of this witness.  So

17 it's just about a quarter of 11:00.  We're going to take a

18 10-minute recess, midmorning recess.  Please remember not to

19 discuss the case.  Keep an open mind.  And we'll get back here

20 in about 10 minutes.  Thank you very much.  The jury is

21 excused.

22         I said before I'm going to break for lunch a little

23 before 12:00 noon.  Thank you.

24         All right.  The jury may be excused back to the jury

25 room.

1       (The jury exits the courtroom.)

2               THE COURT:  Okay.  All right.  Who is the next

3   witness going to be?

4               MR. DION:  His name is Shaun Mathis, Your Honor.

5               THE COURT:  He's here?  He's outside?

6               MR. DION:  Yes, he is.

7               THE COURT:  All right.  And then after that?

8               MR. DION:  Well, we have Mr. Braker.  He's the Union

9   Rep.  He says that he needs to be out of here by 2:30.

10              THE COURT:  Yeah.

11              MR. DION:  I told him to come in at 1:00.

12              THE COURT:  Well, why don't you call him next?

13              MR. DION:  Mr. Braker?

14              THE COURT:  We're not going --

15              MR. DION:  He's not -- Mr. Braker is --

16              THE COURT:  He's not here yet?

17              MR. DION:  -- not coming in until 1:00.  Yeah.

18              THE COURT:  All right.  Well, I may not be back until

19  1:15, just -- I've got to go out of the building for a lunch

20  meeting.

21              MR. DION:  Oh, okay.  So that's --

22              THE COURT:  All right.  But you can put him on --

23              MR. DION:  -- that's fine.  He just has to leave by

24  2:30.  So -- so --

25              THE COURT:  Well, we'll put him on right after lunch.

1          MR. DION:  I'm just trying to be --

2          THE COURT:  How long will his direct be?

3          MR. DION:  About 15 minutes.

4          THE COURT:  All right.  Do you see any problem?

5          MR. COHEN:  Not at all.  I'm going to have like three

6    questions for him.  I mean, he's --

7          THE COURT:  All right.  Well, we'll take him out of

8    turn if necessary.

9          MR. DION:  Okay.

10          THE COURT:  Okay?

11          MR. DION:  Okay.  So -- so what I'm foreseeing is, if

12    we put Mr. Watson on the stand, then we may have to interrupt

13    his testimony for lunch, and may have to interrupt it for --

14          THE COURT:  Yeah.  That's --

15          MR. DION:  So maybe I do it after Braker.

16          THE COURT:  Do what?

17          MR. DION:  Do Mr. Watson -- start Mr. Watson.

18          THE COURT:  Well, we're going to get back here by

19    11:00.  And then we're going to go until like five of 12:00.

20          MR. DION:  Okay.

21          THE COURT:  So who's the next witness?

22          MR. DION:  Yeah.  He's going to be short.  Shaun --

23    Shaun Mathis.  So --

24          THE COURT:  Well, then who's after him?

25          MR. DION:  Then we'll put on Watson.

1          THE COURT:  Well, you have to put -- you'll have to

2  put him on.

3          MR. DION:  Okay.  Yeah.

4          THE COURT:  So we'll interrupt him if he's still on

5  the stand when we take a lunch break.

6          MR. DION:  Okay.

7          THE COURT:  When we come back, I'll explain to the

8  jury we're going to -- we're going to interrupt his testimony

9  for the Union Representative.  Okay.

10          MR. DION:  Then if -- I imagine we'll probably be

11  either in -- into probably cross -- at the point of

12  cross-examination by the time Mr. Braker needs to testify.  So

13  there may be another interruption with that.  So --

14          THE COURT:  It's all right.

15          MR. DION:  Okay.

16          THE COURT:  Who's after that?

17          MR. DION:  After that is Zenetta, Mr. Watson's wife,

18  and I think that's it.  We're going to --

19          MR. COHEN:  What about Tom Prendergast?

20          MR. DION:  We're not going --

21          THE COURT:  Well, if you're --

22          MR. DION:  We're not going to --

23          THE COURT:  If your --

24          MR. DION:  -- put him on.

25          THE COURT:  -- right now in the testimony by 4:30,

1  then you're going to have -- Mr. Cohen, you're going to have to

2  start putting witnesses on.

3  　　　　　MR. COHEN:  That's fine.

4  　　　　　THE COURT:  Okay?

5  　　　　　MR. COHEN:  We're prepared to put our case on.

6  　　　　　THE COURT:  All right.  Thank you.

7  　　　　　MR. COHEN:  Thank you.

8  　　　　　MR. DION:  Thanks, Your Honor.

9  　　　　　THE COURT:  All right.  Ten-minute recess.

10  　　　　　MR. DION:  Oh, Your Honor, I don't know if you knew

11  this, but we did agree on some proposed points for charge.  So

12  the stuff that you have, you know, you can trash and take a

13  look at our proposed.

14  　　　　　THE COURT:  All right.  Well, hand them up.  Are they

15  -- do you have them here?

16  　　　　　MR. DION:  Yeah.  I have three copies.

17  　　　　　THE COURT:  All right.  I got your joint pretrial

18  memorandum.  All right.  Thank you.

19  　　　　　MR. DION:  Yeah, sorry about that.

20  　　　　　MR. COHEN:  We woke up finally.

21  　　　　　THE COURT:  All right.  Thank you.

22  　　　　　MR. DION:  Sometimes I just look at an order and I

23  just get blinders on.

24  　　　　　MR. COHEN:  Yeah.

25  　　　　　MR. DION:  Yeah.  So --

1          THE COURT:  All right.  Okay.  I'll be back in 10.

2    Thank you.

3          MR. DION:  I actually did the pretrial order in

4    another case like last week.

5        (Recess from 10:48 a.m. to 11:07 a.m.; outside the

6    presence of the jury.)

7          THE COURT:  Okay.  Let's bring the jury in, please.

8          All right.  Mr. Watson, you're the next witness.  All

9    right.  Come on up, please.  Mr. Watson --

10         MR. WATSON:  Yes, sir.

11         THE COURT:  -- he's -- oh, he's not -- who's the --

12   where's the next witness?

13         MR. DION:  Oh, let's bring them in.

14         THE COURT:  Go get him.

15         MR. DION:  Should we go --

16         THE COURT:  Somebody's got to get him.

17         MR. DION:  Okay.

18       (Witness summoned.)

19         THE COURT:  This is Mathis, right?

20         MR. COHEN:  Sure, if I recognize him.

21         THE COURT:  Yeah.

22       (The jury enters the courtroom.)

23         THE COURT:  Okay.  Please be seated.

24         The next witness is already in the witness box.

25   Please rise, please.

1        THE CLERK:  Please raise your right hand.

2         SHAUN MATHIS, PLAINTIFF'S WITNESS, SWORN

3        MR. MATHIS:  I do.

4        THE CLERK:  Thank you.  Please say your full name for

5   the record, and spell your last name.

6        THE WITNESS:  Shaun Mathis; S-H-A-U-N -- I mean, I'm

7   sorry, M-A-T-H-I-S.

8                     DIRECT EXAMINATION

9   BY MR. DION:

10  Q    Good morning, Mr. Mathis.

11  A    Good morning.  How are you?

12  Q    All right.  So can you just tell the jury how old you are?

13  A    Thirty-five.

14  Q    And your race?

15  A    I'm black.  I'm biracial.  My mom is white and my dad is

16  black.

17  Q    Okay.  And where do you live presently?

18  A    I live in northeast Philadelphia.

19  Q    And do you live with anyone there?

20  A    My fiancee.

21  Q    And do you have any kids?

22  A    Yes.  My daughter.

23  Q    Are you presently employed?

24  A    Yes.

25  Q    And what are you doing for yourself right now?

1          THE COURT:  Speak close to the microphone, please,
2    Mr. Mathis.
3          THE WITNESS:  Not a problem.
4          THE COURT:  Thank you.
5          THE WITNESS:  I do independent contract work.  I do
6    armed security.
7    BY MR. DION:
8    Q    And is there any particular location where you're working
9    right now?
10   A    The clothing store at J and Hyde Park, as well as a gas
11   station.
12   Q    Okay.  Now, you remember when you started to work at Lloyd
13   Industries?
14   A    Yes.
15   Q    When was that?
16   A    I want to say -- my memory is terrible -- between May and
17   June, I want to say, of 2015.
18   Q    Okay.  And you recall working with Ronald Watson?
19   A    Yes.
20   Q    All right.  Can you identify him here in the courtroom
21   today?
22   A    Yes.  The gentleman sitting right behind you.
23   Q    Now, was Mr. Watson already employed there when you were
24   -- when you came into the company?
25   A    Yes.

1  Q    And what was your position there?

2  A    Assembler.

3  Q    Can you just explain to the jury what -- what an assembler

4  does over at Lloyd Industries?

5  A    They assist or, you know, build the louvers --

6  Q    Yeah.

7  A    -- regardless of the size, from beginning to end.

8  Q    And how difficult is it to learn this work?

9  A    It's not very difficult.

10 Q    Is there a certain type of person that would be able to

11 perform this work?

12 A    Anybody from -- from my understanding.

13 Q    So you would say it's basically just general labor --

14 A    Yes.

15 Q    -- type work?

16 A    Yes.

17 Q    It doesn't -- you don't have to possess any -- any

18 specific skill to perform assembly work?

19 A    No.

20 Q    Now, did you ever -- so where did you work?  What -- what

21 part of the -- of the plant at Lloyd Industries?

22 A    I -- when I first started, about -- I want to say for two

23 weeks I worked in a section where they made very small louvers,

24 I want to say 12 by 12.  But the biggest was maybe 2 feet by 2

25 feet.  After that I was moved over to a section where they made

1  the larger ones that were 40 by 60, maybe, and some were

2  smaller or larger than that.

3  Q    Now, besides the size of these louvers, was there any

4  significant difference in the type of work that you were doing

5  as an assembler?

6  A    I'm confused by your question.

7  Q    Well, you said you started out with the smaller louvers

8  when you started with the company, correct?

9  A    Yes.

10 Q    And then when you moved over to another section, you

11 worked with the larger louvers?

12 A    Correct.

13 Q    And were assembling them?

14 A    Yes.

15 Q    So I'm just asking, were they put together in the same way

16 or is there -- was there any significant difference in how you

17 put them together, the small compared to the large?

18 A    Where the smallers would be able to be folded into each

19 other, and require, you know, no screwing or anything of that

20 nature, the larger ones you needed to have precise

21 measurements, and they also required some -- some tooling on

22 them as well as far as wrenching and bolts and things of that

23 nature.

24 Q    Okay.  And what type of tools would you use to do assembly

25 work in the larger area?

1  A    Well, we had a saw that we would cut our pieces on as

2  well.  We also had a press machine to put the holes into the --

3  the metal parts as well, and a drill.

4  Q    And what -- what tonnage press machine was in that area?

5  A    That part I don't know.

6  Q    Okay.  Now, do you recollect if Tom Prendergast was -- was

7  -- came in after you or before you?

8  A    From what I -- from what I saw, he came in after me.

9  Q    Okay.  And just tell the jury, who is Tom Prendergast?

10  A    Tom Prendergast was the shop supervisor.

11  Q    So after you were hired, at some point Tom Prendergast was

12  hired?  He was -- he then became the shop supervisor?  He was

13  your supervisor, correct?

14  A    Yes.

15  Q    And would he -- would you see him on a daily basis?

16  A    Yes.

17  Q    And what's his race?

18  A    White.

19  Q    Now, what was he like?  What was your impression of

20  Mr. Prendergast when he came into the company?

21  A    When he first started, he seemed to be fairly friendly.

22  After about a week is when I saw a dramatic change in how --

23  who and how he dealt with people.  Again, I try my best not to

24  -- to get into the politics of things, but it was quite

25  apparent who he chose to talk to and who he didn't choose to

1  talk to.

2  Q    Okay.  Now, was there anything that you saw that was

3  related to race in his way he was talking to people?

4  A    Not that I can pinpoint. But it was -- being as though

5  that there were only three African-American workers in the

6  shop, from what I noticed, there wasn't much being done as far

7  as conversation as far as those three gentlemen, including

8  myself, and everyone else in the shop.  I just assumed that he

9  had history with people, and I left it at that.

10 Q    Now, you worked in the same area as a gentleman by the

11 name of Steve Malloy; is that correct?

12 A    Yes.

13 Q    And what's his race?

14 A    White.

15 Q    And when did he come to work for the company?

16 A    I want to say maybe a month or two after myself.

17 Q    And did he work side-by-side with you at some point?

18 A    At some point, yes.  He would cycle between two sections,

19 Mr. Watson's section and myself.

20 Q    Okay.  And what was -- what was he doing in your section?

21 A    Again, assisting the -- the building of the louvers.  We

22 would all have a specific task or a specific set number of

23 louvers that we would try to fill based on orders, and he would

24 just come in and help pick up the ball where we could -- where

25 he could.

1 Q    And did you make any observations regarding his -- his

2 performance?

3 A    Yes.  With Mr. Malloy, when he was back in our section, a

4 lot of his work had to be redone.  He wouldn't take the proper

5 care as far as making sure that the pieces were even, making

6 sure that the screens were properly cut, things of that nature.

7 So, you know, it -- myself, the older gentleman in his section,

8 and the other gentleman always had to double-check his work.

9 Q    Was Mr. Prendergast aware of this?

10 A    To my knowledge, I'm not sure.

11 Q    And how about his attendance?

12 A    I guess it was, I guess, comparable to everyone else's

13 there.  But he -- what I did notice is that he would come in

14 maybe two, three times a week late.

15         THE COURT:  Who was?  I'm sorry.

16         THE WITNESS:  Mr. Malloy.

17 BY MR. DION:

18 Q    Did I saw that?  I'm sorry.

19 A    You asked about his attendance.

20 Q    Yeah.  Yeah.  Okay.  So Mr. Malloy would come in late

21 about two -- two or three times a week you said?

22 A    Yes.

23 Q    Okay.  And how about you?  Were you ever late to work?

24 A    Yes.

25 Q    Now, did Mr. Prendergast ever approach you about your

1  lateness?

2  A    Yes.

3  Q    Would -- did he -- what did he say?

4  A    He would ask why I was late, you know, things of that

5  nature, and move on with the day, pretty much.  I was written

6  up, I believe, once, I want to say, for being late.

7  Q    Okay.  Did Mr. Prendergast write you up?

8  A    Yes.

9  Q    So you don't know of any policy in the company where

10 people weren't written up?

11 A    I'm sorry?

12 Q    Do you know of any policy with the company where people,

13 in general, would not be written up?

14 A    No.

15 Q    Okay.  Now, so when you were hired -- hold on.  Oh, okay.

16 When you were hired, what kind of schedule did Lloyd Industries

17 have for worker hours?

18 A    It was fairly loose, I would say.  They would work with

19 most people, from what I saw, as far -- maybe if they had a

20 second job or whatever the case may be.  Overtime was up to

21 your discretion.  If you wanted to stay or if you didn't want

22 to stay, you just had to let someone know.  Other than that,

23 that was -- that was pretty much the schedule.

24 Q    So they were pretty flexible on letting people --

25 A    At least it was made to seem like.

1  Q    -- take appointments and things like that, take days off?

2  A    Yes.

3  Q    And were you told anything about this policy when you were

4  first hired?

5  A    Just to make -- make someone aware -- Mr. Lloyd, or

6  whoever the supervisor was, make them aware if you needed some

7  type of change.

8  Q    And did you notice if that happened, that people were

9  taking advantage of this policy?

10 A    I did.  I noticed a couple employees who would come in

11 after the normal 8:00 start time and maybe stay a little bit

12 later.

13 Q    And about how many workers did you notice this with?

14 A    Two, offhand.

15 Q    Now, to your knowledge, did Mr. Prendergast ever question

16 Mr. Malloy about his coming in late?

17 A    To my knowledge, no.

18 Q    Now, every -- whenever you came in late, about how late

19 would you be?

20 A    Fifteen, 30 minutes.

21 Q    Now, you were coming from Philadelphia, correct?

22 A    Yes.

23 Q    Going out to Montgomeryville?

24 A    Yes.

25 Q    About how long of a ride is that?

1  A    With traffic, 40, 45 minutes.

2  Q    So you would sometimes hit traffic?

3  A    Every once in a while.  But it -- we started so early, it

4  wasn't too much traffic up around there at that time.

5  Q    Now, did you observe any relationship between Prendergast

6  and Malloy?

7      A    Not -- no, not that I -- that I recognize, no.  They

8  spoke here and there but Mr. Malloy spent a lot of his time by

9  hisself.

10     Q    And did you ever -- so what -- I'm sorry.  Now, do

11 you feel that Mr. Watson could do the assembly work in -- in

12 the department that you were working in?

13     A    Yes.

14     Q    And how do you know that so much for sure?

15     A    I've seen Mr. Watson work.  There wasn't anything in

16 me watching him work that would say that he wouldn't be able to

17 do the job.

18     Q    So what kind of training is there given for assembly

19 work, any?

20     A    None.  No, it was more or less learn as you go.

21     Q    And you actually went over to work in Mr. Watson's

22 department every once in a while?

23     A    I would go over to help out -- help tape some things

24 and things of that nature.

25     Q    And what type of things -- so would you --

1   specifically, what type of work would you do over there?

2       A     In his section they had these fiberglass pieces that

3   were cut out that fit into the back of the louvers that had to

4   be -- louvers that had to be taped in.

5       Q     Uh-hum.

6       A     So that's -- that's what I would go and help out

7   with.

8       Q     Okay.  And why did you have to go over to his

9   department to take -- to do that?

10      A     If -- I guess if someone called out or if they had a

11  lot of orders to be filled.

12      Q     Is that the way it was done there at the plant that

13  -- that people would be asked to cover for other people in

14  other departments?

15      A     It -- a lot of it depended on how much work was --

16  was available.  If one section didn't have a lot of orders or

17  all of the orders were filled, then they would be moved to

18  another section to help out.

19      Q     So whenever there was a downtime then people would be

20  reassigned to different tasks in different departments,

21  possibly?

22      A     Yes.

23      Q     And do the -- do the assembly tasks change on a daily

24  or weekly basis?

25      A     No, not really.  The only thing that really changed

1  was the -- the -- the amount of orders we had to fill.

2        Q     And what was your starting rate at Lloyd Industries?

3        A     Twelve-fifty.

4        Q     Twelve-fifty per hour?

5        A     Yes.

6        Q     And were you working 40 hours a week?

7        A     At the time I was, yes.

8        Q     So what happened at -- near the end of your

9  employment?  Can you tell the jury what happened?

10       A     I was looking for employment to -- that was closer to

11 home to help, you know, compensate some more -- supplement some

12 funds and things of that nature.  And when I asked Mr.

13 Prendergast about maybe making my schedule a little bit more

14 flexible, I was hit with a roadblock and told I was -- wasn't

15 able to.  Shortly after that my hours were then cut to part-

16 time hours without my knowledge.  And after I talked to Mr.

17 Prendergast about it he told me that after I come into work on

18 time some more then maybe we'll think about.  And shortly

19 thereafter I left.

20       Q     So you left employment.  How much were your hours

21 reduced to?

22       A     Almost in half.  I was working mainly 20, 22 hours.

23       Q     And your initial purpose of approaching Mr.

24 Prendergast was to maintain your full-time hours while at the

25 same time doing something else?

1    A    Correct.

2    Q    That is correct?

3    A    Yes.

4    Q    Okay.  So this job that you were seeking closer to

5 home was going to be a second job?

6    A    Yes.

7    Q    Okay.  Understood.  So what happened when you left?

8 Did you go then to that other job --

9    A    I did, yes.

10   Q    -- that you were seeking?  How many hours a week did

11 they give you over there?

12   A    Thirty-five.

13   Q    And was the -- did you have to take a cut in pay?

14   A    I did, yes.  It was about a two or three dollar cut

15 in pay.

16   Q    And so what is your feelings with regards to Mr.

17 Prendergast, you know, his reaction to your request for -- for

18 the change in your schedule?

19   A    I felt that he was being a little hard nosed for no

20 really -- no real apparent reason.  I was -- you know, I'd -- I

21 was a good worker, at least I thought I was.  I, you know, was

22 late sometimes.  That was my irresponsibility.  But the work

23 got done.  And you know I was willing to not let the job go

24 completely, just need a little bit of flexibility.  So the fact

25 that he would not let me do that kind of rubbed me the wrong

1  way.  Rubbed me the wrong way a lot.  And then to have my hours

2  cut, without first prior talking to me about it, that right

3  there was, you know, for me made me rub -- he rubbed me the

4  wrong way a lot with that.

5       Q    Do you feel that you were forced out?

6       A    I believe so.

7       Q    And Mr. Malloy remained full-time after that?

8       A    From what I understood, yes.

9       Q    Well, when you were part-time, before you quit, was

10 Mr. Malloy full-time?

11      A    Yes.

12      Q    All right, thanks.  Thank you, thank you.

13      A    Thank you.

14           MR. COHEN:  May I proceed with cross-examination,

15 Your Honor?

16           THE COURT:  Yes.

17           MR. COHEN:  Thank you.  Okay.

18           Can you pull Exhibit 19, please?

19                         CROSS EXAMINATION

20 BY MR. COHEN:

21      Q    Good morning, Mr. Mathis.  My name is Keith Cohen.

22 I'm an attorney and I represent Lloyd Industries in this

23 matter.  Were you subpoenaed by Mr. Dion's office to be here

24 today?

25      A    Yes.

1      Q      Do you have the subpoena with you?

2      A      I do.

3      Q      Okay.  And were you -- did you take time off from

4  work to be here?

5      A      Yes.

6      Q      Okay.  And you were paid a witness fee?

7      A      Yes.

8      Q      Okay.  Now, you worked at Lloyd Industries directly

9  with Ron Watson or not directly with -- side-by-side with him?

10     A      Not directly side-by-side, no.

11     Q      You're not friends with Ron Watson, are you?

12     A      We are.

13     Q      You are?  Okay.

14     A      We're friends at the -- through the job.

15     Q      Okay.  So you -- you're friendly with Ron from when

16 you worked at Lloyd Industries, you developed a relationship

17 with him?

18     A      Through the job that was pretty much it.

19     Q      Sure.

20     A      Yes.

21     Q      Social friends or just work friends?

22     A      Just work friends.

23     A      Okay.  And you know -- excuse me, you no longer work

24 at Lloyd Industries, correct?

25     A      Correct.

1    Q    In fact, you were terminated from your employment?

2    A    No, I wasn't.

3    Q    You were not?

4    A    I was not terminated.  I -- I left after I got --

5 after I was told my hours were cut to part-time.

6    Q    Okay.

7         MR. COHEN:  May I approach the witness, Your Honor?

8         THE COURT:  Yes.

9 BY MR. COHEN:

10   Q    I'm going to show you -- I'm -- I'm old-fashioned the

11 way -- it's still paper.  Can you take a look at this document?

12   A    Yes, sir.

13   Q    Do you recognize this document?

14   A    No, I don't.

15   Q    You -- you never saw this document before?

16   A    No.

17   Q    So -- so this -- this -- did you live at 2517 West

18 Oakdale Street in Philadelphia?

19   A    Yes.

20   Q    That's your home?

21   A    Yeah.  It was.

22   Q    So this -- this letter from Eileen Lindsay, you never

23 received?

24   A    No.

25   Q    Okay.  All right.

1          MR. DION:  You were referring to -- you got up on the

2    screen, the first page?  What -- that may have been a different

3    page in P19, right?

4          MR. COHEN:  Uh-hum.

5          MR. DION:  Yeah, we had this page.

6          MR. COHEN:  Yeah, there are several pages, he didn't

7    recognize it, anyway.  Thank you.

8          UNIDENTIFIED SPEAKER:  Can the jury see?  What do you

9    have put up there?

10         MR. DION:  Yeah.

11         MR. COHEN:  It's -- there's a --

12         MR. DION:  The difference is the last page.

13         MR. COHEN:  I think it's the full last page of --

14   D19.

15         MR. DION:  Yeah.

16         THE COURT:  Which is this, 19?

17         MR. COHEN:  D19.  Correct.

18         Actually it's not in the book.

19         THE COURT:  Wait a minute your exhibits have later

20   letters.

21         MR. COHEN:  Yeah.  It's their -- I didn't realize it.

22         THE COURT:  The plaintiff's 19.

23         MR. COHEN:  Yeah, correct.

24   BY MR. COHEN:

25     Q    Mr. Mathis, you -- you didn't shadow Steve Malloy

1 while you were working at Lloyd Industries, correct?

2     A    No.

3     Q    So you don't know what meetings he had with anybody

4 at Lloyd Industries with regard to his schedule or any

5 discipline he may or may not have received, correct?

6     A    Correct.

7     Q    And you -- you didn't undergo or have a employment

8 evaluation at Lloyd Industries, correct?

9     A    No.

10     Q    And nobody gave you a document saying you were

11 satisfactory or -- or unsatisfactory in terms of your work?

12     A    Correct.

13     Q    All right.  And when you asked for a change in your

14 hours, you were asking that they work with your schedule and

15 accommodate your schedule with the work that was being done at

16 Lloyd Industries --

17     A    Correct.

18     Q    -- is that correct?  And when Mr. Prendergast did not

19 agree to do that, that was upsetting to you?

20     A    It was.  Only because I've noticed that the other --

21 some other employees that work there were able to do that with

22 their schedules.  And they were able to start, instead of 8:00,

23 maybe at 12:00 and stay little bit later past 6:00.

24     Q    Okay.

25     A    So I was unaware or confused I should say, to why my

1  -- my request was shot down.

2       Q    You requested a special accommodation for your

3  schedule?

4       A    No more than any other employee who had --

5       Q    Who --

6       A    -- who asked for the same accommodations.

7       Q    Were you privy to other employees at -- at the

8  company getting special accommodations on a regular basis; is

9  that your testimony?

10      A    There was one gentleman that would sometimes work in

11 my section by the first name, I believe, of Blake, who would

12 come in at 12 o'clock.  And he would stay past 5:00 or 6:00 or

13 whatever the case may be.  But his start time was 12:00.  So I

14 was just looking for something to that effect.

15      Q    Do you know if he got a special accommodation or that

16 was just his -- his schedule for his job?

17      A    Well, he had -- another -- he had other employment

18 outside of the job.  So I had assumed that that was a part of

19 the -- the way it was done.

20      Q    It -- isn't it true that Lloyd Industries employees a

21 lot of full-time and part-time employees, that people kind of

22 come and go throughout the day and into the evening and

23 morning; isn't that true?

24      A    Yes.

25      Q    And that everybody has a different schedule, whether

1  you are a full-time or part-time employee?

2      A    No.

3      Q    No?

4      A    A lot of the full-time employees start at eight

5  o'clock and they stop at 4:00.

6      Q    Okay.

7      A    If you would like overtime, then you could stay past

8  that.  But most of the full-time employees started around eight

9  o'clock.

10     Q    Okay, all right.  And now you mentioned in your

11 testimony that you had -- you didn't speak regularly or you

12 felt something about Thomas Prendergast in terms of his -- his

13 approach to you or your -- your sense of him.  Did you feel

14 that he was a racist?  Is that your testimony?

15     A    Well, when I would come in and say good morning to

16 Mr. Thomas Prendergast and I get ignored, and then the

17 gentleman behind me who was not the same complexion as I, would

18 say good morning, and they get a response, it's kind of hard to

19 ignore.  Again, I don't get into the politics of things, but

20 things are hard to ignore.

21     Q    So it's your testimony that because he didn't

22 acknowledge you or say hello to you, that you believe he was a

23 racist?

24     A    No.  What I'm saying is is that when you make it

25 apparent to not speak to someone but speak to someone directly

1  behind them that there is something that you're holding

2  personally against that person.  And being as though that there

3  were only three African-American workers in the -- in the

4  factory at the time, I noticed a lot of that behavior directly

5  towards us.  So I draw no conclusions on -- on no one, but

6  that's what I saw.

7     Q    Do you know why there are -- why there are only three

8  African-American employees at the company?

9     A    No, I don't know why.

10    Q    Do you feel that the African-American employees at

11 the company were not treated like other people?

12    A    I'm just going based off what I -- what I

13 experienced.

14    Q    Did you -- did anyone ever say anything of a -- of a

15 racial nature to you that would make you uncomfortable while

16 you were employed there?

17    A    No.

18    Q    Did you ever observe anybody say anything of a racial

19 nature to Mr. Watson or Mr. Broadnax (Phonetic) that would have

20 made them uncomfortable?

21    A    Not that I noticed.

22    Q    Okay.  Were you paid the same salary as the other

23 employees in your department?

24    A    From what I understand; we didn't discuss our

25 salaries.

1      Q    Right.  Okay.  Now when you left Lloyd Industries,

2  did you seek unemployment?

3      A    No.

4      Q    Have you filed a lawsuit against Lloyd Industries for

5  any type of discrimination?

6      A    No.

7      Q    With regard to your employment situation today how

8  are -- are you doing the same type of work that you did?

9      A    No, I'm not.

10      Q    Okay.  And with respect to assembly work, do you --

11  is your testimony that all assembly work is real simple easy

12  stuff?

13      A    No.  That's not what I'm testifying.  Inside of Mr.

14  Lloyd's factory, what I'm saying is is that things were very

15  self-explanatory and there wasn't any trying -- training to --

16  given to you stating that this is what you had to do, and this

17  is the process to this.  You were thrown into the fire.  So it

18  wasn't very -- it didn't require a lot of brainpower to -- to

19  go ahead and put them together.

20      Q    Okay.  Did you make any observation of Mr. Watson's

21  worth -- work ethic at Lloyd Industries?

22      A    The same as most.  He would come in, do his job, go

23  to lunch, come back, do -- do his job and go home.

24      Q    Did he work a full 40 hour week each week, that you

25  observed?

1    A    From what I observed, yes.

2    Q    Okay.  He was -- there were never any weeks when he

3  worked less time than that?

4    A    Not that I'm noticed.  Again as you said, we didn't

5  work side-by-side, so I don't know.

6    Q    Okay.  All right.  Thank you for your time.

7    A    Not a problem.

8    Q    Thank you, sir.

9         THE COURT:  Okay.

10        Redirect?

11                    REDIRECT EXAMINATION

12  BY MR. DION:

13   Q    Mr. Mathis, that exhibit in front of you?

14   A    Yes?

15   Q    That -- so is it -- you see that that's copied to Mr.

16  Prendergast, correct?

17   A    Yes.

18   Q    Okay.  Is it possible that Mr. Prendergast, or the

19  company, made a decision to terminate you, without your

20  knowledge before you left employment?

21   A    That's a possibility, yes.

22        MR. DION:  Well, let's put P8 on the screen.

23        THE COURT:  What number?

24        MR. DION:  P8, Your Honor.

25        You got it.

1        THE CLERK:  Yeah.

2        MR. DION:  All right.

3   BY: MR. DION:

4   Q    So when this -- can you find your name on this list?

5   A    Yes.

6   Q    On, P8?

7   A    Uh-hum.

8   Q    Okay.  Does this reflect what you remember as the

9   reason for your termination?

10  A    Yes.

11  Q    Okay.  You voluntary resigned?

12  A    Yes.

13  Q    Okay.  So is it possible that it could have been both

14  here?  Or you don't know?

15  A    That part, I -- I don't know.

16  Q    Okay.

17       MR. DION:  All right.  Thank you.

18       THE COURT:  Recross?

19       MR. COHEN:  Yeah, just quickly.

20                   RECROSS EXAMINATION

21  BY MR. COHEN:

22  Q    Mr. Mathis, the reason that you resigned is because,

23  number one, you weren't getting the hours you wanted, and,

24  secondly, it was a really difficult commute for you to get to

25  the plant; is that correct?

1      A     The commute --

2      Q     The --

3      A     The commute itself wasn't that bad.  It was a

4  straight shot up 309.  The hours that they cut my -- when they

5  cut my hours it was no longer financially feasible for me to

6  take the trip.  So I could no longer continue my employment.

7      Q     Okay, thank you.

8      A     Not a problem.

9            THE COURT:  Okay.  Thank you, Mr. Mathis.

10           THE WITNESS:  Thank you.

11           THE COURT:  All right.  Who's the next witness?

12           MR. DION:  Mr. Watson, Your Honor.

13           THE COURT:  All right.  Come on up, Mr. Watson.

14           THE CLERK:  Please raise your right hand.

15           (The witness was sworn.)

16           THE WITNESS:  Yes, I do.

17           THE CLERK:  Thank you.  Please state your full name

18  for the record.

19           THE WITNESS:  Ron Watson.

20           THE COURT:  Okay, Mr. Watson, you're going to have to

21  keep your voice up.

22           THE WITNESS:  Ronald Watson.  Okay, yes, sir.

23           THE COURT:  Speak right into the microphone, please?

24           THE WITNESS:  Yes, sir.

25           THE COURT:  Say your name again?

1           THE WITNESS:  Ronald Watson.

2           THE COURT:  All right.  That's good, speak real close

3    to the microphone, all right?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  Okay.

6            RONALD WATSON, PLAINTIFF'S WITNESS, SWORN

7    BY MR. DION:

8       Q    Mr. Watson, how old are you?

9       A    I'm 58, sir.

10      Q    And what's your race?

11      A    African-American, black.

12      Q    And are you married right now?

13      A    Yes.

14      Q    And who is your wife?

15      A    Zenetta Ruffin.

16      Q    Do you have any children?

17      A    Yes.

18      Q    How many?

19      A    One.

20      Q    And what's her name?

21      A    Shequana (Phonetic) Watson.

22      Q    And, how old is Shequana now?

23      A    Forty.

24      Q    She doesn't live with you?

25      A    No, she don't.

1    Q    And what's she doing for herself?

2    A    She works for Chase Manhattan Bank.

3    Q    Thank you.  Now, where do you live right now?

4    A    I live in the West Oak Lane section of Philadelphia.

5    Q    Okay.  And how long have you -- does Zenetta live

6 with you?

7    A    Yes.

8    Q    And how long have you -- how long you been together

9 with Zenetta?

10   A    Thirty-five years.

11   Q    And the -- your daughter is with Zenetta?

12   A    Yes.

13   Q    You know, did you ever serve in the military?

14   A    Yes.

15   Q    And what years were you in the military?

16   A    From '79 to '82.

17   Q    And what happened in '82, were you discharged?

18   A    Yes.

19   Q    And were you discharged honorably?

20   A    Yes.

21   Q    And are you presently employed?

22   A    Yes.

23   Q    And who is your employer?

24   A    Generation Metal.

25   Q    And where is that located?

1    A    Trevose, Pennsylvania.

2    Q    And when did you start working there?

3    A    April of -- of this year, 2018.

4    Q    And what's your position there?

5    A    Punch press operator.

6    Q    Okay.  Can you loosen up, you can loosen up a little.

7  You seem stiff.  All right?  Now, at -- so you've been there

8  for the past seven months with Generation Metal?

9    A    Yes.

10   Q    And -- and what's your position?  What you do there,

11 what's your --

12   A    I operate about 10 to 15 different presses, different

13 tonnages, sanding machines.

14   Q    Uh-hum.

15   A    Saws, forklift, overhead cranes, drills, drill

16 presses.

17   Q    Are the presses that you operate similar to the ones

18 that you were operating over at Lloyd Industries?

19   A    Yes.

20   Q    And what is your rate of pay there?

21   A    Fifteen dollars an hour.

22   Q    Now, I'm going to take you to the -- I'm going to go

23 back in the past to when you first applied to Lloyd Industries.

24 Do you remember when that was?

25   A    Yes, I do.

1    Q    Okay.  And when was it?

2    A    December of 20 -- December 1st, 2015.

3    Q    2015 or '14?

4    A    I mean, 2014, I apologize.

5    Q    Okay.  Are you sure about that, right?

6    A    Absolutely.

7    Q    Okay.  Now and who did you interview with at that

8 time?

9    A    Mr. Lloyd.

10   Q    Do you recognize him in the courtroom today?

11   A    That gentleman right there.

12        THE COURT:  All right.  Pointing out Mr. Lloyd.

13        THE WITNESS:  Yes, Mr. Lloyd, right there.

14 BY MR. DION:

15   Q    And what's your understanding of what position you

16 were hired for?

17   A    Punch press operator.

18   Q    Okay.  And you -- you knew that your -- that you were

19 sometimes referred to also as machine operator?  Correct?

20   A    Yes.

21   Q    And at the workplace, did you do any assembly work?

22   A    Yes, I did.

23   Q    Now, what percentage of your work was assembly?

24   A    Forty percent of the time.

25   Q    Forty percent?

1      A      Basically.

2      Q      Okay.  And which departments did you do assembly work

3 in?

4      A      As Mr. Lloyd described the fire -- the fire HVC

5 system area where it is you had to put the AC10's, AC20's

6 together.  And that was over there by the shop -- shop steward

7 Russell and Shawn Broadnax, that's who showed me how to do

8 that.

9      Q      Okay.  So, Shawn Broadnax, the other African-American

10 man that works at Lloyd, he -- that was his main job, correct?

11     A      Yes.

12     Q      Now did you have any previous experience with being a

13 machine operator prior to Lloyd Industries?

14     A      Yes.

15     Q      And what did -- what did you do?

16     A      I've always worked with machines.  Always punch

17 presses, forming machines, drill presses, CNC machines, stuff

18 of that nature.

19     Q      Okay.  So in your various jobs you had in the past,

20 you -- a lot of them involved the use of machinery, would that

21 be correct?

22     A      Yes.

23     Q      Did you also operate forklifts?

24     A      Yes.

25     Q      Were you certified in that area?

1      A      Yes.

2      Q      Now Lloyd Industries is a union shop, is that

3  correct?

4      A      Yes.

5      Q      Do you know if -- what point you were made a member

6  of the union?

7      A      My eighth month there, because that's when I went

8  into Billy Lloyd's office and asked for a raise at eight

9  months.

10     Q      Yeah.

11     A      And when I did go in and ask for a raise, he said,

12 yeah, I'll give you dollar, I throw a dog a bone.

13     Q      And I'll --

14     A      That's what he said.

15     Q      Right.  So -- just trying to remember the other

16 question.  Does join the union, right.  So it's the union shop,

17 correct?

18     A      Yes.

19     Q      Okay.  Now, do you have -- and what union did you

20 join?

21     A      Local 19 Sheet Metal Workers Union.

22     Q      And do you know who the -- your union rep was?

23     A      Inside the -- the plant that we worked at which was

24 Lloyd Industries --

25     Q      Uh-hum.

1    A    -- it was supposed to have been Russell, but at the

2 local union, Local 19 Sheet Metal Workers Union building on

3 Columbus Boulevard, it was Fred Braker.

4    Q    Okay.  And do you know what Fred Braker's position is

5 over there at Local 19?

6    A    I believe he's at the -- the -- the highest -- the

7 highest person that runs the -- the union.  I'm not sure of his

8 title specifically.

9    Q    Okay.  Now, when you first started working at Lloyd,

10 were there any other African-American workers in the plant at

11 that time?

12    A    Yes.

13    Q    And who was that, do you recall?

14    A    Shawn Broadnax.

15    Q    And you got to know Shawn Broadnax as you were

16 working there, is that correct?

17    A    Yes.

18    Q    You didn't know him before?

19    A    No.

20    Q    Okay, okay.  And did you learn how -- his history

21 with the company?  What's your understanding of his history

22 with the company?

23    A    I know that he worked there for a long time.  And he

24 was friends with everybody and he knew them.  Knew -- they have

25 a long history.

1    Q    Now -- so to your knowledge were there any other

2  African-Americans that were brought into the company during

3  your employment?

4    A    Shaun Mathis, that's it.

5    Q    Okay.  And he was the gentleman that testified

6  earlier today, correct?

7    A    Yes.

8    Q    Now, what was your -- now, when you came into Lloyd

9  Industries did you have to go through a probationary period?

10   A    Yes, 90 days.

11   Q    And what was your understanding of the probationary

12 period?

13   A    I was satisfactory.

14   Q    And what happens if you weren't satisfactory?

15   A    You get terminated.

16   Q    Okay.  Now -- so you made it in 90 days, no one told

17 you -- do you remember the union after -- after your 90th day?

18   A    No, they didn't.

19   Q    Okay.  Were you -- do you have any idea if you were

20 paying the union dues?

21   A    I didn't start paying union days until I joined at

22 the end of the eighth month when he gave me the raise, because

23 he asked me, was I in the union.  I said, no.  Then he said,

24 join it.  He give -- give it to Russell.  And then when I got

25 it from Russell, that's when I joined.

1    Q    Okay.  Now, do you know approximately how many

2 workers were over at Lloyd Industries?

3    A    Between 60 -- 60 people, 65.

4    Q    Okay.  And you agree that there was only three

5 African-Americans during the time that you were employed,

6 correct?

7    A    Yes.

8         MR. DION:  Now let's bring up P19 on the screen?

9 BY MR. DION:

10   Q    So -- so, P19, did you see this document before

11 today?

12   A    Yes.

13   Q    Okay.  And what is it?  If you know?

14   A    It's my work schedule for Lloyd Industries, the weeks

15 that I worked.

16   Q    Okay.  And it shows your week to week hours that you

17 worked?

18   A    Yes, it does.

19   Q    Okay.  And if we turn to page 3 on this, are we able

20 to calculate what you average weekly hours were?

21   A    Yes.

22   Q    And what did that come out to?

23   A    33.87 per hours -- per week.

24   Q    Okay.  And what was your last rate of pay at Lloyd

25 Industries?

1      A      Thirteen-fifty.

2      Q      So what does that give us as an average weekly wage

3 upon your last day of work?

4      A      $457.24.

5      Q      Okay, thank you.

6      THE COURT:  Are you -- is this a good place to take a

7 break, Mr. Dion?

8      MR. DION:  Yeah, we could.  I'm sure you could.

9      THE COURT:  Okay.

10      All right, ladies and gentlemen, I'm going to have to

11 take a -- our luncheon recess now.  And I'm going to ask you to

12 come back at ten after 1:00.  That's a little over an hour.

13 But I have to go out of the building and we also -- we're going

14 to enter -- when you come back, we're going to interrupt Mr.

15 Watson's testimony.  And Mr. Dion wants to call another witness

16 who has a time problem.

17      So when you come back I'll explain.  We'll have that

18 other witness appear rather than Mr. Watson.  And that witness

19 can't be here until at least one o'clock.  So that's where we

20 stand.  I don't know if it stopped raining or not yet but it's

21 outside.  Ms. Lutz will tell you there's a place that you can

22 go have lunch if you like.  The cafeteria it's run by the

23 government in the next building, you don't have to go outside

24 and -- but if you want to go outside, you're welcome to.

25      All right.  Please remember, keep an open mind, don't

1 discuss the case.  So we'll be back around 1:10.  Thank you.

2 The jury is excused.

3      (The jury exited the courtroom.)

4           THE COURT:  Okay.  Thank you very much.  Back at

5 1:10.

6           MR. DION:  Thank you, Your Honor.  See you about

7 1:15?

8           THE COURT:  Pardon?

9           MR. DION:  We'll see you about 1:15, right?  You said

10 you might be 15 minutes out?

11           THE COURT:  Well, I hope to be here at 1:10.  But if

12 I'm -- I may be a few minutes late.  I've got to let go -- up

13 to -- uptown, so I don't know.  But I'll try to be back.  Okay?

14 Thank you.

15           MR. COHEN:  Okay.

16           MR. DION:  Go ahead.  Take an umbrella.  I don't

17 think it ever stops raining.

18      (Lunch recess from 11:50 a.m. to 1:28 p.m.)

19           THE COURT:  Sorry I was delayed.

20           MR. COHEN:  That's okay.

21           MR. DION:  It's all right, Your Honor.

22           THE COURT:  All right.  Bring the jury in.

23           MR. DION:  The witness just walked out.

24           THE COURT:  Is your witness here?  Bring the witness

25 in.

1          MR. DION:  Okay.

2          MR. COHEN:  He just went to the bathroom.

3          MR. DION:  Oh.

4          MR. COHEN:  You show up and they go to go.  What's

5     that all about?

6       (Pause)

7          THE COURT:  Is he there?

8          MR. DION:

9          MR. COHEN:  He'll be back.

10          MR. DION:  He'll be right back.  Give him a minute.

11          THE COURT:  Have you seen him yet?  Does he know to

12     come in the courtroom?

13          MR. COHEN:  Yes.  Yeah.  He was just here.  He'll be

14     right back.

15          THE COURT:  He is here?

16          MR. COHEN:  He's here.

17          MR. DION:  You may even want to wait in the hall for

18     him or tell him hurry.

19       (Attorneys confer.)

20       (Jury enters the courtroom.)

21          THE COURT:  All right.  Please be seated.

22          Ladies and gentlemen, I'm told the witness -- I'm

23     sorry for the delay in starting over again, but here we are.

24     We adjourn no later than 4:30.  I think I told you that when

25     you were selected.  Please be seated.  There's a -- we said we

1  were going to call another witness out of turn to accommodate

2  his schedule.

3           Are you sure he's here?

4           MR. DION:  He is.  He's coming right back.  I'll go

5  make sure.

6           THE COURT:  And then when this witness is done, then

7  Mr. Watson will resume his testimony.

8           All right.  Come on up here, sir, please.

9           THE CLERK:  Please raise your right hand.

10             FRED BRAKER, PLAINTIFF'S WITNESS, SWORN

11           THE CLERK:  Please state your full name and spell

12  your last name.

13           THE WITNESS:  Fred Braker.  Last name B-R-A-K-E-R.

14           THE COURT:  All right.  Have a seat.  Keep your voice

15  up.

16                         DIRECT EXAMINATION

17  BY MR. DION:

18  Q    Good afternoon, Fred.  You're an employee of Local 19?

19  A    That's correct.

20  Q    What's the name of the union?

21  A    Sheet Metal Workers' International.

22  Q    And what's your position?

23  A    I'm a business representative.

24  Q    And what is that?

25  A    I negotiate contracts, handle grievances, look for work

1  for the membership.

2  Q    You also handle grievances?

3  A    I do, yes.

4           MR. DION:  Let's put P-21 up.

5  BY MR. DION:

6  Q    You're familiar with the Collective Bargaining Agreement

7  with Lloyd Industries, correct?

8  A    Yes.

9  Q    And you signed off as a witness on that, right?

10  A    Yes, I did.

11  Q    All right.  And you have a pretty good understanding of

12  the agreement itself?

13  A    As best as I can interpret it.  A lot of times I have to

14  go to my attorney to clarify things as well.

15  Q    Okay.  But you have an understanding?

16  A    For the most part, yes.

17  Q    And the -- you're familiar with Article 10 of the

18  agreement, which is the seniority clause?

19  A    (No verbal response)

20           MR. DION:  Let's turn over to page 8.

21           THE WITNESS:  Yes.

22  BY MR. DION:

23  Q    Now were you aware that Mr. Watson is seated over here?

24  And do you recognize him at all?

25  A    I'm familiar, yes.

1  Q    Okay.

2  A    I represent over a thousand individuals.

3  Q    Okay.  So you understand that he had been a member of the

4  Union?

5  A    Yes.

6  Q    Okay.  And he worked in Lloyd Industries; is that correct?

7  A    That's correct.

8  Q    So if you can, just state your understanding of the

9  seniority policy.

10  A    Without even looking at it, it's like plant-wide seniority

11  providing the individual can perform the necessary work.

12  Q    And plant-wide means you're not restricted just to one

13  particular department or another, correct?  Plant-wide.

14  A    In this particular agreement, yes.

15  Q    Now did there come a time when Mr. Watson made a grievance

16  in the union?

17  A    Actually, he did not file a grievance procedure.  He

18  called me up.  I met him at the hall, and I filed the

19  grievance.

20  Q    Okay.

21  A    The proper procedure would be to go to the shop steward

22  first.  The shop steward would bring it to the shop supervisor.

23  And then if it can't be rectified and that, then it comes to

24  me.

25          MR. DION:  Let's put P-13 up on the screen.

BY MR. DION:

Q    Did you have an opportunity to review P-13 before our proceeding today?

A    Yes, I did.  I wrote it.

Q    Okay.  That's your signature on the steward line?

A    Correct.

Q    And so, after you heard what Mr. Watson told you, this is what you wrote up, that there was a violation of Article 10, seniority -- layoff out of seniority?

A    I attempted to file the grievance, yes.

Q    Okay.  And you were arguing on his behalf that he was capable of performing the work in another department, correct?

A    From the information he provided me, he told me he can.  I have no first-hand knowledge of what he can or cannot do though.

Q    So you -- at that point, you were relying on whatever was told to you by the employer itself?

A    No.  Actually, I went up and visited the shop and spoke to a lot of the employees there.

Q    A lot of the employees?

A    Correct.

Q    Now --

A    Meaning the shop steward that was back in his area.

Q    Right.  Guys back in his area, the press room?

A    Yes.

1  Q    Okay.  And so, did you talk to Mr. Lloyd?

2  A    I communicated with him through emails to set up a time

3  and asked for a response to the grievance.

4  Q    Okay.  And did you talk to Mr. Prendergast?

5  A    I don't recall.  I may have.  I don't recall.  I really

6  went in to speak to the other employees.

7  Q    Okay.  Do you remember --

8  A    I'm sure I probably did.  I went into his house.  So I

9  usually say hello to everybody when I go in.

10  Q    Okay.  All right.  And so --

11          MR. DION:  So let me bring up P-20.  Okay.

12          THE COURT:  What number?

13          MR. DION:  P-20.

14  BY MR. DION:

15  Q    All right.  You haven't seen this document, P-20, before I

16  don't think, right?

17  A    No, sir.

18  Q    Okay.  So you see down at the bottom in blue is Mr.

19  Watson's position?

20  A    Yes, sir.

21  Q    Okay.  Now are you familiar with the classifications of

22  the positions there at Lloyd Industries?

23  A    Not really.  I mean I know the different positions, but I

24  don't know who's capable of what in the place to be quite

25  honest with you.

1  Q    So when Mr. Watson came to you with his grievance, did he

2  explain to you that he was a machine operator/assembler?

3  A    That's what he told me.

4  Q    And who did you talk to in his department?

5  A    I know I spoke to the shop steward, Russ Murphy

6  (Phonetic).  I forget the other gentleman's name in the back

7  there.  I don't know.

8  Q    So he's not -- that's not somebody from his department

9  then is what you're saying?

10 A    No.  Russ is the shop steward.

11 Q    All right.  Okay.

12 A    He's been there the beginning of time.

13 Q    So you didn't talk to anybody in the press room?

14 A    I talked to the one gentleman back there.  I just -- his

15 name is slipping my mind.

16 Q    Okay.  The guy who runs the 200 time press?

17 A    I'm thinking his name is Tom, but I don't recall right off

18 the top of my head.

19 Q    All right.  Tom is seated outside the courtroom today.

20 Did you see him?

21 A    I did not, no.

22 Q    Okay.  You didn't talk to him at all?

23 A    No.

24 Q    All right.  So do you remember having any conversation

25 with Tom about Mr. Watson?

1   A    Tom Prendergast?

2   Q    No.  Tom, the 200-ton press operator.

3   A    Yes.  Yes, I do.

4   Q    Okay.  So what did he have to say?

5   A    He basically said that he wasn't a very good worker, that

6   he didn't show up a lot and, you know, came back from lunch

7   smelling bad, I think alcohol.  So when I told Mr. Watson, I

8   said, you know, maybe you want to take a layoff instead of, you

9   know, getting terminated.  At that point, he said okay.  And

10  that was in my office with the organizer, Brian Blum

11  (Phonetic).

12  Q    You're saying that Mr. Watson said okay to a layoff?

13  A    To accept the layoff, yes, as opposed to a possible

14  termination down the road.

15  Q    So what you're saying is he wasn't going to be terminated,

16  correct?

17  A    No, he was.  I mean --

18  Q    Well, how can he be terminated if he was being laid off?

19  A    Because, unfortunately, Mr. Lloyd had never documented any

20  of the infractions.  Like I tell most of my contractors,

21  documentation is key.  Many of them are very reluctant to do

22  that.  I don't know why, but that's where we're in situations

23  like right now.  If someone is warned and warned and warned,

24  and I'm aware of it and everybody is aware of it -- so there

25  was no documentation on the termination, but it would have been

1 just a matter of time, in my opinion, since I've been doing

2 this fairly long time.

3 Q    All right.  There was no determination made by you, a

4 formal determination, correct?

5 A    I don't understand your question.

6 Q    Well, the -- this investigation was done when, in November

7 2015?

8 A    I believe so.

9 Q    And did you provide any documents saying what your

10 decision was or --

11 A    No, I did not.

12 Q    Okay.  And there was no written agreement of anything that

13 was agreed to by Mr. Watson, correct?

14 A    No, sir.

15 Q    Now do you remember sending an email to Mr. Prendergast in

16 August 2016?

17 A    No.

18 Q    Well, is that common for you to, nine months after an

19 investigation, send a email to someone over at Lloyd's?

20 A    Depend what it was about.

21 Q    About a grievance nine months before.  That's not --

22 A    No.

23 Q    That's not part of your procedure, right?

24 A    No.  I'd have to see it --

25 Q    Okay.

1  A     -- to refresh my memory.

2        (Attorneys confer)

3            MR. DION:  Let's put P-17 up on the screen, please.

4  BY MR. DION:

5  Q     Do you recognize that letter?

6            THE COURT:  17 did you say?

7            MR. DION:  Yes, P-17.  Yes.

8            THE WITNESS:   Yeah.

9  BY MR. DION:

10 Q     Okay.  So do you remember Mr. Prendergast asking you to

11 send him a letter about this at that time period?

12 A     I really don't recall.

13 Q     Did he -- did you ever talk to Mr. Prendergast in July or

14 August 2016?

15 A     Again, I don't recall.

16 Q     Was there an email sent to you in regards to this or did

17 you talk to him on the phone?

18 A     I don't recall.

19 Q     So the letter -- why don't you read the email?  You're

20 communicating this to Mr. Prendergast or Mr. Lloyd?

21 A     I believe it's Mr. Prendergast.

22 Q     Okay.  So when you say Tom, I met with Ron, you're saying

23 Tom, I met with Ron?

24 A     Yes.

25 Q     Okay.  All right.  Go ahead.  Read what you wrote.

1  A    At my office after the layoff and researched that he was

2  lowest seniority.  Therefore, there was nothing we could do as

3  to Lloyd Industries firing (Indiscernible Words).

4  Q    So you're -- you determined that he was lowest in

5  seniority.

6  A    From the information I received, yes.  Again, there was

7  other circumstances that I said to Mr. Watson to see what he

8  wanted to do.

9  Q    Right.  Well --

10  A    I mean going forward, I would have had to contact the

11  union to determine -- to see what kind of case we would have

12  had.  I take all that into consideration.  Number one, you

13  know, the grievance wasn't filed timely.  That would have been

14  a hurdle.  The testimony of the other gentleman that I went up

15  and interviewed.  That's why I advised him to take this, take

16  the layoff.

17  Q    So -- but you told him that you weren't going to go any

18  further with it, correct?

19  A    Correct.

20  Q    So what else did --

21  A    For just the reasons that I stated.

22  Q    So what else could he do?  He wasn't the lowest in

23  seniority; am I correct?

24  A    The information I received, he was at the time.

25            MR. DION:  Let's get P-20 back on the screen.  You

1  got it up there?

2  BY MR. DION:

3  Q    So his hire date on P-20 is what, December 4, 2014?

4  A    That's what it says, yes.

5  Q    All right.  So look at the hire dates for the people in

6  yellow.

7  A    That wasn't -- apparently, that wasn't the document I seen

8  at the time.

9  Q    So you agreement with that based on that information,

10  assuming it's all correct, that he was, in fact, not the lowest

11  in seniority?

12  A    Based on that information.

13  Q    So now you're coming in today, and you're saying that --

14  coming up with another reason?

15  A    No, I didn't say I was coming up with another reason.  I

16  said I was taking in all the facts.

17  Q    Coming up --

18  A    I went up and talked to everyone.

19  Q    Coming up with a reason with the report from this guy Tom

20  in the press room and --

21  A    It was by shop steward.  There was a couple -- there was

22  quite a few guys I spoke to.

23  Q    So is that what you do for everybody?  If -- even if they

24  have seniority and they get laid off, you're going to just make

25  a determination some other way?

1 A    No.  I usually state the facts to the individual and give

2 them my recommendation.  If somebody is going to be terminated,

3 yeah, I try to get the employer to give them a layoff instead

4 of the termination, so that they have some way to provide.

5 Q    Well, you didn't talk to Mr. Prendergast before Mr. Watson

6 was laid off, correct?

7 A    Not that I recall, no.

8 Q    Okay.  So you didn't -- so you already had the layoff,

9 right?

10 A    I believe so, yeah.  It was three years ago.  I mean I'm

11 trying to remember.

12 Q    You seem to remember your conversation with Tom pretty

13 well.

14 A    I said it was more than just Tom.

15         MR. DION:  All right.  No more questions.

16         THE COURT:  Okay.  Cross-examine.

17                    CROSS-EXAMINATION

18 BY MR. COHEN:

19 Q    Good afternoon, Mr. Braker.  My name is Keith Cohen.  We

20 met a couple days ago.

21 A    Right.  Okay.

22 Q    I represent Lloyd Industries.  I have a few questions for

23 you.  You were subpoenaed by counsel for the Plaintiff, Ron

24 Watson, correct?

25 A    Yes, sir.

1  Q    And you're here as a representative of the sheet workers

2  union; isn't that correct?

3  A    Correct.

4  Q    And in your job as a union representative, do you work for

5  the employees of these companies or do you assist the employees

6  if they have an issue with their employer?

7  A    I basically work for the employees of the companies, yes.

8  Q    Okay.  And they pay union dues to the union, so that they

9  have your representation and that of your union, correct?

10  A    Correct.

11  Q    And in this particular situation, when you met with Mr.

12  Watson, did you sit down and get the information from him about

13  his grievance with Lloyd Industries?

14  A    I sat down with him, asked him what was going on.  And I'm

15  the one that filed the grievance.

16  Q    Okay.  And you -- I didn't hear how many years you worked

17  with the union for.

18  A    I'm a member for 37 years, and I've been an officer for

19  19.

20  Q    So during that period of time, you've investigated many,

21  many grievances; is that correct?

22  A    That's correct.

23  Q    And you follow a certain procedure in investigating

24  grievances?

25  A    Yes.

1 Q    And in this particular situation, you followed the

2 standard procedure that you would follow in investigating a

3 grievance of an employee?

4 A    Correct.

5 Q    And there was a -- questions about the collective

6 bargaining agreement that you had it looks like witnesses, the

7 one with Lloyd Industries, correct?

8 A    Correct.

9 Q    And Article 10 seniority, it's what we've been discussing.

10 And A of the agreement says a principle of plant-wide seniority

11 providing the employee to retain -- can perform the remaining

12 work shall be applied to layoffs.  The determination as to the

13 employee being retained that can perform this work, is that a

14 decision made by the employer or the employee or the union?

15 A    It would be basically by the employer, because I don't

16 work there.  I have no knowledge of anyone's capabilities other

17 than what they tell me.  But I've had guys say I can build

18 something and then say go ahead and build it.  Well, I can't

19 weld.  And I look at them, well, how you going to build it?

20 You going to put it together with bubble gum?  So I take

21 everything for what it's worth.

22 Q    So --

23 A    I mean anybody can tell me anything.  Until I went up

24 there and spoke with other employees, I got a better

25 understanding.

1  Q    Okay.  And in this particular situation, it was at the

2  discretion or the decision made by Lloyd Industries whether

3  they wanted to place Mr. Watson in a different position within

4  the company, correct?  They made that call.

5  A    For the most part, yeah.

6  Q    Okay.  This --

7  A    I mean I have to argue this with many companies with skill

8  and ability.  There -- the seniority language is so broad and

9  difference agreements.  Some are by classification.  Some are

10 by skill and ability.  Well, who determines the skill and

11 ability.  This is an argument that we have all the time with

12 companies.  So --

13 Q    Understood.

14 A    -- I mean it's not uncommon.  Let's put it that way.

15 Q    Okay.  Thank you.  Mr. Braker, the collective bargaining

16 agreement, does that apply to full-time or part-time employees?

17 A    Full-time.

18 Q    Okay.  And if someone were to work an average of 33.87

19 hours per week, would that be full or part-time?

20 A    Full-time to me would be 40 hours.

21 Q    Okay.  So if the evidence in this case for the 11 months

22 that Mr. Watson at Lloyd Industries or that he worked 33.87

23 hours a week on average, would be -- would he be a full-time or

24 part-time employee based on your knowledge?

25 A    I'm not aware of how many hours he worked --

1  Q    I understand.  But if that were the --

2  A    -- until this happened.  And then I heard, you know --

3  Q    Okay.

4  A    -- a few different things.

5  Q    Okay.

6  A    He was still a member.  So however many hours he worked,

7  you know, he worked.

8         MR. COHEN:  If we could pull up P-13, please, and let

9  the jury see it.

10 BY MR. COHEN:

11 Q    Do you have P-13?  It's the grievance form.

12 A    It's the grievance.  Yeah.

13 Q    Is this form the form that's used by the Sheet Metal

14 Workers' International for grievances between employees and

15 employers?

16 A    Yes.

17 Q    And you completed this on behalf of Mr. Watson in this

18 case, correct?

19 A    That's correct.

20 Q    And that's your handwriting?

21 A    Yes, sir.

22 Q    And your signature for steward?

23 A    Yes.

24 Q    And it's -- it looks like Ronald Watson signed after your

25 signature?

1  A    Correct.

2  Q    And in this particular grievance, is there anything in

3  here about race discrimination?

4  A    No, sir.

5  Q    It looks like Article 10 seniority is the only grievance

6  that Mr. Watson discussed with you concerning Lloyd Industries;

7  is that correct?

8  A    That is correct.

9  Q    And the response from management, did you have an

10 opportunity to review that?

11 A    Yes, I did.

12 Q    And --

13 A    I mean it's hard to read.  The writing is very small.

14 Q    I'm not going to have you read it.

15 A    Thanks.

16 Q    And after reviewing their response, did you come to the

17 conclusion that Mr. Watson was properly laid off by the --

18 Lloyd Industries?

19 A    Again, the information I received as far as seniority, he

20 was below.  And again, I went up there as I normally do.  I'll

21 go investigate.  Go to the shop.  Talk to different people and

22 talk to the shop steward.  Talk to other employees in the

23 plant.  Get a feel.  And then I will usually go back to the

24 individual and say look, this is what I know, you know.  This

25 is what I've discovered, and advise, basically.

1 Q    I understand.  Okay.  And at any point in your

2 communications with Mr. Watson, did he ever raise the issue

3 that he was dismissed or laid off because of his race?  Was

4 it --

5 A    No, sir.

6 Q    Okay.  Thank you.

7          MR. COHEN:  I don't have any further questions.

8          THE COURT:  Okay.

9          Redirect.

10          MR. DION:  Nothing further, Your Honor.

11          THE COURT:  All right.  Thank you, Mr. Braker.  You're

12 excused.

13          THE WITNESS:  Thank you.

14          THE COURT:  All right.  Mr. Watson, you can come back

15 on the stand, please.

16          THE WITNESS:  I can leave, Your Honor?

17          THE COURT:  Yes, thank you.

18          THE WITNESS:  Thank you.

19          THE COURT:  That's not one of our exhibits.  Sir, the

20 paper you're taking?

21          THE WITNESS:  No, it's not --

22          THE COURT:  Okay.  Go ahead.  Thank you.

23     RONALD WATSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

24                         DIRECT EXAMINATION

25 BY MR. DION:

1  Q    Okay.  Ron, during your employ, were you ever issued any

2  written or verbal discipline or counseling?

3  A    No, sir.

4  Q    And did you ever -- and you were never evaluated for your

5  performance; is that correct?

6  A    Occasionally, I would be complimented.

7  Q    So people would come up to give you verbal compliments?

8  Is that what you're saying?

9  A    Yes.

10 Q    Okay.  Can you tell the jury who came up to compliment you

11 and when that was done and what was said?

12 A    Russell the shop steward.

13 Q    Yeah.

14 A    He would say I'm doing a good job.  I believe that he came

15 by a couple times and I was doing good.

16 Q    Uh-huh.

17 A    That's basically it, because I had to impress him because

18 he's the owner.

19 Q    Now you just heard the testimony of Mr. Braker.  Did he

20 say anything that was inaccurate?

21 A    He said a lot that was inaccurate.

22 Q    Why don't you describe what happened when you spoke to Mr.

23 Braker?

24 A    I came to Mr. Braker and I told him -- I said I was laid

25 off from Lloyd Industries.  I think that was the 5th of

November, whatever, right.  And when I told him I got laid off,

he said to me why did I get laid off.  And I told him I didn't

know why I got laid off.  I said I got fired or laid off.  I

didn't know if I got fired or laid off, because of the way it

came about.  I didn't find out until 4:25, after a full day's

work.  I working on my press.  2:00, Fred -- I mean Tom

Prendergast came to my area, gave me my change of medical form,

because we was changing medical insurance at the time, he

passed it to me and left.

At that particular time, 4:25 that day, on my last

day of work, Tom Prendergast said Ron, can I speak to you,

because all this was by the time clock.  I said yes.  I said

what's up.  He said I'm laying you off.  I said what?  He said

I'm laying you off.  I said what you laying me off for.  He

said because I can.  At that point, at 4:25, it is now 4:30,

then I go ask Billy.  I said Billy, can this guy lay me off

like that?  Billy said to me, in an offensive way, like he was

going to hit me, take the layoff, all right?  And I didn't want

to, you know, get violent with the man, because I'm in his

building.  And that's trespassing and assault and all that.  So

I just left.

So then when I told Mr. Fred Braker what happened, he

said what he did is wrong.  Why he just didn't move you to

another area?  I said I don't know.  And then Mr. Fred Braker

said well, Billy is kind of messed up.  He does stuff the way

1  he want to do it.  He was assassinating the man character, but

2  I didn't want to hear that.  And that was what I told him.  And

3  that was the only time that I talked to the -- Fred Braker,

4  that one particular time, and that's it.  This guy didn't hold

5  no conversation with me.  He didn't investigate nothing as far

6  as I know.  I seen him that one particular time, and that was

7  it.

8  Q     Is that when you signed the grievance form?

9  A     Exactly.

10 Q     And did Mr. Braker ever call you up and say hey, you know,

11 I did an investigation, this is my findings?

12 A     No, he didn't.

13 Q     Now going back to the regular script here.  What type of

14 duties were you assigned at Lloyd Industries?

15 A     To operate different presses that was in my area.  It was

16 about four different presses, four to five different presses in

17 my area.  I had to be flexible, so I can do assembly work,

18 which I did, putting the AC-10s, AC-20s, AC-30s together.  I

19 had to also be flexible to operate the forklift, to move the --

20 we was making -- we made all kinds of equipment.  So we made

21 these things called hint -- doors -- hinge doors.  So these

22 doors have to have rods in them.  So the rods are like 18 feet

23 long.  So I had to use the forklift to go this small little

24 particular area, pull the rope around.  It's about maybe 3,000

25 pounds worth of material that I had to use a forklift, drive

1  through the shop, and bring it over to this other machine that

2  I use to cut the rods, the 18-feet long rods they have to make

3  like 12 inches.  So you probably get like 10 pieces out of a

4  rod, but you have to cut them down one piece at a time.  So I

5  had to do that.

6  Q    Sounds pretty complicated there.

7  A    Yes.  Yes.

8  Q    And you did all these duties on a daily basis?

9  A    Yes, because we had -- I had to be flexible.  If they

10 needed me to go somewhere else, I had to be able to do the job

11 that was at hand.

12 Q    And how long does it actually take to become proficient on

13 one of these press machines?

14 A    Well, I got over 20 years' experience with presses.  But

15 you -- in order to learn it, you have to -- you had to be like

16 an apprentice to somebody for like at least six months, you

17 know, because it's not something that anybody can do, you know.

18 It's a technical mechanically inclined thing to set a dye.

19 Q    Now you worked with a press machine at your prior employer

20 before Lloyd; is that correct?

21 A    Yes.

22 Q    Okay.  And from that experience, were you able to take

23 onto the Lloyd industry press pretty quickly?

24 A    Yes, because I knew exactly what to do.

25 Q    And how many different presses did you work at Lloyd's?

1  A    The 30, the 60, the 90-ton, and the 200-ton.

2  Q    You worked the 200-ton before a couple times?

3  A    Yeah.

4  Q    Okay.  That's the one that this guy Tom was handling?

5  A    Yeah.  That's the big press.  That's the biggest press in

6  the shop.

7  Q    Okay.  Now how about assembly work?  You said you did that

8  about 40 percent of the time, correct?

9  A    Yes, because during my employment there, Billy Lloyd hired

10  this other guy named Antonio Cruz (Phonetic) and when he came,

11  he was very -- he's a weird cat, you know.  And he was like

12  wanted to be competitive and fight about a position.  I wasn't

13  fighting about it.  But when he would come, I would have to go

14  to the assembly area where Russ and Shawn was working at.

15  Q    Uh-huh.

16  A    And I do assembly work over there.  And if it wasn't that,

17  I would have to do something else.  Maybe work the forklift and

18  move something or maybe run another press in another

19  department, the automatic.  You just put your foot on it, and

20  the machine run, and it spits out these parts.

21  Q    Okay.  Well, I was leading to my question is how long does

22  it take to learn how to do assembly work?

23  A    15 minutes.  Not even 15 minutes.  All you have to do is

24  watch what somebody doing, because everything is so simplified,

25  you know.  When the parts come out of the machine, that's --

1  being manufactured -- because every fire dampener is a

2  different size, depending on what the building is.  The

3  dimensions are different.  And once they come out the machine,

4  they got interlocker parts.  You simply put them together, fold

5  them.  It locks, because it -- that's the way it come out the

6  machine.  And you put the louvers in, the elliptical pins with

7  the teardrops on them.  And depending on the size of it, you

8  put a motor in.  But you have to test the motor before you put

9  it in.

10  Q    Okay.  Understood.  Now with regards to the allegation

11  that you were drinking on the job, is there any truth to this?

12  A    I never drank on the job.  That's just something that they

13  made.  That's I guess their defense I guess.  I don't know.

14  Q    Now I think Mr. Lloyd had testified that you would go --

15  leave the premises, go to a bar at lunchtime, and then come

16  back with alcohol on your breath.  Is that true that you would

17  leave the premises at lunchtime?

18  A    No.  That's a fixed idea in his mind.

19  Q    Well, can you explain to the jury what you had to do to

20  actually leave the premises at lunchtime?

21  A    You would have to sign out, because you're off the

22  premises.  And if you're off the premises, they don't want to

23  be responsible for you, you know, like that.  It's a insurance

24  thing, I believe.

25  Q    Okay.  And you have to actually clock out formally on the

1  clock or do you sign out?

2  A    Clock out.

3  Q    Okay.  So this is the time clock that keeps track of the

4  exact time that you clock out of the building and then when you

5  come back in again?

6  A    Yes.

7  Q    Okay.  And so, if there -- if you did leave the premises,

8  there would be evidence of that; would that be correct?

9  A    Yes.

10 Q    So where did you usually have lunch when you had lunch at

11 Lloyd Industries?

12 A    In my car.

13 Q    And is that in the parking lot?

14 A    Yes.

15 Q    Okay.  So is that not considered leaving the premises?

16 A    That's not considered leaving the premises, because he had

17 a big parking lot.

18 Q    Okay.  And why did you go in the car?

19 A    Well, the lunchroom is not too big, and it wasn't -- you

20 know, I wasn't comfortable with the tidiness of it.

21 Q    Okay.  Now, do you know a worker by the name of Steve

22 Malloy?

23 A    Yes.

24 Q    And you also know a worker who had a handlebar mustache,

25 right?

1 A    Yes.

2 Q    Okay.  Are those the same people?

3 A    Yes.

4 Q    Can you describe Steve Malloy?  What's his race?

5 A    He's a Caucasian, a white person with a mustache from like

6 the 1920s, like, you know, waxy tip, curled up.

7 Q    And do you know what kind of work he did at Lloyd's?

8 A    He was -- he would come over my area and do some assembly

9 work with the elliptical -- I mean with the teardrops.  He

10 would put the -- I seen him put the teardrops together.

11 Teardrops is -- it comes out the 200-ton press when you put --

12 this press gives -- it gives out three parts, and one of them

13 is a teardrop.  And you put a pin in it.  And you put it in the

14 machine, and it assembles it together, like mashes it together,

15 so it sticks.

16 Q    So just like Shaun Mathis, as he described, he would come

17 over to your press area every once in a while, Steve Malloy did

18 the same thing?

19 A    Yes.

20 Q    Okay.  And what -- when was he hired, Steve Malloy?

21 A    I can't tell you the exact date, but he was hired way

22 after me, you know.  I knew he was knew when he came.  I knew

23 he was brand new.

24 Q    Do you know who brought him in?

25 A    I don't know who hired him.  No, I don't know exactly

1  that.

2  Q    So he was brought in after Mr. Prendergast was brought in?

3  A    He was brought in on his watch.  Yes, he was brought in on

4  his watch, but I don't know if he hired him.  I don't know if

5  he hired him or Billy hired him.  I don't know.

6  Q    And do you remember when Mr. Prendergast came in?

7  A    After me too.  He was after me too.  I'm not sure exactly

8  when, but I know he was definitely afer me.

9            MR. COHEN:  Okay.  Let's bring up Exhibit P-20.

10           THE COURT:  Which number did you say, 20?

11           MR. COHEN:  P-20.  I'm sorry.  I'm sorry, Your Honor.

12  I've got to talk to the microphone.

13  BY MR. COHEN:

14  Q    So are you familiar with P-20?

15  A    Oh, yes, I am.  Yes, I am.

16  Q    Okay.  Now does that give the dates that Mr. Prendergast

17  was hired and Mr. Malloy was hired?

18  A    Yes, it does.

19  Q    Okay.  And am I correct that Mr. Prendergast was hired

20  June 8, 2015?

21  A    Yes, that's correct.

22  Q    And then Mr. Malloy was hired -- let's see if I can

23  remember here.  June 29th?

24  A    Yes.

25  Q    2015, correct?

1  A    Yes.

2  Q    Okay.  So when did you first meet Mr. Prendergast?

3  A    When he laid me off.

4  Q    Okay.  So what happened?  When he was hired, about four

5  months went by.  Maybe close to five months went by between

6  when he was -- when he came in and when you say you first met

7  him.  What happened in between?

8  A    I knew he was the plant manager, but he was never

9  professional.  He never -- he was -- this guy had a attitude

10  that you can feel, and he never spoke to me.  I didn't -- I

11  never said nothing to him.  He never said nothing to me.  And I

12  didn't meet him until the day he laid me off.

13  Q    Right.  You said earlier that he came into your area and

14  handed you the new medical plan documents?

15  A    Right.  That was 2:00 in the afternoon.

16  Q    Before that time, before that time, before that day, did

17  you ever have any exchange with him at all?

18  A    No, except for I went to -- like if I had to get off early

19  or if I had to -- if I called out, I didn't talk to him.  But

20  if I had to leave -- if I had a medical appointment or a dental

21  appointment, or whatever, I would talk to him then.  And that

22  would be it, and everything would be cleared.  That's it.

23  That's the only time I talked to him.

24  Q    Okay.  And did you notice if he talked to other people at

25  the workplace?

1  A    He was a joe with everybody except for me.  He never spoke

2  to me.  He never said a word to me.  He would come in my area,

3  turn his back, smoke a cigarette looking over his shoulder.

4  That was it.

5  Q    Okay.  So I know that you covered this a little bit when I

6  asked you about Mr. Braker.  But can you just explain again

7  what happened on the day that you were fired with Mr.

8  Prendergast?

9  A    I came to work that day.  I did my work like I usually do.

10  2:00 in the afternoon, Mr. Prendergast came over to me with the

11  new forms, because we had his -- this medical insurance company

12  called Life Savings --

13  Q    Yeah.

14  A    -- I believe.  And so, we -- he said to me, he said we

15  switching insurance -- medical insurance people.  I said okay.

16  So he handed me a slip, and that was it.  He didn't say

17  anything else to me.

18  Q    Right.  How did you feel at that point?

19  A    I felt great, because I had a different insurance policy.

20  You know, already, because I got a job.  I'm 30 days from

21  getting another dollar, a week's vacation, personal days.  I

22  knew about the holidays.  And I felt like, you know, life was

23  well worth living at that point.  I was happy.

24  Q    Okay.  Then what happened after that?

25  A    And then I finished up my work that particular day.  The

1  end of the day is at 4:30, but 4:25 everybody run to the clock

2  and shoot the breeze or whatever, you know, maybe for a few

3  minutes, and then, you know, wash your hands and stuff.  And at

4  4:25, when I was going towards the clock, Mr. Prendergast said

5  Ron, can I speak to you for a minute.  I said sure.  I came to

6  the office.  He said I'm laying you off.  I said what?  He said

7  I'm laying you off.  I said for what?  He said because I can.

8  And he just looked at me over them glasses in a sarcastic,

9  nasty way.  And then I went to Bill Lloyd, because Bill was at

10 the shipping area.

11         I said Billy -- I said this guy over here talking

12 about he was laying me off.  I said who is he?  Can he lay me

13 off?  He said take the layoff, all right?  And the way Billy

14 said it, it was so offensive.  And he got in my face.  So I

15 just left.  And then, you know, that was it.

16 Q    So did your employment with Lloyd Industries end on that

17 date?

18 A    That was the end of my employment there, yes.

19 Q    What was that date?

20 A    October 29th of 2015.  I think October 20th or 30th.  One

21 of them days.  I was exactly -- I had 30 days to go before I

22 had a year.

23 Q    Okay.  Now did you hear of anyone else being laid off

24 around that time?

25 A    Shawn Broadnax got fired the next day.

1  Q    Okay.  He's the other African-American gentleman that --

2  A    Yes.

3  Q    -- that worked with you?

4  A    Yes.

5  Q    Now do you think your layoff was legitimate?

6  A    Not at all.

7  Q    How about the seniority aspect?  What's your feeling on

8  what your seniority was?

9  A    That didn't matter.  I didn't matter.  None of that was

10 explored.  None of that was investigated.  None of that was

11 considered.  The only thing that was considered, I was laid off

12 like I wasn't nothing.

13 Q    So you were let go.  You were terminated, correct?

14 A    Exactly.

15 Q    Didn't matter to you whether it was a layoff, fire,

16 whatever.  Am I correct?

17 A    Well, it mattered to me.  I didn't want to get laid off,

18 but that's what happened.  That was the results of the actions

19 that was taken towards me.

20 Q    Now you put a -- what's your feeling on whether or not you

21 can handle one of the other assembly jobs in the plant?

22 A    To do assembly, you can be mentally challenged and do the

23 assembly that they have.  But not to be smart or nothing.  I

24 mean, I did it.  You know, there's nothing in there I couldn't

25 do.  I'm a multitasker.  I'm qualified to do anything and

1  everything that I want to do, especially when it come to

2  employment.  On my resume, it says that, you know.  I don't

3  have a whole lot of time on no jobs, but I got a whole lot of

4  experience from a whole lot of jobs.  And there ain't nothing

5  that I can't do.  And that's the only reason I had got the job,

6  because I had explained to Billy on the day of hire that I knew

7  about presses.  And I was so impressive to him about telling

8  him about the parts of the presses, he said to me here.  Take

9  this application.  Take it home, fill it out.  Start Monday.

10  That's how I got the job.

11  Q    So you heard all the testimony about the people that

12  had -- that were hired after you, correct?  You heard that

13  today?

14  A    Yes.

15  Q    Okay.  You agree that your seniority -- you -- is greater

16  than those people, the yellow highlighted people in P-20?

17  A    I do agree with that, yes.

18  Q    And Mr. Broadnax, he was there even longer than you; am I

19  correct?

20  A    Yes.

21  Q    So obviously, he had seniority over them as well; am I

22  correct?

23  A    Yes.

24  Q    So after you had got done speaking with Mr. Braker when he

25  told you he wasn't going to go forward with the grievance, what

1 did you do after that?

2 A    I went to HRC.

3 Q    PHRC?

4 A    Yes, Philadelphia Human Relations Commission (sic).

5 Q    All right.  I think it's -- I believe it's the

6 Pennsylvania Human Relations Commission; is that right?

7 A    Yes, that's what it is.

8 Q    And do you know whether or not that -- well, you made a

9 complaint with them, correct?

10 A    I filed a -- this racial discrimination case, yes.

11 Q    Okay.  And do you remember any particulars of your charge

12 at all?

13 A    Of what I filed?

14 Q    Yes.

15 A    I told them I was racially discriminated against, because

16 it was nothing done on my so-called layoff that was proper.

17 There was no paper trail on any incident that they'd accused me

18 of.  There was no validation of what he's saying about there's

19 been a lack of work.  There's been -- there was no indicate to

20 me that hey, Ron, look, you want to be laid off of or because

21 of boom-boom-boom-boom, nothing.  So that's why I knew it was

22 racially motivated.  That's what I told the people at HRC.

23 Q    Did you mention to them anything about Mr. Broadnax's

24 termination as well?

25 A    Well, I did, but he wasn't the issue.  I was just -- I was

1  coming by myself, the way I felt, what happened to me, my time

2  in at this particular job, you know.  And I didn't -- I wasn't

3  trying to speak for somebody else.  I was just speaking for

4  myself.  And I did mention him.  I did tell him, you know, what

5  happened, because I did hear about what happened, you know, and

6  how it happened.  And it just wasn't right.

7  Q    Okay.  Now do you know whether or not your complaint with

8  the Pennsylvania Human Relations Commission was dual filed with

9  the EEOC?

10 A    I believe it was.  I believe they did everything they

11 supposed to.

12 Q    Okay.  And what -- was there any evidence of a slowdown at

13 the workplace at all that you saw while you were working there?

14 A    Not at all.  Not where I work at.

15 Q    What about -- what observations did you make that would

16 indicate that there wasn't a slowdown?

17 A    Well, if there was a slowdown, I would think that they

18 would have a meet -- because they just had a union meeting like

19 a month or two months before I got laid off.  But if it was a

20 slowdown, you know, any legit job would just have a meeting at

21 a certain time, that look, this department is slow.  We're

22 going to lay off so many people.  So be prepared for it.  We're

23 going to call you back or whatever, but none of that

24 transpired.  Every day that you go in the shop it's the same

25 amount of work come out every day.  Just -- you know, just --

1 Q    Was there any change in your workload from the time you

2 started till your last day of work?

3 A    No, because it's -- I was full-time.  And plus, he have a

4 part-time guy come in every day, seven days a week, in the same

5 department.

6 Q    Do you think there was a need to lay off two workers at

7 that time?

8 A    No, it wasn't.

9 Q    Did you ever see any parts come in from China?

10         MR. COHEN:  Objection.

11         THE WITNESS:   No, I didn't.

12         MR. COHEN:  I'm going to object.

13         THE COURT:  Overruled.

14         What's your answer?

15         THE WITNESS:  No, I didn't.  The parts that come in,

16 they come in on the trucks.  Sheets -- coils of steel.  They

17 come in.  And most of it's -- most of the parts I used was

18 already in the building.

19 BY MR. DION:

20 Q    After you were terminated, can you just explain to the

21 jury how you felt, how it affected your life?

22 A    I was distraught.  I was heartbroken.  I was very

23 depressed.  I went through a period of depression.  I felt like

24 I was a loser.  I felt discriminated against.  I had no -- I

25 wasn't treated fair.  And I felt as though somebody did

1  something to me that wasn't valid.

2  Q    And did you sustain any loss of pay?

3  A    A lot.  I lost a lot.  I lost a lot to the point whereas I

4  couldn't pay my bills.  So my wife helped me out, you know.  We

5  balanced and we did what we had -- we had to make sacrifices.

6  Couldn't do some of the things that we like to do, you know.

7  Just make adjustments and get on a budgets, you know.  Instead

8  of steaks, eat hamburger, stuff like, you know, whatever.  You

9  know what I mean?  Just can't go places and stuff.  So --

10  Q    Well, when did you eventually find permanent employment

11  after your termination from Lloyd Industries?

12  A    Well, that's -- well, after that, I -- you know, I did

13  collect unemployment.  That helped a little bit.  But the

14  employment I have now is -- I got this in April 9th of this

15  year, and I've been there ever since.  And I do the same type

16  of work.  And matter of fact, I even do more work, you know.

17  What I do I love, you know.  And it's great.  My boss love me.

18  He knows my skill.  He knows my potential.  And he know that

19  I'm 100 percent dependable.  I'm supposed to be at work, but he

20  know -- he granted me time to come off to take care of this

21  business, because I don't miss no time at work, not unless I

22  have to go to a doctor or a funeral or something like that.

23  Other than that, I don't miss no time.  But this the only time

24  that I had full-time work since 2015 December to now.

25          Before that I had some temp jobs, but they wasn't

1 efficient (sic) enough to live.  But I just kept my head up,

2 kept my head to the grindstone until I found what I found.

3 Q    So it took nearly two-and-a-half years for you to find

4 this new job, correct?

5 A    Yes.

6 Q    And that's -- what's the name of that company again?

7 A    Generation Metal.

8 Q    And so, you did work at some temp jobs in that

9 two-and-a-half-year period?

10 A    Yes, I did.

11 Q    Okay.  Do you know approximately how much you earned from

12 those temp jobs?

13 A    Like 3500, something like that, you know.  Nothing big,

14 you know.

15 Q    So it wasn't until you got the job with General Metals

16 that you back to status quo you call it and you were making the

17 same amount of money?

18 A    Yes, I'm at -- yes.

19 Q    You're actually getting $15 an hour now?

20 A    Yeah.  I get 15 for the same work.  Yeah.

21 Q    Now -- so is it -- so you stopped suffering lost pay as of

22 April 9, 2018; is that correct?

23 A    Yes.

24 Q    So the -- did you make a calculation of how much money you

25 lost in that time period between December -- I'm sorry.  I

1  think it was October.  October 29, 2015, and when you got the

2  new job April 9, 2016 -- 2018, with Generations?

3  A    Yes.

4  Q    Approximately how much did that come to?

5  A    $52,247 and some change.  Something like that.

6  Q    That was based on the -- on our calculation before of your

7  average weekly pay when you left Lloyd of 457.25 per week?

8  A    Right.

9  Q    And you subtracted the 3500 that you made from the temp

10 jobs, correct?

11 A    Right.

12 Q    To give you that total?

13 A    Right.

14 Q    Okay.  Thanks.

15         MR. DION:  I have no more questions at this time.

16         THE COURT:  Okay.  Cross-examine.

17         MR. COHEN:  Thank you, Your Honor.

18         Bring up D-1, please.

19                    CROSS-EXAMINATION

20 BY MR. COHEN:

21 Q    Good afternoon, Mr. Watson.

22 A    Good afternoon, sir.

23 Q    You remember I'm Keith Cohen representing Lloyd

24 Industries?

25 A    Yes, sir.

1  Q    I brought up D-1, which is your resume, that was submitted

2  to Lloyd Industries.  And I want to go through this with you.

3  If you'd take a moment.

4  A    Okay.

5  Q    In looking at some of the jobs you've held -- I think the

6  jury has it -- you indicated that from 10/1/2013 to the time

7  you started at Lloyd Industries, you were working -- you were

8  self-employed as a home maintenance laborer, that you were

9  doing remodeling and renovations; is that correct?  That's

10 accurate?

11 A    Yes.

12 Q    Okay.  And you have skills to do that kind of work,

13 correct?

14 A    Yes.

15 Q    And before that, you worked at A&R Metals looks like for

16 about six months?

17 A    Yes.

18 Q    And before that for -- when you were at A&R Metals, you

19 worked as a metal extractor.  And prior to that, Alphasource,

20 in Philadelphia, you worked as a shipping and receiving clerk

21 for what looks like six months also?

22 A    Yes.

23 Q    And before that, you worked as a machine operator for

24 Transcontinental Direct from 7/1/2008 to 5/1/2009.  So that's

25 about I'm going to say around 9, 10 months; is that correct?

1  A    Yes.

2  Q    And before that, you worked as a forklift operator at

3  Davis Company from March 1 of '27 (sic) to July 1, 2008; is

4  that correct?

5  A    Yes.

6  Q    So you've worked a lot of jobs; isn't that right?

7  A    Yes.

8  Q    And now you heard Mr. Braker's testimony?  You were in the

9  room when he testified?

10  A    Yes, sir.

11  Q    So you disagree that he did an investigation on your

12  grievance?  And you don't think he did a good investigation?

13  Is that your testimony?

14  A    Not at all.

15  Q    Okay.  Mr. Braker is the union representative, correct?

16  A    Yes.

17  Q    And you're a union -- you were a union member at that

18  time?

19  A    Yes.

20  Q    And did you have an opportunity to review the grievance

21  form?  Let me pull that up now.

22          MR. COHEN:  The grievance form would be P -- let's

23  see here.  Bear with me.  The grievance form is -- let's see

24  here.

25          MR. DION:  P-13.

1        MR. COHEN:  P-13.  Can we pull it up?

2        (Attorneys confer.)

3  BY MR. COHEN:

4  Q    Mr. Watson, do you see that grievance form?

5  A    Yes, I do.

6  Q    And did you fill this out with Mr. -- he actually wrote

7  it, but you gave him the information in it?  I'm looking at --

8  A    I signed the form when he did the top part.

9  Q    Okay.

10 A    11/9/15.  And he --

11 Q    Understood.

12 A    11/17/15, he did that just days after, the bottom part.

13 Q    This is going to be for somebody tall, I think.  Anyway,

14 Mr. Watson, this form was completed it looks like on November

15 9, 2015, correct?

16 A    No.

17 Q    You see the date on the left-hand top of this document,

18 sir?

19 A    Right, 11/9/15.

20 Q    Correct.  Is that when it was completed, when you wrote --

21 when this paperwork was filled out?

22 A    Yes.  This -- you're talking about the top part, right?

23 Q    Yes.

24 A    The top part not the bottom part.

25 Q    The part that would be filled out by the employee.

1  A    I didn't write that, sir.

2  Q    I understand that.  But is the date that the grievance was

3  written up by Mr. Braker was November 9, 2015?

4  A    Yes, that top part.  Yes.

5  Q    And that was approximately 10 days after you were laid off

6  by Lloyd Industries?

7  A    Yes, sir.

8  Q    And when Mr. Braker completed this form, you were sitting

9  with him; is that not correct?

10 A    I didn't -- what I'm saying to you, sir, the top part --

11 he filled out the top part.  And the bottom part wasn't filled

12 out at that time.

13 Q    I understand that.

14 A    Okay.

15 Q    I'm only asking about the top part.

16 A    Yes, sir.  That's what he did.

17 Q    The top part was filled out by Fred Braker --

18 A    Yes, sir.

19 Q    -- correct?

20 A    Yes, sir.

21 Q    And you signed -- where it says signed on the bottom,

22 signed as Fred Braker's signature --

23 A    Yes, sir.

24 Q    -- followed by your signature, correct?

25 A    Yes, sir.

1  Q    And the information says major grievance, violation of

2  Article 10 seniority and laid off out of seniority employee is

3  something -- unable something of performance work and

4  other -- I guess able to do performance in other department.

5  Is that something you told him?

6  A    No, I didn't.

7  Q    Do you know where he got that information?

8  A    Another fixed idea in his head.  That's the only thing I

9  come up with.

10 Q    So that is your signature on the bottom; is it not?

11 A    Sir, up here, yes, it is.  Right here.

12 Q    And if that's your signature on the bottom, is it safe to

13 say you read what he wrote and signed on it?

14 A    Sir, it's two different dates on here.

15 Q    Mr. Watson, I'm only asking you about the top of this

16 document.  I'm not asking anything else.  It's really simple.

17 A    Okay.

18 Q    My question to you is did you sign your name on the top

19 part of this document after it was completed by Fred Braker?

20 A    Yes.

21 Q    And by you signing this document, is it safe to say that

22 you read what was written there?

23 A    Yes.

24 Q    And when you signed your name on the top of this document,

25 did you not indicate that you agree with what he wrote there?

1  A    Yes.

2  Q    Is there anywhere in that document where there's any

3  mention of a racial discrimination or you being fired because

4  of the color of your skin or being African-American, sir?

5  A    No, it's not.

6  Q    Thank you.  Mr. Watson, earlier in your testimony, we

7  reviewed the hours of work that you did at Lloyd Industries.

8  And the information that was presented to the jury was that you

9  worked an average of 33.87 hours.  Do you agree or disagree

10  with that, sir?

11  A    I agree with that.

12  Q    Weren't you hired to work 40 hours a week?

13  A    Yes, I was.

14  Q    And can you explain to the jury why you worked, on

15  average, 33.87 hours?

16  A    Due to medical problems I had during the time of my

17  employment there.  One time I had got robbed and had got hurt.

18  And the same time, I almost lost my life.  So I had to take off

19  two days.  But I called him.  I let him know what was going on.

20  You know what I mean?  There was never any moment at any given

21  day that I never called or never just walked off from the job

22  or nothing like that.  I always let my -- Tom know if I had a

23  problem like I had a doctor appointment or a therapy

24  appointment.  I always informed him.

25  Q    So is it safe to say, Mr. Watson, that you missed a

1  significant amount of time during your 11 months of employment

2  at Lloyd Industries?  You missed time for whatever reason, but

3  you still missed time, correct?

4  A    Yes, I did.

5  Q    Thank you.  You testified that when you were working at

6  Lloyd Industries, there was never a time when there was a

7  slowdown at work; isn't that correct?

8  A    Absolutely wasn't.

9  Q    Okay.  Did you have access to the books at Lloyd

10  Industries to determine why work was going well or not going

11  well?

12  A    No, I didn't have access.

13  Q    Did you have access to places within the plant where

14  product would come in from other locations that were used to

15  manufacture?

16  A    Yes, I did.

17  Q    You did?  So you had access to all of the stuff that came

18  into the building?

19  A    Yes.

20  Q    And the building is how big, sir?

21  A    It's a pretty nice size building.

22  Q    Over 100,000 square foot?

23  A    I guess I -- it's a big building.

24  Q    I understand.  So is it your testimony that you knew

25  everything that was going on with Lloyd Industries in terms of

1 the volume of business they had in your department and other

2 departments throughout your 11 months at Lloyd Industries?

3 A   Yes, I did, because the parts that I have to get I have to

4 walk around the building to different rooms and look at the

5 inventory for the parts that I need for my department to

6 assemble the parts that I need.  Then I had to also walk around

7 the building to make sure they had the metal that was coming to

8 our department to be formed.

9 Q   Okay.  Mr. --

10 A   That's how I knew.

11 Q   Mr. Watson, is it safe to say you were very angry by the

12 fact that you were laid off, really upset?

13 A   Very -- I was very, very angry.

14 Q   Isn't it true that there is a difference then -- from

15 the -- there is a difference between being fired for cause

16 versus being laid off?  Isn't that true?

17 A   There is a difference.  Yes, it is.

18 Q   Okay.

19 A   That's true.

20 Q   So when you testified earlier that whether you were fired

21 for cause or laid off, it didn't make a difference, you were

22 still laid -- is that right?  Is that your testimony?

23 A   Yes.

24 Q   In this particular case, the fact that you were laid off,

25 didn't that allow you to collect unemployment, sir?

1  A    I could collect unemployment if I'm fired or laid off,

2  because if you didn't do nothing to break -- you didn't do

3  any -- break any labor laws like steal, like the guy named Cal

4  (Phonetic) or the other guy, Connor (Phonetic), like his

5  friends did, you get unemployment, laid off or even fired.  It

6  don't matter.

7  Q    So it's your testimony, sir, that if an employer fires

8  someone for stealing, that employee would still be entitled to

9  receive unemployment?

10  A    They won't get it.  They won't get it, because that --

11  they broke the labor law.

12  Q    I understand that.  So the fact that you were not

13  terminated for cause, for whatever reason, whether it's

14  stealing or destroying property versus being laid off, that

15  would not be a defense of --

16          MR. DION:  Objection.  He's mischaracterizing.

17          MR. COHEN:  I'll withdraw the question.  I'll

18  withdraw.

19          THE COURT:  Rephrase.

20          MR. COHEN:  Yes.  One second.

21      (Pause)

22  BY MR. COHEN:

23  Q    Mr. Watson, you testified that during the two months that

24  Tom Prendergast was your -- was the plant manager, you had

25  absolutely no conversation with him at all?  Is that your

1 testimony?

2 A     Not at all.

3 Q     That the only time you spoke with him was when he laid you

4 off?

5 A     Exactly.

6 Q     And --

7 A     Or if I had to, you know, ask him hey, Tom, I need to

8 leave early today.  I got a doctor's appointment.  Okay, Brian.

9 And that's it.

10 Q     So in reality, you did have a conversation with Mr.

11 Prendergast when you said you needed to leave early or

12 that -- when you called out for some reason; isn't that right?

13 A     Not on the call-outs, but if I had to leave early, yes.

14 Q     So you did speak to him then?

15 A     Yes, professionally.

16 Q     Right.  And when you were advised that you were laid off,

17 you actually reacted in anger and you dropped -- you said a

18 curse word; did you not?

19 A     Yes, I do -- yes, I did.  You want to hear what I said?

20 Q     No.  No, I don't, actually.  Mr. Watson, when you were

21 advised that you were being laid off, you never said to Tom

22 Prendergast or to Bill Lloyd can you put me in another

23 department within the plant, did you?  You just got angry and

24 just -- and made a scene; isn't that right?

25 A     No.

1  Q    No?

2  A    There was no opportunity to ask for no other -- no job

3  that you already had, you know, because it was the way the guy

4  came to me, Your Honor.  And it was the way it was done, you

5  know.  It was done nasty, man.  You know what I mean?

6  Degrading, you know.  It was done disrespectfully, you know.

7  You don't kiss nobody's butt when they being disrespectful to

8  you.  If somebody's disrespectful, you're going to definitely

9  be offensive.

10 Q    So -- Mr. Watson, so you're telling us that there is a

11 kind and gentle way to lay somebody off and you didn't feel

12 that you got that; is that right?

13 A    Yes, it is a kind and gentle way to tell somebody they

14 laid off.

15 Q    So if they had laid you off in a kind and gentle way, you

16 would have been fine with that and you would have had no

17 issues; is that right?

18 A    Absolutely.  I just got finished telling you that.

19 Q    Okay.  So you're more upset about the way you were laid

20 off than the fact you were laid off; is that right?

21 A    No.  It was -- it just -- it's the way this guy said it.

22 It's the way it came about, unprofessionally, one-sided, narrow

23 minded, disrespectful, unexpected.

24 Q    Can you -- other than what you've testified to, can you

25 tell the jury what was said to you that was so disrespectful?

1

2  A    Tom said to me I'm laying you off.  And I said why.  He

3  said because I can.  And I said a curse word back to him.  You

4  know what I mean?  I told him to get the F out of here.  And

5  then I went to the supervise -- to the owner, Billy Lloyd.  And

6  I asked Bill Lloyd.  I say can this guy lay me off like that?

7  And Billy Lloyd got offensive.  Yeah.  Take the layoff, all

8  right?  And because, you know, he's the owner.  And I just left

9  peacefully.  When I wanted to, you know, really get violent in

10 my mind, but I didn't, because I would -- that'll cause

11 assault, you know, and everything else, you know.  And being as

12 though I'm black, I'm already messed up.  You know what I mean?

13 So I left.  I ain't have no win, and that was it.

14 Q    Hence, the extent of the interaction that led you to

15 believe that you were being treated wrongly by Lloyd

16 Industries; is that correct?

17 A    Absolutely.

18 Q    And at no time during the course of your employment at

19 Lloyd Industries did anybody ever make a comment about your

20 race or about your background, correct?

21 A    Well, no, not directly.  No, they didn't do that.  No,

22 they didn't.

23 Q    Nobody said anything.  In other words, you weren't treated

24 poorly because of your race.  You just felt that they just

25 didn't handle it the way you would have liked, correct?

 1            THE COURT:  Now wait a minute.  That's -- just

 2  rephrase.  That's a --

 3            MR. COHEN:  Sure.

 4            THE COURT:  -- multiple question.

 5            MR. COHEN:  Let me ask this question.  I'll rephrase.

 6  BY MR. COHEN:

 7  Q    Mr. Watson, during the course of your employment at Lloyd

 8  Industries, nobody made any racial comments to you, did they?

 9            THE COURT:  Well, just rephrase.  Say did anybody, so

10  it's not a negative.

11            MR. COHEN:  Okay.

12  BY MR. COHEN:

13  Q    Did anybody make a racial comment to you during the course

14  of your employment at Lloyd Industries?

15  A    No.

16  Q    You mentioned Shawn Broadnax a number of times in your

17  testimony.  Is Shawn Broadnax here to testify on your behalf?

18  A    No, he's not.

19  Q    Okay.  You heard the testimony of Shawn Mathis; did you

20  not?

21  A     Yes.

22  Q    He said that you were friendly and friends during the

23  course of your employment at Lloyd Industries; isn't that

24  correct?

25  A     Yes.

1  Q    Okay.  You filed a complaint with the Pennsylvania Human

2  Relations Commission, correct?

3  A    Yes, I did.

4  Q    And you filed a complaint in this case, correct?

5  A    Yes.

6  Q    And in that -- in both of those complaints, you referenced

7  that your work was satisfactory, correct?

8  A    Yes, it was.

9  Q    Do you have anything in writing that -- or any witnesses

10 that are -- that would come forward in this case to describe

11 your work as satisfactory besides yourself?

12 A    Well, Billy Lloyd he's the witness.  He the owner.  He

13 wouldn't hire -- I wouldn't be here for 11 months if I wasn't a

14 satisfactory worker.

15 Q    Mr. Watson, you heard Mr. Lloyd's testimony; did you not?

16 A    Well, of course, he going say that.

17 Q    Well, again, is there anyone other than yourself who can

18 describe your work as satisfactory?  I mean certainly, Mr.

19 Mathis didn't comment on it, because he wouldn't --

20          THE COURT:  Well, now you're -- you asked one

21 question and you started another one.

22          MR. COHEN:  Sure.

23 BY MR. COHEN:

24 Q    Do you have anybody other than yourself that will describe

25 your work as satisfactory, sir?

1  A    My wife.

2  Q    Your wife?

3  A    Yes.

4  Q    Did your wife work with you at the job?

5  A    No.  She know my skills.

6  Q    And she happens to be your wife, correct?

7  A    That's right.

8  Q    Okay.  Mr. Watson, you've come before this jury and you've

9  said that there was a period of many months, from essentially

10 October 29, 2015 until April 8, 2018, where you were not

11 employed; isn't that correct?

12 A    Yes.

13 Q    And at your deposition I asked you can you provide me with

14 any documentation to show me what you did to seek employment

15 during that lengthy period of time.  Do you recall that?

16         MR. DION:  Objection, Your Honor.  He asked him for

17 papers at his deposition?

18         THE COURT:  Are you objecting?

19         MR. DION:  I'm objecting because he's getting into

20 discovery question here.  He didn't ask what paper he received.

21 He asked --

22         THE COURT:  Rephrase the question as to something --

23         MR. COHEN:  Let me rephrase.

24         THE COURT:  -- something that's in his personal

25 possession.

BY MR. COHEN:

Q    Mr. Watson, during the course of the litigation of this case, had you produced for my office any documents to show that efforts you made to secure employment during the period of October 29, 2015, and April 8, 2018, sir?

A    No, I didn't.

Q    Okay.  You testified that you earned $3500 during that time period; is that correct?

A    Yes, I did.

Q    And can you give me a reason why you only earned $3500 during that time frame?

A    Working for low amounts of money.

Q    Okay.  You weren't disabled during that time period, were you?

A    Not at all.

Q    And you worked as home remodeling -- you've had your own business.  Can you tell me why you didn't seek work in that area that you have expertise in?

A    I did seek work in that area.  It wasn't available.

Q    Okay.  You describe your work at Lloyd Industries as excellent, proficient, safe, the best that it can be.  Is that your testimony?

A    Sounds like me.

Q    Okay.  And again, when you were laid off from Lloyd Industries, you were never told why you were laid off and that

1  was upsetting to you?

2  A     That was extremely upsetting.

3  Q     Okay.  And if Lloyd -- if Lloyd Industries was having a

4  slowdown in work and didn't have the demand for the product

5  from your department, you would disagree with that?

6  A     I wouldn't have no say so in that, sir.  If it slows down,

7  I would have no say so.  I'm not the business part of the

8  company.

9  Q     Okay. So you would have no information to challenge a

10  business decision made by Lloyd Industries that you and others

11  needed to be laid off at a time when business was slow,

12  correct?

13            THE COURT:  No, that's --

14            THE WITNESS:   Correct.

15            THE COURT:  All right.  Go ahead.

16  BY MR. COHEN:

17  Q     In your complaint, you're claiming emotional distress,

18  physical problems related to the fact that you had lost your

19  job; isn't that correct?

20  A     Absolutely.

21  Q     And did you have any doctor's records or any medical that

22  you can produce for the Court showing that you sought treatment

23  to address these problems?

24  A     I did a lot of praying.  I did a lot of praying.  That's

25  it.  That's the only thing that got me through this, prayer,

1 confidence in myself, and just keep pushing.

2 Q    But you didn't go see a doctor or anything?

3 A    Not at all.

4 Q    Okay.  As a result of your complaint filed with the

5 Pennsylvania Human Relations Commission, were you provided any

6 kind of relief in terms of your claim?

7 A    I guess they just told me they did the best that they

8 could.  Seek an attorney.  And they was very professional in

9 helping me to the best of their ability.

10 Q    And that was the extent of the advice and direction they

11 gave you, correct?

12 A    Right, because they said they couldn't go no further.

13 Q    Okay.

14 A    They said Billy Lloyd wasn't going to come to the Court

15 anyway.  That's why they stopped, because they couldn't make

16 him come to the Court.  So they said get an attorney and take

17 it from there.

18 Q    Okay.  And with respect to the job you held as a punch

19 press operator at Lloyd Industries, you're not aware of anybody

20 else taking your position, are you?

21 A    I am aware of who took my position and when.

22 Q    Okay.  So you're saying today that you have knowledge

23 about someone who took your position --

24 A    I know exactly who --

25 Q    Okay.

1  A   -- took my position.

2          MR. COHEN:  May I approach the witness with his

3  depositions, Your Honor?

4          THE COURT:  Go ahead.

5          Ask -- wait till the question is over.

6          You're -- that completes your cross?

7          MR. COHEN:  No.  I'm going to -- I have his

8  deposition transcript.

9          THE COURT:  All right.  Go ahead.

10          MR. COHEN:  I want to just review it with him if I

11  may, Your Honor.

12          THE COURT:  Go ahead.  About how much longer will you

13  be?

14          MR. COHEN:  This is it.

15          THE COURT:  Okay.

16  BY MR. COHEN:

17  Q   Mr. Watson, I'm going to refer you to page 86, line 1 to

18  3.  I'll read the question.   Do you recall giving a deposition

19  at your attorney's office on April 13, 2018?

20  A   Okay.

21  Q   Do you --

22  A   Say that again, sir.

23  Q   Do you recall giving a deposition at your lawyer's office

24  in Philadelphia on April 13, 2018?

25  A   Yes.

1  Q    Okay.  And in the deposition, I asked you -- let me go to

2  the question.  The question is at the top -- at the bottom of

3  85.  My question was:

4         Is it your testimony that someone was hired at Lloyd

5  Industries to replace you when you were dismissed from your

6  job?

7         And I'm going to read your answer, okay?  And your

8  answer is:  I don't know how they handled that, actually.  I

9  wouldn't know who they put in my position except that I believe

10 the word I got is Tom.  They took Tom.

11        Okay.  Is that your testimony, that you believe Tom

12 took your position, but you're not certain?

13 A    Tom did take my position.

14 Q    How do you know that, sir?

15 A    Well, a couple people told me.

16 Q    Okay.  Who are those people?

17 A    A couple friends I had there.  I think it was Shawn.  A

18 couple guys.  I forgot their names.  Spanish guy told me that

19 Tom -- because they said they fired all the blacks.

20 Q    With regard to your department where you worked, would you

21 do the punch press work and then Shawn Broadnax would do the

22 assembly?  Is that how it worked?

23 A    Well, I did punch press.  Shawn didn't -- he didn't do it.

24 He just stayed in assembly.  I would go over to his area and

25 work.

1  Q   Okay.  But you provided him with the material that he

2  would use to do the assembly, correct?

3  A   Yes, I did.  I did.  I supplied some parts.  Yes.  They're

4  called -- it looked like the back of a lock.  I forgot.  Some

5  kind of -- I forgot the part.  Yes, I did supply the parts to

6  him though.

7  Q   So when you were laid off from your job with regard to the

8  punch press work, that would affect his employment, because he

9  wouldn't have the parts to put together, correct?

10  A   I really don't know the answer to that, because when they

11  laid me off, my department is still running.  It's still

12  running.  They just put somebody in my position and still

13  running the department.

14  Q   And you testified earlier that the assembly work that was

15  done at Lloyd Industries was very simple.  Anybody could pretty

16  much do it.  Is that your testimony?

17  A   That's right.

18  Q   It didn't take a whole lot of experience or knowledge?

19  A   No.  They show you right there on the spot.

20  Q   And it's your testimony that in the department that you

21  were working you had seniority?

22  A   Yes, I did.

23  Q   Okay.  And you had seniority over Shawn Broadnax?  Is that

24  the one?

25  A   No.  He had more seniority than me.

1    Q    So who did you have more seniority over, sir?

2    A    Anybody that brought to the -- they brought to the

3    department to work, because I had to show them what to do.

4    Q    But you worked in a small department within Lloyd

5    Industries; isn't that correct?  There were just a few

6    employees?

7    A    Right.

8    Q    Okay.  And I'm asking you who in that department did you

9    have seniority over?

10   A    Well, like I said, I took that as being as though I'm

11   working in that area and I know what's going on in that area,

12   whoever comes over there, I got seniority on them, like Steve

13   Malloy, for instance.  When he came over, he had to be showed

14   what to do, because he didn't know what to do and he just

15   started.  That's who had -- I had more seniority than.

16   Q    But Steve Malloy did not work in your department, did he?

17   A    Yes, he did sometimes.

18   Q    But he was -- he floated; isn't that correct?

19   A    Right.  Anybody that coming in my department is floating

20   if they working beside me.  Every day somebody had to come

21   over, every single day, because it's so much work coming out.

22   You had to have like two machines working, my press and another

23   press, make AD ramps or making the teardrops, or me, I'm making

24   hinges or I'm making knots, or I'm putting up elliptical pins

25   with teardrops on them.  Whatever we needed today I would be

1  doing it.  And my department was the heart of it.  It's the

2  replenishing of everything that's got to be done.  If my

3  department don't run, his business is shut down.  That's the

4  heard of it.  You know like you got a heart in your body.  If

5  your heart is out your body, everything is dead.  So that

6  department never slows down.

7  Q    So your testimony is you know Mr. Lloyd -- or the Lloyd

8  Industries business better than Mr. Lloyd afer 11 months?

9  A    I didn't say that.

10          THE COURT:  Wait.  Wait.  Just a minute.

11          MR. COHEN:  I withdraw the question.

12          THE WITNESS:  I didn't say that.

13          THE COURT:  Just a minute.  That's argumentative.

14          MR. COHEN:  I understand.

15          THE COURT:  Strike --

16          MR. COHEN:  One --

17          THE COURT:  Just strike the question and the answer.

18  Next one.

19          MR. COHEN:  One last question.

20          THE COURT:  Yes.

21  BY MR. COHEN:

22  Q    So you would disagree with the business decision made by

23  Lloyd Industries to lay off you and others in your department

24  based on a reduction of work, and the fact that they were

25  getting parts from China as testified by Mr. Lloyd?  You

1 disagree with that?

2 A    Absolutely.

3 Q    Thank you.

4          THE COURT:  All right.  Mr. Dion, how much redirect

5 do you have?

6          MR. DION:  Just a -- just brief, Judge.

7          THE COURT:  All right.  Go ahead.

8          Ladies and gentlemen, we're going to take a mid-

9 afternoon break, but I'd like to finish this witness, if you

10 can hang on.

11         Okay.  Go ahead.

12         MR. DION:  Okay.

13                    REDIRECT EXAMINATION

14 BY MR. DION:

15 Q    So, Ron, this person Tom, is that the same person that Mr.

16 Braker mentioned when you spoke to him, is that you?  You heard

17 Mr. Braker's testimony, right?  He said something about that he

18 spoke to someone named Tom, but wasn't Tom Prendergast?

19 A    You're talking about the other Tom then.

20 Q    Yes.

21 A    That's the one that -- that took my position.

22 Q    Right.  Okay.  So the Tom that never actually worked in

23 your -- in your department until after you left, right?

24 A    He would come over once in a while, you know, because Tom

25 was a nice person.  He would come over because they had those

1 four or five presses over there.  About five -- four, five,

2 six, right.  Like I said I had to be on one constantly, and

3 then other parts would have to be made.  So he would come over

4 and stick the two pins in, and do -- you call it AD ramps

5 (Phonetic), they real easy, it's real easy to do.  You just

6 have to make sure you're paying attention so you don't lose

7 your fingers.

8 Q    All right.

9 A    He -- he -- he would come over and do that.

10 Q    Right, he worked part in shipping and receiving?

11 A    Yeah, mostly -- mostly -- most of the time he worked in

12 shipping and receiving, that was -- that was his -- that was

13 his main function, because he was good at, look like carpentry,

14 look like carpentry work because you got to box up the material

15 that they send out professionally, so it won't get damaged in

16 shipping.

17 Q    Okay.  And just briefly, can you just explain to the jury

18 the efforts that you made to find new work while you were --

19 during that two and a half year period that you were

20 unemployed?

21 A    I looked on the internet, I go to the 7-11, it's in

22 Montgomery County, on Street Road.  And I always gets the Bucks

23 County Courier Times, that's where all the jobs is at.  And

24 that paper have all the listings of any type job that you

25 qualify for, and that's how I got my jobs.  Also, you know,

1  people, relatives, friends, you know, you hiring, you know

2  where I can get some income from, you know what I mean.  And

3  that's how -- that's how I sold myself, you know what I mean.

4  And the internet, ND, and even though there's a lot of jobs out

5  there, because you apply for them that don't mean you going to

6  get them.  You know you just got to keep on pushing, keep your

7  head up, stay positive no matter how many doors close, and

8  that's how I pursue my life.

9  Q    And is that how you found the job with -- can you describe

10 how you found the job with Generations?

11 A    This -- I did Generation that was this thing where he had

12 an ad on the internet, or ND, as a die setter operator.  A die

13 setter is somebody that sets the dies -- sets dies in these

14 machines that manufacture parts.  And it's -- it's -- it

15 manufactures a part, it stamps the name in it, or stamps a

16 number in it, and that's what the guy wanted.

17         So what I did, once I seen this -- once I looked it

18 up on the computer, I seen the phone number, I called the guy

19 up, I say, how you doing.  I told him who I was.  I said I got

20 experience at doing this.  He said, great, can you come out

21 tomorrow?  I said yes.  He said, we closed on Fridays, so come

22 out tomorrow.  I said, all right, so this was on a Thursday.  I

23 went out there Friday morning, and the shop was closed.  When I

24 went out there and I talked to him, his name is Mike.  And he

25 walked me around the shop, he got like 60 -- 60 different

1 presses, all different tonnage from 125 ton, 90, 60, 30 ton

2 presses, right.  Even miniature, well, he got presses down

3 there that -- anyway, so he said, you familiar with these

4 machines?  I say yeah.  He said you can set one up and you can

5 break one down, and you can operate it?  I said yeah.  He said,

6 well, when can you start?  Can you start Monday?  I said yeah.

7 He said, all right, come on in Monday.  So I started Monday,

8 and I've been there ever since.

9 Q    Thank you.

10           THE COURT:  Any recross?

11           MR. COHEN:  Thank you.

12                   RECROSS EXAMINATION

13 BY MR. COHEN:

14 Q    Mr. Watson, you filed this lawsuit on March 24th, 2017,

15 isn't that correct?  I have the lawsuit in front of me so I'm

16 reading from.

17 A    For -- for now, I --

18 Q    For this case.

19 A    Yes.

20 Q    And in that lawsuit you are alleging certain damages that

21 you want this jury to award you, correct?

22 A    Yes.

23 Q    And when you applied for work, you typically do something

24 like you did for Lloyd Industries, like an application for

25 employment whether online or in person, correct?

1  A    Yes.

2  Q    You have produced absolutely zero applications for jobs

3  during the two and a half years --

4             THE COURT:  Well, I thought he -- you already asked

5  him about that, on cross.

6             MR. COHEN:  Well, he's -- I know that.

7             THE COURT:  Didn't you?  He said he didn't have any

8  documentation.

9  BY MR. COHEN:

10  Q    And you have no documentation?

11  A    No, sir.

12  Q    Thank you.

13             THE COURT:  Okay.  All right.

14             That concludes the testimony of Mr. Watson.  Ladies

15  and gentlemen, we're going to take a mid-afternoon break now

16  for about 10 minutes.  Please keep an open mind and we'll

17  resume and we'll adjourn no later than 4:30.  thank you.

18             (The jury exited the courtroom.)

19             THE COURT:  Okay.  All right.  Who's the next

20  witness, Mr. Dion?

21             MR. DION:  Zenetta Ruffin, and then that's it.

22             THE COURT:  Is she your -- is she your last witness?

23             MR. DION:  Yes.

24             THE COURT:  All right.  How long will her direct be?

25             MR. DION:  Ten minutes.

1          THE COURT:  All right.  So than you're going to rest?

2          MR. DION:  Yes.

3          THE COURT:  Okay.  And then, Mr. Cohen, I'll allow

4    you to --

5          MR. COHEN:  It would be -- it would be wonderful if I

6    could put Tom Prendergast on.  I'll be 15 minutes with him.

7          THE COURT:  All right.

8          MR. COHEN:  I'll make it really so we can get him

9    done.

10          THE COURT:  Well, I'll tell you what, you can -- how

11   many other witnesses do you have?

12          MR. COHEN:  I have Tom --

13          THE COURT:  Besides Mr. Prendergast.

14          MR. COHEN:  William Lloyd.  Again, we -- we don't

15   have a -- you know, it'll be -- he'll be 15 minutes, maybe.

16          THE COURT:  Well -- you mean something you didn't

17   bring out this morning?

18          MR. COHEN:  I'm sorry.

19          THE COURT:  You're going to recall Mr. Lloyd for

20   testimony you didn't bring out this morning?

21          MR. COHEN:  Just a handful of questions about the

22   safe business practices.

23          THE COURT:  All right.  Well -- all right.  So do you

24   want to do that this afternoon if there's time?

25          MR. COHEN:  Whatever -- whatever pleases the Court, I

1  will do whatever.

2  THE COURT:  All right.  Do you have any rebuttal?

3  MR. DION:  I may, Your Honor.  I may have some

4  rebuttal.

5  THE COURT:  All right.  Well, it sounds like we're

6  going to have arguments and charge tomorrow morning.  All

7  right.

8  MR. DION:  Yes.

9  THE COURT:  All right.  Let me just think out loud.

10  I want to give you a chance to put any Rule 50 motions on the

11  record.  Do you want to do that now, even -- what's an offer of

12  proof for Mrs. Watson?

13  MR. DION:  Well, we established the case here, we

14  showed statistical evidence of --

15  THE COURT:  No.  What's she going to testify to?

16  MR. DION:  Oh.  Who?

17  THE COURT:  Mrs. Watson.

18  MR. COHEN:  The wife.

19  MR. DION:  Okay.  Zenetta is going to be coming in to

20  testify to a -- to damages and also about the alcohol.

21  THE COURT:  Okay.  All right.  So, Mr. Cohen, I'm

22  going to ask you to make your Rule 50 motion right now.  You

23  can state the grounds, but I don't want any argument.

24  MR. COHEN:  Well, you said the -- you know --

25  THE COURT:  I mean, now you know what the wife is

1  going to say, that's the last witness.

2         MR. COHEN:  Move for a -- a -- a --

3         THE COURT:  Keep your -- pull the microphone closer;

4  keep your voice up.

5         MR. COHEN:  At this time the defendant would move for

6  a motion on, you know, a direct verdict, that plaintiff has not

7  met the burden of proof to establish any racial motivation for

8  the dismissal of Mr. Watson.  There's been -- not met the

9  burden of proof here.

10        THE COURT:  All right.  I'll hold it under

11 advisement.  Okay.  All right.  And I'll be back in five

12 minutes, and we'll get going.  So have Mrs. Watson in the

13 courtroom, then you'll rest, and then you can admit your

14 exhibits.  But whatever has been shown to the jury is admitted

15 without objection.  Okay.

16        MR. COHEN:  Okay.

17        THE COURT:  And then you will put on Mr. Prendergast,

18 and at this time we'll put on --

19        MR. COHEN:  Okay.

20        THE COURT:  -- Mr. Lloyd back on the stand.

21        MR. COHEN:  Okay.

22        THE COURT:  Okay?

23        MR. COHEN:  Thank you, Your Honor.

24        THE COURT:  All right.  Thank you.

25        MR. DION:  Thank you.

1          THE COURT:  Then I -- but then I'm going to have some

2     legal questions for plaintiff about how you want to charge the

3     jury, whether you want to limit it to a charge of intentional

4     discrimination, which is basically what your points for charge

5     are, or whether you want any evidence on the so called

6     McDonnell Douglas shifting burden, which you did not submit any

7     points for charge on.  Okay.  So we'll discuss that at the --

8     at the conclusion of the testimony.  All right.  Thank you.

9          MR. DION:  Thank you, Your Honor.

10          MR. COHEN:  Thank you, Your Honor.

11      (Recess from 3:10 to 3:23 p.m.)

12          THE COURT:  Okay.  All right.  Look, I stand

13     corrected on what I just said.  In looking at your new joint

14     proposed jury charge, you definitely do want the McDonnell

15     Douglas shifting burden.  So that's how we'll charge.

16          MR. DION:  Yeah, that's --

17          THE COURT:  Okay.  All right.  Let's bring the jury

18     in.  Where's the witness?  Mrs. --

19          MR. DION:  I'll get her.

20          MR. COHEN:  And, Your Honor, we do have the proposed

21     burden form here.

22          THE COURT:  All right.  Do you want to hand that up

23     too, please?

24          MR. DION:  Yeah.  We only have one copy, is this

25     okay?  Can we --

1          THE COURT:  We'll make some --

2          MR. DION:  -- we can print them out tonight.

3          THE COURT:  -- we'll make some copies.

4          MR. COHEN:  Okay.

5          THE COURT:  All right.  Bring in Mrs. Watson, please.

6          Mr. Dion, where's Mrs. Watson?

7          MR. DION:  Yeah, her name -- I'm sorry, Your Honor --

8          THE COURT:  Well, go get her.

9          MR. DION:  -- we need to get her up.

10          THE COURT:  Bring her inside, please.

11          MR. DION:  Okay.

12     (The jury entered the courtroom.)

13          THE COURT:  All right.  Come up here, Mrs. Watson,

14 please.  Okay.

15          All right ladies and gentleman, I understand the

16 plaintiff has one more witness, it's Mrs. Watson, who's now

17 taking the stand.

18          ZENETTA RUFFIN, PLAINTIFF'S WITNESS, SWORN

19          THE WITNESS:  Yes.

20          THE COURT DEPUTY:  Can you state your full name and

21 spell your last name for the record?

22          THE WITNESS:  Zenetta Ruffin, R-U-F-F-I-N.

23          THE COURT:  All right.  Please have a seat, please.

24                    DIRECT EXAMINATION

25 BY MR. DION:

1 Q    Thanks, Zenetta.  How old are you, ma'am?

2 A    Fifty-six.

3 Q    And you don't have the same last name as Mr. Watson,

4 correct?

5 A    No.

6 Q    All right.  Can you just -- you call yourself his wife,

7 were you actually formally married?

8 A    No.

9 Q    Okay.  Like how long have you been together with him?

10 A    Forty years.

11 Q    And that's nonstop, you never separated or anything?

12 A    Only separate when he was in the military.

13 Q    Okay.  So -- so you've known him since before the military

14 as well?

15 A    Yes.

16 Q    And where are you presently living?  I'm sorry -- do

17 you --

18 A    With Ronald.

19 Q    -- live -- you live with Mr. Watson?

20 A    Yes.

21 Q    I'm sorry, where do you presently work?

22 A    At a hospital, University of Penn.

23 Q    Okay.  And what is your job there?

24 A    Registered nurse.

25            THE COURT:  Keep your voice up, please, or talk

1  closer to --

2  BY MR. DION:

3  A     Registered nurse.

4  Q     Okay.  And how long have you been employed at the hospital

5  University of Pennsylvania?

6  A     Since 2012.

7  Q     And were you employed anywhere before that as a registered

8  nurse?

9  A     Yes, Thomas Jefferson University Hospital.

10  Q     And how long were you employed -- employed there before

11  that?

12  A     About 15 years.

13  Q     Okay.  So how long have you been a registered nurse?

14  A     Eighteen years.

15  Q     Now, so you see Mr. Watson every day, correct?

16  A     Yes.

17  Q     And you talk to him and interact with him every day?

18  A     Yes.

19  Q     And back -- if I can ask you to just think back to when

20  you lived with him in 2014 and 2015, those years.  Did he

21  partake in alcohol at all during that time period?

22  A     Socially.

23  Q     Did you ever know him to -- to come home from work

24  smelling of alcohol?

25  A     No.

1  Q    And, yeah, maybe you can just explain to the jury a little

2  clearer about anything -- him with alcohol.  Can you just

3  explain that to them, was there any --

4          MR. COHEN:  I'm going to object here, form of the

5  question, I'm not sure what he's asking, Your Honor.

6          THE COURT:  Do you understand the question?

7          THE WITNESS:  Not really, I don't, no.  I'm sorry.

8  BY MR. DION:

9  Q    Okay.  So just explain to the jury when you say he's a

10 social drinker what do you mean by that, and how often would he

11 partake in alcohol?

12 A    Well, at home, dinner, social events, parties.

13 Q    Okay.  And what type of things does he drink?

14 A    Beer, wine.

15 Q    And have you ever known him to be drunk in the morning,

16 or?

17 A    No.

18 Q    And he never comes home from work intoxicated or anything

19 like that?

20 A    No.

21 Q    Okay.  And has he -- does he drink more than -- does he

22 drink enough to get himself intoxicated or anything?

23 A    No.

24 Q    So if someone told you that he would leave work every day,

25 go to lunch and come back smelling of alcohol, would you

1 believe that?

2 A    No.

3 Q    Now, do you consider him a responsible person?

4 A    Yes.

5 Q    And during the time period I just described 2014, 2015,

6 can -- well, I'm sorry.  After he -- do you remember the date

7 he was terminated from employment, correct?

8 A    Yes.

9 Q    All right.  Do you know approximately when that was?

10 A    The end of October, I believe 29th.

11 Q    Twenty?

12 A    Ninth of October.

13 Q    Twenty ninth of October, what year?

14 A    2015.

15 Q    Okay.  And since -- from that time forward did you -- well

16 after he was terminated did you notice his mood?

17 A    Yes.

18 Q    And can you describe what -- what he was like at that

19 time?

20 A    Well, he was upset about the termination.  He didn't

21 understand why he was terminated; it just came abruptly.  And

22 he was sad, he felt disrespectful -- disrespected, and it was a

23 bad time for him.

24 Q    And before he was fired, when he was working at Lloyd

25 Industries, how -- what was his mood at that time?

1  A    It was good, he -- he enjoyed -- he liked the job, he

2  liked the work he was doing.  There was no complaints from him.

3  Q    And -- so how long did it take him to find new work to

4  your recollection?

5  A    Full-time or part -- part, probably took three years.

6  Q    And what was it like during this time period, can you

7  explain to the jury what it was like?

8  A    Well, it was difficult.  Well, we had just purchased a

9  home about five months before that, and we had to rearrange

10 everything to compensate for the job loss.

11 Q    And how was -- what was Mr. Watson's mood during the time

12 period that he was unemployed?

13 A    He was sad, he was sad, depressed, the whole household,

14 the mood was difficult during that time.

15 Q    Can you just -- can you think of any particular thing that

16 occurred that would demonstrate how upset he was during that

17 time period?

18 A    I don't understand, let me think -- I don't understand the

19 question, I'm sorry.

20 Q    Well, can you -- well, before he was terminated you said

21 that he was -- how about we do it this way.  What -- what is

22 the -- what was the difference between before he was terminated

23 and after he was terminated, in terms of his mood?

24 A    Totally different, I mean he -- his -- his mood was

25 different, he was sad, like I said, he was depressed.  It was

1  difficult for us financially because like I said we just bought

2  the home, and we had to readjust a lot of things to compensate

3  for the loss of income.

4  Q    Okay.  Now did this last until the time that he got his

5  new job with Generation Metal?

6  A    It wasn't as bad -- it was not as bad if it was -- you

7  know, it lessens up, but it still was there, you know.  For him

8  have to -- by him having such a difficult time finding

9  employment after he lost the job.

10 Q    Okay.  And what did you do to get by during the time

11 period when you were -- when he was unemployed.

12 A    Well, we had to cut out some things, some expenses that we

13 had.  And I had to pick up extra shifts to compensate.

14 Q    Oh, you did?

15 A    Yes.

16 Q    And did you -- did that have any affect on his mood, did

17 -- what was his reaction to you having to work all these extra

18 shifts?

19 A    Well, he didn't like it, he just felt like he wasn't doing

20 his fair share by me working extra time, I worked 12 hour

21 shifts, during that I had to do an additional like 12 or maybe

22 additional 24.

23 Q    Okay.  All right.  Thank you very much.

24 A    Thank you.

25           THE COURT:  All right.  Cross examine.

1          MR. COHEN:  Thank you, Your Honor.

2                    CROSS EXAMINATION

3  BY MR. COHEN:

4  Q    Good afternoon, Ms. Ruffin.  My name is Keith Cohen, I

5  represent Lloyd Industries with regard to the claim brought by

6  Ronald Watson.  I have a few questions for you.  You've been n

7  living with Ron Watson for four years, is that correct?

8  A    Forty years.

9          THE COURT:  Forty.

10 BY MR. COHEN:

11 Q    Forty --

12          THE COURT:  Forty, 4-0.

13 BY MR. COHEN:

14 Q    Four zero, 40 years?

15 A    Yes.

16 Q    I'm just making sure I heard you right.

17 A    Uh-huh.

18 Q    You -- you're not legally married?  In other words you

19 don't have a marriage certificate, correct?

20 A    No.

21          THE COURT:  That's not relevant, next question.

22 BY MR. COHEN:

23 Q    Ms. Ruffin, you testified that Ron drinks socially, is

24 that correct?

25 A    Yes.

1  Q    And is it your testimony that you've never smelled alcohol

2  on his breath at any time?

3  A    Not -- well, the question was when he come home, but, no,

4  I didn't.  I mean, if we're out socially, of course, I'm going

5  to smell alcohol --

6  Q    Okay.

7  A    -- if he's drinking socially.

8  Q    All right.  So you have smelled alcohol on his breath,

9  correct, at some point in your relationship.

10  A    Yes.

11  Q    Okay.  And, you know, you -- you've never in your 40 years

12  with Mr. Watson observed him in -- well, intoxicated to any --

13  any level, is that your testimony?

14  A    No.

15  Q    Never.  Okay.  Isn't it true that if the jury were to

16  reward a significant amount of money to Ron, it would have a

17  positive impact on your life and on your family?

18  A    Yes.

19  Q    Okay.  This layoff on -- came as a shock to Ron, correct?

20  A    And to me, yes.

21  Q    And to you as well, and I'm sorry for that, and it created

22  a lot of stress in your household financially, you had bought a

23  house; isn't that correct?

24  A    Yes.

25  Q    And did it make -- it made things difficult for your

1  family?

2  A     Yes.

3  Q     Did Ron ever during the course of that time talk to you

4  about him being treated unfairly, other than this layoff?  Did

5  he ever come home and say, oh, they treat me lousy there,

6  before he was laid off?

7  A     Well, he was -- he -- he explained to me that someone was

8  fired, one of the managers, and he didn't -- he liked that

9  person, but that's basically -- that's all I remember.

10 Q     My question to you was, prior to Ron being laid off, Mr.

11 Watson being laid off at Lloyd Industries, did he ever come

12 home and say to you, boy, they're really treating me poorly

13 there because of my skin color?

14 A     No.

15 Q     Did he ever come home and say that anybody said some

16 racially insensitive words to him while he was there?

17 A     Well, he said he felt it wasn't racial, he felt

18 uncomfortable, it wasn't like racial, he said he felt

19 uncomfortable with the new person that was hired, the new

20 manager, or supervisor.

21 Q     He felt uncomfortable with the new plant manager, is that

22 what you are saying?

23 A     Yes.

24 Q     But he didn't feel uncomfortable based on his race,

25 correct?

1  A    He didn't say race, he said he was --

2  Q    Okay.

3  A    -- he felt uncomfortable.

4  Q    Thank you, that's all I have.

5  A    Uh-huh.

6           THE COURT:  Any redirect?

7           MR. DION:  No, Your Honor.

8           THE COURT:  All right.  Thank you, very much.  You

9  may step down.

10          All right.  Now, Ms. -- ma'am, you can sit in the

11 courtroom now if you want.

12          All right.  Do you have any other witnesses, Mr.

13 Dion?

14          MR. DION:  No, Your Honor, with that we're going to

15 introduce the exhibits, put the exhibits in evidence that we

16 already agreed to, and plaintiff closes its case.

17          (Plaintiff's Exhibits received into Evidence)

18          THE COURT:  Okay.  So, ladies and gentlemen, the

19 plaintiff has now completed -- presented their testimony.  Now,

20 you recall you earlier heard the Defense counsel, Mr. Cohen's

21 opening, so it's now Mr. Cohen's turn to put on witnesses.

22          Go ahead.

23          MR. COHEN:  Thank you, Your Honor.

24          At this time the defendant would call Tom

25 Prendergast, he's outside, I'll get him.

1          THE COURT:  All right.  Go get him, please.  All

2    right.  Come up here please, sir.

3              THOMAS PRENDERGAST, DEFENSE WITNESS, SWORN

4          THE WITNESS:  I do.

5          THE COURT DEPUTY:  Can you please state your full

6    name and spell your last name?

7          THE WITNESS:  Thomas Allen (Phonetic) Prendergast, P-

8    R-E-N-D-E-R-G-A-S-T.

9          THE COURT:  All right.  Have a seat please.  Keep

10   your voice up.

11         Go ahead, Mr. Cohen.

12         MR. COHEN:  Thank you, Your Honor.

13                      DIRECT EXAMINATION

14   BY MR. COHEN:

15   Q    Good afternoon, Mr. Prendergast, how you doing today?

16   A    Good.

17   Q    Okay.  And could you tell me by whom you're employed?

18   A    I am employed by Lloyd Industries.

19   Q    And what is your job, sir?

20         THE COURT:  Can you pull closer -- move closer to the

21   mike and keep your voice up.

22   BY MR. COHEN:

23   Q    What is your position?

24   A    I'm the plant manager.

25   Q    And what do you do as a plant manager?

1 A    I run the facility, I purchase materials, and make sure

2 the work gets out the door.  I make sure the people are working

3 the right way, I make sure they've got all the PP&E available

4 to them, and make sure the environment is safe.

5 Q    How long have held that position?

6 A    I've been there three years.

7 Q    Do you know your start date?

8 A    Yeah, June 8th, 2015.

9 Q    Okay.  And Thomas, what is Lloyd Industries?

10 A    Lloyd Industries is an HVAC supplier, that's heating,

11 ventilation, air conditioning, make sheet metal parts.

12 Q    Is it a manufacturing facility?

13 A    It's a manufacturing facility, yes.

14 Q    And how many employees are there?

15 A    Right now, on the floor, about 70.

16 Q    And what types of customers do you service?

17 A    We --

18 Q    Or what -- what customers do you service?

19 A    You mean the names of the customers?

20 Q    You can name some of them.

21 A    Well, S. W. Anderson, Ferguson, Dasco, Osco, mainly

22 anybody you ever heard of we supply.

23 Q    Can you tell the jury about your experience as a plant

24 manager, what kinds of positions have you held to provide you

25 with training to do that job?  Briefly, sir.

1  A    I've been a supervisor, I've been a general supervisor,

2  I've been a foreman, I've been a fabrication supervisor, I've

3  been a plant manager twice.  As far as back in the 80's I've

4  been -- been in management profession for about 35 years.

5  Q    And in your capacity as the plant manager at the Lloyd

6  Industries, Montgomeryville location, did you have any

7  supervision of the plaintiff in this case, Ronald Watson?

8  A    Yes, when I was hired he would have been one of my

9  employees.

10 Q    Okay.  And when -- when did you first meet Ronald Watson?

11 A    I met Ronald Watson, I believe the second day there.  He

12 had asked me for gloves, and earplugs, like he did every other

13 day.  And maybe once or twice a week, he asked me if it was

14 allowed for him to leave early, he had to tell someone in

15 management, and Billy wasn't around, so he told me.

16 Q    Why would he need gloves and earplugs?

17 A    For working on the machines that he did on the dies, keep

18 his hands clean, and earplugs from the noise.

19 Q    What kind of work did Ron Watson do at Lloyd Industries?

20 A    When I was there he was running a punch press.

21 Q    Okay.  And is that different than being a machine

22 operator, or is it the same thing?

23 A    It's the same thing, machine operator, sure.

24 Q    All right.  And what -- what does a punch press operator

25 do?

1  A    A punch press operator puts parts in, hits a pedal and it

2  comes down, and it makes two pieces into one, more or less.

3  You're putting different parts and pieces to have one final

4  assembly when you come out.

5  Q    Did -- did you have any opportunity during the course of

6  your supervision of Ronald Watson to speak to him about his job

7  while he was employed there?

8  A    To speak to him?

9  Q    Yes.

10  A    We'd speak on many occasions in the men's room, while we

11  were both having to do what we had to do.  And he asked me

12  where I was from, and I told him Quakertown area, and he told

13  me -- he was not familiar with Philadelphia, and he said, yeah,

14  he goes, well, he lived right off Christopher -- Christopher

15  Columbus Boulevard.

16  Q    Okay.  Mr. Watson, testified previously that the only time

17  he had any communications with you was when you laid him off,

18  do you agree or disagree?

19  A    Farthest from the truth.

20  Q    Okay.  So you testified earlier that Mr. Watson would ask

21  you for time off?

22  A    Sure.

23  Q    Did he regularly ask you for time off, or just

24  periodically?

25  A    Weekly.

1  Q    Okay.

2  A    Yeah.

3  Q    Was Mr. Watson hired as a full-time employee?

4  A    Yes, he was.

5  Q    Did he work full-time employee hours?

6  A    No, he didn't.

7  Q    Okay.  And could you explain that to the jury?

8  A    Usually full-time it requires you to be there eight hours

9  a day, forty hours a week Monday through Friday.  I believe he

10 averaged 32, 33 hours a week.

11 Q    How would you describe Mr. Watson in terms of his -- his

12 employee work, you know, work reputation?

13 A    Work reputation, he -- he wasn't the greatest employee, he

14 wasn't a get up and goer, he was a little slow, and he just

15 done his own thing more or less.

16 Q    There has been some discussion about personnel reviews at

17 Lloyd Industries, and people being written up or not written

18 up.  Are you aware of the policy at Lloyd Industries?

19 A    Oh, yes, I am.

20 Q    What is the policy, sir?

21 A    The policy is first one you get a verbal, which means you

22 would talk to the fellow and then make some kind of notation

23 somewhere.  Next, would be a written.  Okay.  That is a written

24 one that the employee you hope signs.  Usually they rip it up

25 and throw it in the trash.  And third, would be termination.

1 Unless it's a severity of a fight or something like that, then

2 you're terminated automatically, you're right out the door.

3 Q    Is it the policy of Lloyd Industries to not do

4 disciplinary against its employees; is that generally the

5 policy or not?

6 A    We try to -- we're a little lax on it.  We would like our

7 employees to want to come to work every day, not to have to

8 come to work and earn a paycheck.  So we are a little lax on

9 several areas, but anything of safety nature, anything of that

10 we are pretty strict on.  Yeah.

11 Q    Did Mr. Watson during the course of employment receive a

12 raise at any point?

13 A    In my -- I don't know.

14 Q    Okay.

15 A    That wouldn't have been -- I never --

16 Q    That's not something you do?

17 A    -- gave him a raise, no.

18 Q    Okay.  Was Mr. Watson treated any differently than other

19 employees in his department during the course of his employment

20 at Lloyd Industries?

21 A    Absolutely not.

22 Q    Did you, during the course of your dealings with Mr.

23 Watson, treat him any differently than you would other

24 employees?

25 A    No.

1  Q    Did you not speak to him because of anything about his

2  personal background?

3  A    No.

4  Q    Tell us who makes the decision at Lloyd Industries about

5  laying off employees for business reasons?

6  A    That initially would come from me.  I'm there to make sure

7  the work gets out; or if we don't have enough work, what do I

8  do about it?  I then have a plan, and then I submit it to my

9  boss, Bill Lloyd.  We collaborate and come to an agreement and

10  I follow it out.

11  Q    As the plant manager are you responsible for the

12  productivity --

13  A    Oh, yes.

14  Q    -- of the company?

15  A    Oh, yes.

16  Q    And are you answerable or accountable to Lloyd?

17  A    Oh, sure, if I don't make money, I'm out the door.

18  Q    Okay.  And with regard to --

19  A    As simple as that.

20  Q    -- the layoff of Mr. Watson, how did you arrive upon that

21  decision, sir?

22  A    Well, we have a little lull, maybe two, three times a

23  year.  And a lull means that not that much work is coming in.

24  Mr. Watson's, what he done fed three different areas, it was

25  the A line and the D line and FSD line.  We didn't have much

1  work coming in, so there was really no work to do.  So it was

2  he was the lowest man on seniority, so he was let go.

3  Q    What department did he work in, sir?

4  A    I'll call it the punch press.

5  Q    Okay.

6  A    Punch press area.

7  Q    And how many employees were there in that department?

8  A    Only two.

9  Q    And who were those employees?

10 A    That was Ed Maurer (Phonetic) and Ron Watson.

11 Q    Okay.  And was -- why was Ron Watson laid off on October

12 29, 2015?

13 A    Lack of work.

14 Q    Okay.  And I'm going to refer you to what's been marked as

15 D-7.

16         MR. COHEN:  Can you pull that up for me, please?

17 Thank you.  I'm not used to all this computer stuff.  It's

18 pretty cool.

19 BY MR. COHEN:

20 Q    Mr. Prendergast --

21 A    Yes.

22 Q    -- if you could take a look at this document, sir?

23 A    Yes.

24 Q    Do you recognize this document?

25 A    Yes, I do.

1  Q    And is this a Lloyd Industries document, sir?

2  A    Yes, it is.

3  Q    And what is the purpose of this document?

4  A    This document is a -- goes in our file for the reason --

5  the individual, the date, and what we were doing with them,

6  whether it be a termination, a layoff, a separation of work.

7  It's so we know and everybody else knows that he was laid off

8  for lack of work.

9  Q    Okay.

10  A    I mean it tells you exactly why he was let go.

11  Q    Is there a difference between termination and layoff in

12  terms of how the employee is treated?

13  A    In this, for instance, a layoff is where we do have a lack

14  of work, but you're able to collect unemployment.

15  Q    Okay.

16  A    If you were terminated, we could fight that where you

17  can't get unemployment if given a reason.

18  Q    And would termination be something for cause like --

19  A    Termination would be something for cause, something

20  against the company, something against another person.  In

21  short, we're going to terminate them and we're going to, you

22  know, we don't want him to get any money because he was at

23  fault.

24  Q    This document that is marked as D-7, this looks to be

25  employee separation notice.

1  A    Right.

2  Q    And did you fill this out?

3  A    Yes.

4  Q    And is -- who was the employee, is it Ronald Watson?

5  A    That's Ronald Watson, yes.

6  Q    And his last day of work would be 10/29 --

7  A    10/29.

8  Q    -- 2015?

9  A    Right.  And layoff due to lack of work.

10 Q    And he testified that he was laid off at the end of the

11 day, at like four --

12 A    Yes.

13 Q    -- 4:25, 4:30?  Is that customary to lay somebody off at

14 the end of the day?

15 A    Every company I ever worked at and ever worked for, yes.

16 Q    And was it --

17 A    Why would you lay someone off in the middle of the day?

18 Q    Right.

19 A    You wait to 4:25 cleanup time and then you -- and then

20 he's out the door.

21 Q    Would he be paid for that whole day?

22 A    Yeah.

23 Q    And --

24 A    Because you're only talking five -- five minutes.

25 Q    Mr. Prendergast, is it the practice or the policy of Lloyd

1  Industries to have a meeting with the employees in certain

2  departments to discuss the volume of work and whether there's

3  going to be layoffs or no layoffs?

4  A    There's no set policy in stone though for that, no.

5  Q    Okay.

6  A    That --

7  Q    You generally don't do it?

8  A    No, that's strictly up to me --

9  Q    Okay.

10 A    -- and the way we see the business and when I get with

11 Bill.

12 Q    Is -- Bill Lloyd testified earlier today that there's --

13 there are periodically there have been problems with employees

14 damaging the machines and the product and so forth.

15 A    Yes.

16 Q    Is -- are you aware of that, sir?

17 A    Yes, I am.

18 Q    And is it the -- is it your job and the policy of Lloyd

19 Industries to keep the employees sort of happy so they don't

20 damage things?

21 A    Well, we keep them motivated, but we also we let them know

22 we're not going to stand for breaking machines just for fun.

23 They will be fired.  I will call the cops, I will have them

24 arrested.

25 Q    Okay.

1  A    Because that's -- that's no.  Because I have 72 people,

2  I'm trying to keep Lloyd Industries open and supply them with a

3  job, why am I going to let two or three people screw it up for

4  the rest of them?

5  Q    Thank you.

6  A    That ain't going to happen.

7  Q    There's testimony in this case that there at the time that

8  Mr. Watson was laid off, there were only three African-American

9  employees at the Lloyd Industries --

10 A    Exactly right.

11 Q    -- Montgomeryville plant?

12 A    Yes.

13 Q    Is that true?

14 A    Yes.

15 Q    And can you tell the jury why that's true?

16 A    Because we have a sign out on the lawn.  We put a --

17 there's an ad in ZipRecruiter, there's an ad on Monster and an

18 ad in CareerBuilders; and no one has ever applied to any of the

19 ads.

20 Q    Okay.  Are there any ethnic minorities at --

21 A    Vietnamese right now are the only ones that are applying

22 for jobs.

23 Q    Okay.

24 A    Okay.  And Vietnamese, and that's it.

25 Q    Mr. Prendergast, was Ronald Watson treated any differently

1  at Lloyd Industries based on his race, sir?

2  A    No.

3  Q    Did you ever observe or hear of anybody making negative

4  racial comments to Mr. Watson during the course of his

5  employment at Lloyd Industries?

6  A    No, and there -- if I did hear about it, it would have

7  been taken care of that second.

8  Q    Okay.

9  A    We don't do that at Lloyd.

10           MR. COHEN:  I think that's all I have.

11           THE COURT:  All right.  Cross examine?

12                      CROSS EXAMINATION

13  BY MR. DION:

14  Q    Hello, Mr. Prendergast.

15  A    Hello.

16  Q    I'm sorry?

17  A    I said hello.

18  Q    Now, you terminated or I guess you laid off Mr. Watson,

19  you made the decision, correct?

20  A    Yes.

21  Q    And you laid him off for lack of work?

22  A    Lack of work, yes.

23  Q    All right.  And there was no input regarding his

24  performance at all; is that correct?

25  A    When it comes down to it, no, it's just lack of work, low

1  man on the seniority list, so he would have been the first one

2  to go, yes.

3  Q    Okay.  Now, why do you say that he would be the first one

4  to go?

5  A    In his department he was the low man, the lowest man, so

6  the lowest man is usually the first one to go in a layoff.

7  Q    Are you not familiar with the collective bargaining

8  agreement?

9  A    Yes.

10 Q    Okay.  So what does the collective bargaining agreement

11 say about who gets let go first in a layoff?

12 A    Usually department-wise, it's the lowest man.  He was the

13 lowest man on the union, so he wasn't any -- he wasn't able to

14 bump anyone.

15 Q    Well, let's put up P-twenty -- P-21, please.  And go to

16 page 8.  So you're familiar with that clause there?

17 Yeah, read it over.  Let me know when you're ready to talk

18 about it.

19 A    I don't see page 8.  Oh, you've got a whole thing there.

20 Oh.

21 Q    No, article -- article 10.

22 A    Okay.

23 Q    Are you familiar with that clause?

24 A    Yes.

25 Q    Okay.  So it starts out that company-wide is a

1 determination of seniority, correct?  Plant-wide?

2 A    Plant-wide can be that, yes.  And it states that if he

3 would put in for another job or deem that he could do the job,

4 but this never happened in this case.  After Mr. Watson was

5 laid off, I didn't see or hear him for two-and-a-half years.

6 Q    Well, sir, is it not your responsibility to when you lay

7 off someone, to follow the seniority policy?

8 A    Seniority --

9 Q    And make sure that the person with the lowest seniority

10 gets laid out --

11 A    And --

12 Q    -- laid off?

13 A    -- he was laid off.

14 Q    Now, how about Mr. Broadnax; you laid him off too,

15 correct?

16 A    Mr. Broadnax was laid off, yes.  Because when Mr. Watson

17 was laid off the parts he made were also taking care of the A

18 line, the D line and the FSD line.  That's all the parts that

19 he made.  And they were slow in them areas, so it was a domino

20 effect.

21 Q    Okay.  But that's the first time I think we've heard that

22 today.  But are you saying that he was also the lowest in

23 seniority in his department?

24 A    I wouldn't know that.  I know we used to have trouble with

25 him, we used to tell him to please be quiet every day.  He had

1 a big mouth and he would walk off the job and talk to other

2 people and hold them up.  And he was told several times, please

3 stop it.

4 Q    Right.  So what you're saying now is that you didn't lay

5 him off because he wasn't the lowest in seniority, that you

6 laid him off under the --

7 A    I didn't lay --

8 Q    -- pretext that he was --

9 A    -- I laid --

10 Q    -- lowest in seniority?

11 A    Okay.  He was laid off, I don't know if he was the lowest

12 in seniority.  I don't even know if he was in a union.

13 Q    Well, you laid him off.

14 A    See, he left, he came back and that was in the time that I

15 was hired, so I really didn't even know the fella.

16 Q    Right.  Okay.  Now, how about Mr. Mathis?

17 A    Mathis, yes.

18 Q    Do you remember him?

19 A    Yes.

20 Q    Okay.

21 A    Very nice guy.

22 Q    And he came over and he asked you to change his schedule?

23 A    No.

24 Q    No?

25 A    He said he was having problems, I didn't want to go into

1  things.  And he didn't know what time he could come in or what

2  time he could leave.  I said if you could try to set up a

3  schedule like 10:00 to 2:00, 10:00 to 3:00, something like

4  that, I would work with him.  What he didn't --

5  Q    That's a part-time schedule you're referring to, right?

6  Where you would put him on for four hours?

7  A    No, I said if you -- we work ten hours a day.  If he could

8  -- and all he wanted to do was work five or six.  He says he

9  couldn't work a full day.  And I said, okay, maybe we could

10 work with you.  Okay.  I never took any hours off him.  I never

11 said well, you're restricted to four or five hours.  The guy

12 didn't work more than 20 hours a week.  He never came in.

13 Q    Are you saying that he didn't work 40 hours a week?

14 A    I'm not saying he never worked 40 hours a week, but for a

15 long time he didn't.  And for a long time what he didn't say

16 was we couldn't find him on certain days.  I found him out in

17 the car either sleeping or having a meeting with his girlfriend

18 while still on company time without punching out.  And I asked

19 him to please stop that because you're stealing from the

20 company and you could be terminated for that.  And that

21 happened more than three, four times.  That's when he had a

22 talk with me saying if we -- I said, if you can tell me what

23 hours, but he never came up with hours and he never came up

24 with any kind of when he wanted to work.  He just came in when

25 he wanted to and he left when he wanted to, more or less.

1  Q    Right.  So if you had this conversation with him, did you

2  change his hours?

3  A    No, because he never asked for -- he never said what hours

4  he wanted.  So I, if he wanted --

5  Q    How did his hours get cut down after --

6  A    He cut them.  He cut them down.  He decided not to come to

7  work.  And then soon after, a couple of weeks after that, he

8  didn't show up for five days.  And that was job abandonment and

9  he was terminated.

10 Q    Now, the -- you know what's common with the three

11 gentlemen that I just mentioned, correct?

12 A    Yeah, they're all black.

13 Q    Okay.  And you came into the company,  you started working

14 there in June --

15 A    June --

16 Q    -- two-thousand --

17 A    -- 2015.

18 Q    -- fifteen, correct?

19 A    Yes.

20 Q    Right.  And about three weeks later you hired Mr. Malloy,

21 correct?  Steve Malloy?

22 A    I did not hire him, but okay, he came aboard, yes.

23 Q    Okay.  And what was his position?

24 A    Assembler, I believe he was hired for.  Being that I did

25 not hire him, I do not know what his specification was.

1  Q    Well, you supervised him too, right?

2  A    Once he came on the floor and he filled his paperwork out,

3  then he became my responsibility, yes.

4  Q    He was an assembler?

5  A    I believe he was hired as an assembler, yes.

6  Q    Okay.  And he worked in the same area as Mr. Mathis,

7  correct?

8  A    He worked a couple of weeks back there, yes.

9  Q    Okay.  And did you know him to come in late to work?

10 A    No.

11 Q    Not at all?

12 A    Very rarely.  Very rarely.  Mr. Malloy was usually right

13 on time unless he had a trouble and he had something going on,

14 he would tell us way in advance.  But he was always there.

15 Q    Right.  So it is okay to tell you in advance if something

16 is going on --

17 A    Sure.

18 Q    -- and take some -- take off some time, correct?  Okay.

19 A    We work with anybody.

20 Q    All right.

21 A    But you've got to give us something to work with.

22 Q    Now, so when the layoff came around you then laid off only

23 Mr. Broadnax and Mr. Watson, correct?

24 A    Yes.

25 Q    And by that time Mr. Mathis had already been out of the

1 company?

2 A    I think it was right after that.

3 Q    Right.

4 A    I'm not positive on a date.  I think that was about a week

5 or two later.

6 Q    Okay.

7 A    Yeah, he just didn't show up and he never showed up.

8 Q    Okay.  Now did the union contact you to see if he was able

9 to do another job after he made a grievance?

10 A    Who are we talking about?

11 Q    Watson.

12 A    No.

13 Q    Sorry.

14 A    No.

15 Q    So the union guy, Fred Braker never came over and spoke to

16 you?

17 A    No.  I talked to him on the phone, that was it.

18 Q    Okay.  Now, did you consult with Mr. Lloyd in making these

19 decisions to lay off these two --

20 A    Yes.

21 Q    -- workers?

22 A    Yes.

23 Q    Okay.  And what was Mr. Lloyd's reaction to that?

24 A    He understood and he thought that was the right move.

25 Q    Okay.  Now, so with regards to applicants, you say that

CROSS EXAMINATION - PRENDERGAST                    204

1  you're not receiving any applications from African-Americans

2  or --

3  A    No --

4  Q    -- blacks?

5  A    -- no, we're not.

6  Q    So can I take that that you haven't hired any since this

7  all happened?

8  A    Exactly.  We did have one fella, I -- William Tables

9  (Phonetic) that used to work for us.

10 Q    Right.

11 A    And Bill let him come back part-time.  I think he worked

12 maybe three, four days, then he disappeared.  Then we found out

13 what happened to him, he's in jail for killing his wife right

14 now or his girlfriend.

15 Q    All right.

16 A    But he came back, we had him.  We'll take anybody.  As

17 long as you want to work, we'll take anybody.

18 Q    And did you say that you have a policy where you -- a

19 progressive disciplinary policy --

20 A    Yes.

21 Q    -- that you follow?

22 A    Yes.

23 Q    And there are write-ups, aren't there?

24 A    Yes.

25          MR. DION:  All right.  Thank you very much.

1          THE COURT:  All right.  Any redirect?

2          MR. COHEN:  No redirect, Your Honor.

3          THE COURT:  All right.  Thank you.

4          THE WITNESS:  Thank you.

5          THE COURT:  You're excused.

6          All right.  Next witness, please?

7          MR. COHEN:  We call Mr. Lloyd.

8          THE COURT:  All right.  Mr. Lloyd, come back on the

9  stand.

10          So ladies and gentlemen of the jury, a little of the

11  -- the Plaintiff called Mr. Lloyd this morning and Mr. Cohen

12  asked him a lot of questions.  He can recall him as part of the

13  Defense case, as long as it's not repetitive of what Mr. Lloyd

14  already testified to.

15          All right.  State your full name on the record?

16          THE WITNESS:  William P. Lloyd.

17          THE COURT:  All right.  You're still under oath.  Go

18  ahead.

19          MR. COHEN:  Thank you.

20      WILLIAM LLOYD, DEFENSE WITNESS, PREVIOUSLY SWORN

21                    DIRECT EXAMINATION

22  BY MR. COHEN:

23  Q   Mr. Lloyd, you've heard the testimony of Tom Prendergast.

24  Do you agree or disagree with his testimony?

25  A   I agree.

1  Q    Okay.  You have a plant down in Florida, sir?

2  A    Yes, I do.

3  Q    And I want to refer to, I think it's D -- hold on one

4  second.  D-22.

5         MR. COHEN:  Can you put up D-22, please?  I'm sorry,

6  D-23.  Sorry.

7  BY MR. COHEN:

8  Q    Can you take a moment to look at D-23?

9  A    Okay.

10 Q    Okay.  These look to be a list of employees for

11 Pennsylvania and Florida?

12 A    Correct.

13 Q    Okay.  And in looking at specifically the list of

14 employees for Florida -- by the way, where is your Florida

15 plant; where is it located?

16 A    Orange Park.

17 Q    And what does that plant do, sir?

18 A    Clone of my company down there, same thing.  Same recipe.

19 Q    Same thing you do here?

20 A    Absolutely, um-hum.

21 Q    Okay.  And looking at the roster of employees, it looks

22 like there's a good -- there's a mix of various racial and

23 ethnic backgrounds; is that correct?

24 A    Correct, yes.

25 Q    Yes?  Okay.  And this list that I've shown you that's

1 marked as I believe D-23, is this an accurate list of your

2 employees in Florida?

3 A    Yes.

4 Q    And can you tell the jury how many African-American or

5 black employees you have?

6 A    It looks like I have eight.

7 Q    Okay.  And is it the policy of Lloyd Industries to treat

8 all of its employees the same way?

9 A    Yes, it is.

10 Q    And there's been testimony in the case about working as an

11 assembler, probably too much testimony.  Is being an assembler

12 at the Lloyd Industries plant in Montgomeryville a very simple,

13 easy task?

14 A    In some departments, yes.

15 Q    Okay.  Are some departments more complicated, sir?

16 A    Absolutely.

17 Q    And can you explain to the jury what you mean by that?

18 A    Well, some departments you have to do a lot of

19 measurements and assemble parts together, make sure it's

20 correct, make sure it's sealed tight because we've got to

21 prevent the smoke from leaking into the occupied space also.

22 What we try to do is pressurize the stairwells and hallways so

23 the people can evacuate.  So we pump a lot of air into that and

24 evacuate the smoke out.

25 Q    Okay.  With respect to the business operations of Lloyd

1  Industries, is it a frequent occurrence when work is slower in

2  certain departments that employees get laid off?

3  A    Yes.

4  Q    That's a common occurrence, sir?

5  A    Sure.

6  Q    And with respect to the layoff that brought about this

7  lawsuit, was that done for a business purpose, sir?

8  A    Absolutely.

9  Q    And was that within the authority of Thomas Prendergast as

10 the -- as the plant manager to do that?

11 A    Yes.

12 Q    Okay.  And when Mr. Watson was laid off, did you object to

13 that or did you try to stop that, sir?

14 A    No.

15         MR. COHEN:  Okay.  I think that's all I have.

16         THE COURT:  Okay.  Any cross?

17                    CROSS EXAMINATION

18 BY MR. DION:

19 Q    Mr. Lloyd, you testified this morning that you had 80

20 percent black employees down in Florida?

21 A    Correct.

22 Q    Is that the proper percentage there?  How many total

23 employees are there on that list?

24 A    It looks like 25.

25 Q    Twenty-five.  So eight of twenty-five is not eighty

1 percent, correct?

2 A    That is correct, my math was wrong.

3 Q    Okay.  Now, down in Florida, do you have a -- do you

4 participate in a work release program for --

5 A    Prisoners.

6 Q    -- convicts?

7 A    Yes.

8 Q    Convicts?  So when you do that, do you get to choose who

9 comes into your plant?

10 A    No.  I don't know how that works down there with work

11 release.

12 Q    Okay.  Now, how many of the people are on, that work for

13 you, are on work release?

14 A    Probably 25 percent, something like that.  Um-hum.

15 Q    Now, how much time do you spend down there in Florida?

16 A    Three, four weeks a year.

17 Q    And Mr. Prendergast isn't down there at all, correct?

18 A    Never been there.

19 Q    So who's running the plant down there?

20 A    Paul Brundage is the manager down there.

21 Q    Okay.  You're the -- you're still the CEO of that plant as

22 well or is there --

23 A    Correct, yeah.

24 Q    No partner on that?

25 A    No, sir.

1  Q    All right.  So you entrust the running to the plant to

2  that person you just mentioned?

3  A    Yes, him and Scooter.  Um-hum.

4          MR. DION:  Okay.  That's it.  Thank you.

5          THE COURT:  Any redirect?

6          MR. COHEN:  No redirect.

7          THE COURT:  All right.  Thank you.  You may step

8  down.

9          Any other witnesses?

10          MR. COHEN:  No, Your Honor.  The Defendant would like

11  to move into evidence D-1 through 24.

12          THE COURT:  Okay.  Any objection?

13          MR. DION:  No, Your Honor.

14          MR. COHEN:  Thank you, Your Honor.

15          THE COURT:  Okay.  So all the exhibits, ladies and

16  gentlemen of the jury, that have been shown to you are admitted

17  into evidence.  And you'll have paper copies when you

18  deliberate.

19      (Defense Exhibits D-1 through D-24 admitted into Evidence)

20          All right.  You rest then?

21          MR. COHEN:  Defendant would rest, Your Honor.

22          THE COURT:  All right.  Any rebuttal, Mr. Dion?

23          MR. DION:  Your Honor, if I can consult with my

24  client?

25          THE COURT:  Sure, take your time.

1          All right.  Let's just hold on for a minute, see if

2 Mr. Dion has any rebuttal.

3          MR. DION:  Your Honor, we're going to do a brief

4 rebuttal.

5          THE COURT:  What's that?  I'm sorry?

6          MR. DION:  A brief rebuttal.

7          THE COURT:  From who, Mr. Watson?

8          MR. DION:  Yes, Mr. Watson.

9          THE COURT:  All right.  And how brief?

10          MR. DION:  Five minutes, at the most.

11          THE COURT:  All right.  Come on up.

12      RONALD WATSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

13          THE COURT:  All right.  We only have ten minutes

14 left, but you can take five, Mr. Cohen can have five.  Go

15 ahead.

16                DIRECT EXAMINATION (REBUTTAL)

17 BY MR. DION:

18 Q    Mr. Watson, you just heard Mr. Prendergast's testimony

19 earlier?

20 A    Yes.

21 Q    Is that true about all the conversations he had with you

22 in the bathroom and such?

23 A    That's not true at all.

24 Q    Can you elaborate on that?

25 A    Mr. Prendergast never had a conversation with me in no

1  bathroom.  He would stand at the front door to block the door.

2  When I'd walk in, he'd look at me with a nasty look.  And

3  that's about the -- that's about the most that it was.

4  Q    Now with regards to your, the time that you were

5  terminated, were you given an opportunity from Mr. Prendergast

6  to ask to be put into another position in the plant when -- at

7  the time of your termination?

8  A    No, I wasn't because when at the time that he told me I

9  was being laid off, the nasty -- the nasty way he said it was

10 nasty sarcastic, there wasn't no room for him to say, well,

11 we're going to look out for you in the future or, you know,

12 just hang on a couple of weeks, we'll call you back.

13        It was nothing like that.  It was like, I'm laying

14 you off because I can and you ain't coming back.

15 Q    Right.  Can you duplicate what exactly what he did when he

16 said you're laid off?

17 A    I'm laying you off.  And I said, why?  He said, because I

18 can.  And that's when I went over to Billy.

19        MR. DION:  All right.  Thank you.

20        THE COURT:  Cross examine?

21        MR. COHEN:  Yes.

22                    CROSS EXAMINATION

23 BY MR. COHEN:

24 Q    Mr. Watson, in your complaint that you filed with the

25 Court, you said that Mr. Prendergast said that -- in number 12

1  of your complaint, on October 29, 2015, Mr. Prendergast called

2  Plaintiff into his office and notified Plaintiff that he was

3  being laid off.  And that he said, and you asked him, and 13

4  says, Plaintiff asked Mr. Prendergast why he was being laid

5  off.  And Mr. Prendergast said, because I can.  You just

6  testified that he said because I can, and I'm not bringing you

7  back.  Which is true, sir, what you said in your --

8  A    I said --

9  Q    -- complaint or --

10 A    -- I said, he said I'm laying you off because I can.

11 Q    All right.

12 A    I said the way he said it was like, you're not coming

13 back.  He said it so nasty.  It wasn't -- it wasn't no room

14 like you asked him before why I didn't ask for no other

15 position, first of all, I shouldn't have to ask for no other

16 position because I'm already working there, you know what I

17 mean?  I've earned that.  Didn't nobody give me nothing.  I

18 earned my position.  And this man didn't know me from a can of

19 paint.  He never spoke to me since he's been at the plant.  And

20 when he said that to me, I was distraught.  So he, when he told

21 me that he's laying me off, of course I was upset about that so

22 I went to the boss, the owner of the company.  And the owner of

23 the company had backed him up and said, just take the layoff,

24 all right.  And the way he said it he was violent.  So I just

25 left the building.

1 Q    It was -- it impacted you that he said it to you in a

2 nasty way, correct?

3 A    That's the way it was, sir.

4 Q    Can you explain to me why nothing in your complaint

5 mentions him saying --

6         THE COURT:  No, that's -- no.  He didn't write the --

7         MR. COHEN:  I'll withdraw the question.

8         THE COURT:  He didn't write the complaint.

9         MR. COHEN:  That's true.  Thank you.  I have no more

10 questions.

11        THE COURT:  Okay.  All right.  Any redirect?

12        MR. DION:  No, Your Honor.

13        THE COURT:  All right.  Thank you, Mr. Watson.

14        THE WITNESS:  Thank you.

15        THE COURT:  Any surrebuttal?

16        MR. COHEN:  No, Your Honor.

17        THE COURT:  Okay.  So ladies and gentlemen, that

18 completes the testimony.  So the next item for tomorrow morning

19 will be the closing arguments and then the charge.  Okay.

20        Now, I'd like you to be in here again at 9:15.  And I

21 anticipate starting then or very shortly thereafter.  I have to

22 go over with counsel the charge of the Court ahead before the

23 arguments.  But I don't think that will take very long.

24        How long does each side -- if I offer -- offer you up

25 to 30 minutes each side, that will be satisfactory?

1          MR. COHEN:  For closing?

2          THE COURT:  Yeah, for closings?

3          MR. DION:  How about ten minutes?

4          THE COURT:  Well, you can take as long as you want.

5          MR. DION:  Okay.

6          THE COURT:  All right.  I'll tell you what.

7          MR. DION:  We don't need 30 minutes.

8          THE COURT:  I'm going to start -- I'm going to ask

9  you to come in at 9:30.  I'm going to have the lawyers come a

10 little bit earlier.  So you come in at 9:30.  And then we'll

11 have the closing arguments.  And then we'll have the charge.

12          Now, what I do when we have a jury deliberation is

13 Ms. Lutz when you come in will have a menu for you and you can

14 pick out a sandwich or a salad at our expense so you don't have

15 to go out for lunch.  So that when the charge is done, or

16 shortly thereafter, we'll have lunch brought in for you.  Okay.

17 So you don't have to take any kind of luncheon recess.  And

18 actually, I'm going to be out of the building again for a

19 period of time while you're deliberating.  But I think that way

20 you're sure to start your deliberations late morning.  And I'll

21 give you the full details when you get here at 9:30.

22          Okay.  So please keep an open mind.  As I promised

23 you, it's been a short case but an important case.  And we'll

24 see you tomorrow morning at 9:30.  Thank you.

25      (The jury exits the courtroom.)

1          THE COURT:  All right.  Again, I appreciate that both

2    of you have agreed on the core charge on the substantive claim.

3    So I don't imagine that the charge conference is going to be

4    lengthy in any way.  Okay.  And I'll go over it with you anyway

5    after I review what you submitted this morning.

6          Okay.  And I'll give you up to half an hour.  But,

7    Mr. Dion, you get a half hour is the total for your opening and

8    your closing.

9          MR. DION:  And that should be sufficient.

10         THE COURT:  You can take up to a half an hour, Mr.

11   Cohen, or less, that's up to you.  Okay.

12         And then we'll -- I usually just take a brief recess

13   and then charge the jury.  The jury charge in this case will

14   probably take 30 to 40 minutes.

15         MR. COHEN:  What time would you like us here at

16   tomorrow?

17         THE COURT:  I'm sorry, what?

18         MR. COHEN:  What time would you like us here in the

19   courtroom, at 9:00 o'clock?

20         THE COURT:  9:20.  Just come in like --

21         MR. COHEN:  9:20?

22         THE COURT:  -- ten minutes ahead.  Yeah.

23         MR. COHEN:  Okay.

24         THE COURT:  All right.

25         MR. COHEN:  And we will do the --

1    THE COURT:  But I want to see -- sorry?

2    MR. COHEN:  I'm sorry.  We'll do the charging

3 conference.

4    THE COURT:  We'll do the charging conference then,

5 but I'm -- it's going to be very short.

6    MR. COHEN:  Right.

7    THE COURT:  And then the jury will be here at 9:30.

8    MR. COHEN:  Okay.

9    THE COURT:  So then we'll start the arguments.

10    MR. COHEN:  That's fine, Your Honor.  Thank you, Your

11 Honor.

12    THE COURT:  Okay.  Can I see counsel at sidebar off

13 the record?

14    (The trial recessed at 4:22 p.m. until November 14,

15 2018.)

16                    *  *  *  *  *

17              **C E R T I F I C A T I O N**

18    I, Donna Morris, court approved transcriber, certify

19 that the foregoing pages, 1 to 41, is a correct transcript from

20 the official electronic sound recording of the proceedings in

21 the above-entitled matter, and to the best of my ability.

22

23    *Donna Morris*

24 _____

25 DONNA MORRIS                DATE:  November 27, 2018

**C E R T I F I C A T I O N**

          I, Tami S. Mayes, court approved transcriber, certify

that the foregoing pages 42 to 73 is a correct transcript from

the official electronic sound recording of the proceedings in

the above-entitled matter, and to the best of my ability.

_____

Tami S. Mayes, CET-547          Date: November 27, 2018

**C E R T I F I C A T I O N**

          I, Antoinette M. Franks, court approved transcriber,

certify that the foregoing, from page 74 to page 140, is a

correct transcript from the official electronic sound recording

of the proceedings in the above-entitled matter, and to the

best of my ability.

_____

Antoinette M. Franks, CET-683          Date: November 27, 2018

1  **C E R T I F I C A T I O N**

2          I, Kelli Ray, court approved transcriber, certify

3  that the foregoing pages 141 to 217 is a correct transcript

4  from the official electronic sound recording of the proceedings

5  in the above-entitled matter, and to the best of my ability.

6

7

8  _____

9  Kelli Ray, CER-349, CET-349          Date: November 27, 2018

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25