UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RONALD WATSON,              .    Case No. 2:17-cv-01049-MMB
                           .
        Plaintiff,         .
                           .
    v.                     .    U.S. Courthouse
                           .    601 Market Street
                           .    Philadelphia, PA 19106
LLOYD INDUSTRIES, INC.,    .
                           .
        Defendant.         .
                           .
                           .    November 14, 2018
. . . . . . . . . . . . . ..    9:26 a.m.


                    TRIAL (DAY 2)
         BEFORE HONORABLE MICHAEL M. BAYLSON
         SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        SAMUEL A. DION, ESQ.
                          DION & GOLDBERGER
                          1845 Walnut Street, Suite 1199
                          Philadelphia, PA 19103

For Defendant:            KEITH J. COHEN, ESQ.
                          LAW OFFICES OF KEITH J. COHEN
                          585 Skippack Pike, Suite 200
                          Blue Bell, PA 19422

Audio Operator:           JANICE LUTZ

Transcribed by:           ERIN PERKINS & GILLIAN LAWRENCE
                          Court Transcribers
                          Lawrence Court Transcription & Video
                          P.O. Box 530790
                          DeBary, FL 32753
                          833-800-LCTV

        Proceedings recorded by electronic sound
    recording, transcript produced by transcription service.

I N D E X

|                                              | PAGE |
|----------------------------------------------|------|
| PLAINTIFF'S CLOSING ARGUMENTS                | 10   |
| DEFENDANT'S CLOSING ARGUMENTS                | 23   |
| PLAINTIFF'S CLOSING ARGUMENT (REBUTTAL)      | 32   |
| JURY CHARGE                                   | 33   |
| JURY VERDICT                                  | 60   |

EXHIBITS

ID.   EVD.

NONE

1    (Call to Order of the Court.)

2         JUDGE MICHAEL M. BAYLSON:  Okay.  Good morning.

3         THE PARTIES:  Good morning, Your Honor.

4         THE COURT:  Okay.  All right.  We've gone over the

5    joint suggestions for the charge that you submitted and I find

6    that they timely agreeable; however, I think there was no

7    mention of a duty to mitigate, which is in the standard Third

8    Circuit charge.

9         Please be seated.

10        So I'm going to add a paragraph about that.  As I

11   understand the claim on the back -- there's no -- there's no

12   claim for front pay in this case; is that right, Mr. Dion?

13        MR. SAMUEL A. DION:  Correct, Your Honor.

14        THE COURT:  All right.  So --

15        MR. DION:  That's right.

16        THE COURT:  -- I have a separate charge on back

17   pay --

18        MR. DION:  Okay.

19        THE COURT:  -- that, you know, I put in here, I

20   thought it was the date of the verdict, but your verdict form,

21   it says through April 9th, 2018.  Is that agreeable to both of

22   the -- that's the day Mr. Watson got another job?

23        MR. DION:  Correct, Your Honor.

24        MR. KEITH COHEN:  That's his testimony, Your Honor.

25   That's his testimony.

1          THE COURT:  That's agreed?

2          MR. COHEN:  As of April 8th, 2018 was when he got a

3  job, but --

4          THE COURT:  All right.

5          MR. COHEN:  -- there is testimony, which is a little

6  bit confusing, that he worked part time during that time frame

7  and that he earned $3500.

8          THE COURT:  Right.  Well, I have -- I submit I say

9  here, you must reduce anywhere by the amount of expenses that

10  Mr. Watson would have incurred in making those earnings.  I'm

11  not sure there's any evidence about that.  But then I also say

12  in -- if you word that, that you're instructed to deduct from

13  back pay, whatever wages Mr. Watson has obtained from other

14  employment during this period, but what you're saying is that

15  he -- it's agreed that he didn't have any other employment from

16  the date he was terminated, which was October 29th, 2015, until

17  April 8th, 2018.  Is that agreed?

18          MR. COHEN:  That is not agreed, Your Honor.  That's

19  not the evidence in the case.  In fact, he testified that he

20  worked for various job placement companies --

21          THE COURT:  Okay.

22          MR. COHEN:  -- for a period of time.

23          THE COURT:  All right.  All right.  So --

24          MR. COHEN:  But he was not --

25          MR. DION:  Those are temp jobs.

1          THE COURT:  So you would agree with that -- that

2   paragraph, that sentence I just read, that the jury should make

3   a deduction from what he earned from other employment during

4   that period?

5          MR. DION:  Right.

6          MR. COHEN:  That is correct.

7          THE COURT:  What's the --

8          MR. DION:  Do you agree that they were temp jobs?

9          MR. COHEN:  I agree that they were temp jobs, but

10  they --

11         MR. DION:  Right.

12         MR. COHEN:  -- were still jobs, so he --

13         THE COURT:  Yeah.  Well, okay.

14         MR. COHEN:  -- had employment.

15         MR. DION:  Right.  So you don't get --

16         THE COURT:  Well, I think I have to charge that --

17         MR. DION:  -- cut off the damages.

18         THE COURT:  -- way.  Now, how the jury deals with

19  that is up to them.

20         MR. DION:  Okay.

21         MR. COHEN:  Correct.

22         THE COURT:  All right.

23         MR. DION:  Well, you can't --

24         MR. COHEN:  It's up to the jury.

25         MR. DION:  -- get cut off for damages on a temp job,

1  only on a permanent job, Your Honor.  So --

2        THE COURT:  Well, if you -- whatever he earned, the

3  jury is entitled -- the jury should deduct that from the back

4  pay figure.

5        MR. DION:  Right.  Understood.

6        THE COURT:  Do you agree?

7        MR. DION:  Yes.

8        THE COURT:  All right.  Okay.  All right.  So I have

9  the back pay, so I'll -- and the verdict form will show October

10  29, 2015, through April 9th, 2018, okay?

11        MR. COHEN:  Yes, Your Honor.

12        MR. DION:  Yes, Your Honor.

13        THE COURT:  All right.  All right.  And -- all right.

14  Otherwise, I -- I'm generally going to follow the charge that

15  you did, which is the Third Circuit model charge.  Okay.

16        MR. DION:  Are you going to be giving the other

17  smaller charges on preponderance of the evidence, things like

18  that, Your Honor?

19        THE COURT:  On what?

20        MR. DION:  Charges on preponderance of the evidence

21  and things like that?

22        THE COURT:  Yeah.  Oh, yeah, I'm going to say --

23        MR. DION:  Okay.

24        THE COURT:  -- preponderance of the evidence and --

25        MR. DION:  Okay.

1          THE COURT:  -- I mean, I'll include all the standard
2    charges.

3          MR. DION:  Okay.

4          THE COURT:  And if you have any exceptions, you can
5    -- when I'm done, I will ask you if you have any exceptions and
6    then you can come in -- yeah, charge on preponderance of the
7    evidence.  And --

8          MR. COHEN:  Credibility of witnesses, things of that
9    nature, the --

10          THE COURT:  And then -- just one second.

11          All right.  I'm also going to charge on nominal
12    damages, unless the plaintiff doesn't want me to.

13          MR. DION:  I don't think it's necessary here, Your
14    Honor.  You can take that out.

15          THE COURT:  So I --

16          MR. DION:  As much as I would like to get attorney's
17    fees --

18          THE COURT:  What?

19          MR. DION:  -- get an award of damages, but I don't
20    think it's a good idea.

21          MR. COHEN:  Well, if they give you all the damages,
22    you would get 33 cents.  No, I'm kidding.

23          THE COURT:  Okay.  Anything else?

24          MR. COHEN:  You're going to give -- you'll give the
25    standard charge with reference to credibility of witnesses --

1          THE COURT:  Yes.

2          MR. COHEN:  -- all that?

3          THE COURT:  Yes.

4          MR. COHEN:  Okay.  We don't need to go through that?

5          THE COURT:  Yep, credit -- yes.

6          MR. COHEN:  That's fine.  Yeah.

7          THE COURT:  Credibility, what is not evidence, things

8  like that.

9          MR. COHEN:  Correct.  Thank you.

10         THE COURT:  Okay.

11         MR. COHEN:  Yeah, we're good.

12         THE COURT:  All right.  Okay.  All right.  Are you

13 ready for the closings?

14         MR. DION:  Yes.  How does the verdict sheet look,

15 Your Honor?  Is that --

16         THE COURT:  It looks fine.  I'm going to use it --

17         MR. DION:  Okay.

18         THE COURT:  -- just like this.

19         MR. DION:  Okay, great.

20         THE COURT:  And I'll explain it to the jury after I

21 charge, okay?

22         MR. DION:  Yes, Your Honor.

23         MR. COHEN:  Thank you, Your Honor.

24         THE COURT:  All right.  All right.  Well, I'm

25 prepared to have the jury come in.  Well, I'll be back in --

1  just give me 60 seconds and I'll be right back, okay?

2              MR. DION:  Okay.

3              MR. COHEN:  Sure.

4              THE COURT:  All right.  And then we'll bring the jury

5  in.  Thank you.

6              (Court in recess from 9:31 a.m. until 9:35 a.m.)

7              (Jury enters the courtroom.)

8              THE COURT:  Okay.  Be seated, please.  All right.

9  Ladies and gentlemen of the jury, good morning.  You're -- just

10 going to say one word about the closing arguments.  These are a

11 very important part of the case.  As opposed to the openings,

12 which were just as a sort of roadmap, this is the opportunity

13 for the lawyers to present their arguments as to why you should

14 -- your verdict should be in favor of their client.  So give

15 them close attention.

16             Lawyers are -- will argue the facts and will explain

17 the law, but you're the judges of the facts, as I will tell you

18 in more detail.  And I'm sure they will do their best to recall

19 the facts as they represented by the witnesses, but it's your

20 recollection and your decision about the facts.

21             When it comes to the law, I will give you

22 instructions on the law immediately following the arguments and

23 you have to follow the instructions on the law.  But the

24 instruct -- but the lawyers, I'm sure, will do their best to be

25 accurate about both.

1    Now, the plaintiff, as I will tell you, has the
2 burden of proof.  For that reason, Mr. Dion, counsel for the
3 plaintiff, he gets both an opening and a closing argument.  He
4 gets to open, that's what he's about to do now, then Mr. Cohen
5 will present his argument, and then Mr. Dion is allowed to make
6 a reply argument, last argument.  Following of which, if you
7 need a break, we'll take a break and then I'll give you the
8 charge, which will take about 30 minutes.

9    And so, we'll -- we're ready.  Mr. Dion -- Mister --
10 each attorney has a total of 30 minutes, if they want to use
11 that much.  That's up to them.

12    All right.  Go ahead.

13                    CLOSING ARGUMENT

14    MR. DION:  Thanks, Your Honor.

15    Good morning, jurors.  Again, I told you yesterday
16 that we would show that the three African-American or black
17 employees were let go within a four-day period.  We proved
18 that.  It was indisputable.  Mr. Lloyd admitted that.  We --
19 showing Exhibit P-8, the three African-American employees were
20 fired on October 26th, October 29th, and October 30th.  And I
21 say fired for Mr. Mathis because, as he testified, he said he
22 was forced to resign based on a cut in his hours, which is
23 tantamount to a termination.  Also, there was a termination
24 letter sent to him saying that he was terminated as of October
25 26th, 2015.

1      So this type of evidence, where we have three -- the

2 only three African-American or black employees out of 60 or 65

3 people is what we refer to as statistical evidence.  The Judge

4 will instruct on statistical evidence and the use of

5 statistical evidence in your consideration.  And part of the --

6 part of the charge to the jury is that you -- you should

7 evaluate statistical evidence along with all other evidence.

8      In this case, the statistical evidence is quite

9 compelling.  Only five percent of the employees at Lloyd

10 Industries were African-American or black.  And once the

11 company, I use the term loosely, that they white washed the

12 plant, then nothing has really improved since then, as you

13 heard from the testimony.

14      All this talk about the -- the Florida plant having

15 80 percent African-American employees, I think you heard the

16 testimony yesterday that there's really no truth to that.  And

17 Mr. Lloyd himself spends three weeks down in Florida and he

18 doesn't even select the employees down there.  And a lot of

19 them come from a work-release program from prison.  So he

20 doesn't really have a hand in selecting these employees.

21      Now -- but we don't really need to hang our hat on

22 statistical evidence here.  We do not have to show direct

23 evidence of discrimination in this case.  Our evidence is based

24 on the testimony and inferences that can be made from that

25 testimony and other evidence.  So the proffered legitimate

1 reason for termination in this case is low in production,
2 layoff. We have -- and then we can show many reasons why that
3 proffered reason was false and we have established that in the
4 testimony. We showed Mr. Watson, in fact, was not the lowest
5 in seniority. We showed that Mr. Watson could do assembly
6 work, and we showed that Mr. Lloyd could not explain why Mr.
7 Watson -- why he felt Mr. Watson couldn't do assembly work.

8        And let me just go over those three items
9 line-by-line so we can get into the testimony a little further.
10 So Exhibit 20 shows that five employees were hired after Mr.
11 Watson; Nguyen Cam, Tam Van Huynh, Steve Malloy, Dulup
12 Patteran, and Mike Tran. Now, I leave out Mr. Mathis, since he
13 was let go before the decision-making, but he was also hired
14 after. Four of these people did assembly work. Why you would
15 hire a guy Steve Malloy, a white guy, and not think he's got to
16 be the first to go, I don't know, but we definitely showed he
17 was not lowest in seniority -- that Mr. Watson was not lowest
18 in seniority by any stretch of the imagination. Mr. Watson
19 could do the assembly work. Steve Malloy was an assembler,
20 Nguyen Cam, Tam Huynh, all these people were assemblers. He
21 could have taken that work.

22        Under the union contract, collected bargaining
23 agreement, the policy was that Mister -- I'm sorry, if there --
24 in the event of a layoff or a low in production, the person
25 with the lowest seniority has to go, assuming that someone else

1 can do their job.  You don't go to the person with higher

2 seniority and don't even offer them the chance at another job.

3          Now -- so let's go to Mr. Lloyd.  His testimony was

4 pretty interesting.  I'm sure you're going to remember this.

5 So we asked him, could Mr. Watson work as an assembler?  His

6 response to that was, no, he can't because he's a punch press

7 operator.  So then I asked him, so you're saying all Mr. Watson

8 can be is a punch press operator?  And with a smirk on his

9 face, he answered yes.  The -- it's almost like he's making a

10 mockery of the whole thing and it's -- it just rings untruthful

11 here.

12          You heard the testimony of Mr. Shaun Mathis, a very

13 credible witness.  I felt he was -- he was -- he was humble and

14 he -- you know, he admitted, yeah, I was late a couple times.

15 It was my fault.  If you noticed, he was kind of resistant to

16 even saying that there was a racial component there, but then

17 when -- when push came to shove, it spilled out.  And this is

18 the type of evidence that you really need to think about

19 because, like I said, we don't have to produce evidence of

20 direct discrimination -- direct evidence of discrimination.

21 It's very rare that somebody is going to say, well, you're

22 fired because you're black.  That's not -- it's just not going

23 to happen.  We wouldn't be here today if that happened because

24 then the case would, obviously, have to settle.  No one is

25 going to court and -- with a direct compelling evidence like

1 that.

2          So we have to look at things like that.  We had to
3 get inside the person's head.  And one way we get into their
4 head is to show, are they being untruthful about the -- their
5 reason that they're given for termination.  If they're being
6 untruthful about that, what are they trying to hide?  Then we
7 look at the statistical evidence, put it together.

8          So Mr. Lloyd, he had no good explanation for why Mr.
9 Watson couldn't do assembly work.  I even said, well, all this
10 is, is you put two -- two components together, right?  And he
11 said yes.  You heard Mr. Mathis and Mr. Watson explain how easy
12 assembly work is.  So Mr. Mathis said basic labor could do that
13 job and could be performed by anyone.  And Mr. Watson said,
14 even a mentally challenged person could do it.  Needless to
15 say, it's a very simple job.  And I think that we definitely
16 proved that he could do assembly work.  And this -- let's put
17 it this way, the statements of the simplicity of the assembly
18 work were completely unchallenged by the Defendant.  There was
19 no cross-examination, no one was saying like, oh, this is very
20 complicated.  We had to do this, this, this, and this.  It was
21 completely unchallenged.  So I'm confident that no one can come
22 out of this trial and believe that Mr. Watson couldn't do
23 assembly work.

24          So now we have to look at, well, there were these
25 shifting reasons that they had to come out.  When they were

backed against the wall, the witnesses, they started saying,
well, this guy was the worst employee on Earth.  He -- he came
in drunk every day.  He -- his attendance was lousy.  He was --
he was slow.  He walked away from his work area.  It's funny,
because you -- when you think about all three of these men,
there were similar things said about them, but -- so let's look
a little bit further into that.

Mr. Lloyd, he was here testifying and he was taking
the position that Mr. Watson was fired because he was the
lowest in seniority and couldn't do the -- the job.  Then I
reminded, at his deposition, he said these things about Mr.
Watson was drunk all the time, and all this.  And then he
started really seizing on that and trying to give those as the
reason.

So let's -- let's talk about the drinking on the job.
This is a factory with heavy machinery and to think that this
man would -- he testified that he knew about this supposed
drinking problem nearly the whole time Mr. Watson was employed
there.  Are you, as owner of the business, going to allow a
person to work heavy machinery as a danger to himself or
others?  There's -- it's just unfathomable.  But he gave -- he
said that he would come back from lunch with the smell of
alcohol on his breath.  They had no proof that he even left the
premises.  If they -- we had the clock-out sheets.  They were
evidence in the case.  Unfortunately, no one actively put them

out there, but believe me, if there was a shred of evidence
that he left the premises, they could have just showed the
clock-out sheets when they clock out every day.

And you saw Mr. Lloyd's face when I said, well,
doesn't he have to clock out?  And he said yeah.  You know, and
it was just not -- this never happened.  You heard Zenetta's
testimony.  He does not have a drinking problem.  He doesn't
come home from work smelling of alcohol.  I know he's a --
she's his wife of 40 years, but there's balance on both sides.

And, now, another thing is, there were no write-ups,
so if Mr. Watson, in fact, had attendance problems or -- or any
other performance problems, they should be documented with
write-ups.  This is very important for an employer because they
had to make a paper trail if they want to fire a person for --
for poor performance or attendance.  You heard Shaun Mathis
testify that he was actually written up one time for
attendance.

And then you heard the bombshell, Mr. Lloyd claimed
that they didn't do any write-ups in 15 years because the
employees will sabotage the equipment and they don't want to
take that kind of risk.  The only thing is, is plant manager,
Mr. Prendergast, he didn't get that memo.  He's been writing
people up and he follows the procedure in the collective
bargaining agreement.

The collective bargaining agreement, if we can go to

1  the section, that's -- was is that P?  Is it P-21?  Yeah.  If

2  we can go to the section on progressive discipline.

3          He cited that nearly word for word.

4          Well, let me just tell you this, I don't want to take

5  up too much of my 30 minutes, but you're going to be given a

6  copy of the collective bargaining agreement, so you'll find it

7  in there.  So what Mr. Prendergast said was pretty much word

8  for word what's in the collective bargaining agreement, in the

9  section on progressive discipline.

10         Now, you all will also see, on P-8, that some people

11 were -- that they noted that people were written up prior to

12 their termination since 2015.  So this has been going on, even

13 -- this has been going on for years.

14         Now -- so what do we make of this lie?  If a person

15 lies, then you may choose to disregard all or some of their

16 testimony, depending on the situation, but it definitely should

17 be considered.  And in this case, when the -- when the person

18 is actually lying to try to deflect the truth about the act --

19 the discriminatory act here, which was the termination, then

20 you really got to think about that.  And so, if he's willing to

21 say, oh, there's no evidence of a write-up because we didn't

22 even write people up, then you got to ask yourself, well, so

23 now we find out he -- there's -- there are write-ups.  He was

24 lying.  What's the truth?

25         Now, we heard the testimony of Fred Baker (sic

1  throughout) and I -- I warned you yesterday that he wasn't

2  exactly on our side.  Fred Baker is the union representative.

3  I told -- I told you up front, this guy is not going to really

4  be for us.  And I brought him in to just show that the union

5  was useless to Mr. Watson and there was no binding decision

6  made with the union regarding his termination.  Mr. Braker

7  would like you to believe that he went over to the plant and

8  questioned people and he stated some hearsay from a coworker.

9        And I ask you, why would you take the word of a

10 coworker on a person's performance and not just go straight to

11 the source, Mr. Lloyd or Mr. Prendergast?  It makes no sense.

12 But even more so, if we look at Exhibit P-17, P-17 he

13 summarizes what he did, which is completely consistent with

14 what Mr. Watson said.  He said, I met with Mr. Watson after his

15 layoff and researched that he was the lowest in seniority;

16 therefore, there was nothing we could do, as Lloyd Industries

17 was following RCBA.  So he didn't even research who had lower

18 seniority.  I show him a list, I show him all the people we

19 just mentioned that were hired after him and he said, oh, I

20 didn't have that.  Isn't that the thing that he has to look at

21 to determine if somebody has lower seniority?

22        Another thing is, is that if you look at P-17, it

23 seems like he's trying to help the employer.  That email was

24 written nine months after the investigation was completed,

25 delivered to Tom Prendergast.  Well, as you recall, Mr. Watson

filed a PHRC complaint, complaint of discrimination. You got

to ask yourself, was that an email just sent to them to help

them with that PHRC case? I think you can see, this guy is

willing to compromise the truth to help the employer over a

union member. It's just -- it's just a horrible situation.

But I -- I just really needed to bring him in just to show that

there was nothing binding with the union. And I think you can

make your own conclusions on this gentleman.

Now, there's no reason to not terminate a person for

cause, if a person comes in drunk, or -- I'd fire him the first

day, most people would, a person comes in -- is not having good

attendance, you'd write them up. Three strikes you're out,

that way you don't even have to pay unemployment. You know,

there's a -- why -- they're trying to say that they're being

nice to a person, let them collect unemployment, but the thing

is, they -- they don't want to pay unemployment. There's a big

-- it's a lot of money. No one wants to pay unemployment. You

only can get out of unemployment if you got a reason.

They're also misstating the unemployment law. In

their -- in their cross, they tried to question Mr. Watson.

Well, if a person steals, they won't get unemployment, right?

Well, they never said that he did anything intentional

misconduct like that. That's the only way you can't

unemployment, if you're guilty of some kind of intentional

misconduct at the workplace, or you intentionally quit. But if

1  you're -- if you're fired because of performance, you get your
2  unemployment.  So you got -- so this cross-examination really
3  was deceiving.  But as I said -- as the Judge will instruct
4  you, lawyers' questions are not evidence.

5          Now, finally, we come down to Mr. Prendergast.  And
6  Mr. Prendergast, he came in and he claimed ignorance.  He
7  wanted to -- wanted you to think that he just thought --
8  because Mr. Watson was the lowest in seniority in his
9  department, that he was lowest in seniority.  And -- but if you
10 recollect, I asked him, well, what about Mr. Broadnax, was he
11 lowest in his seniority in his department too?  He couldn't
12 answer it.  He just started backing up saying, oh, he was going
13 around talking all over the place, and getting up and talking
14 -- he went back tot he same old line that everybody had, Mr.
15 Broadnax was talking too much at the workplace.  We caught him
16 in a lie.  He didn't think that just because a person was
17 lowest in seniority in a department they were lowest in
18 seniority because he didn't apply that standard to Mr.
19 Broadnax.  Mr. Broadnax wasn't lowest in seniority in his
20 department and Mr. Prendergast couldn't say that.

21         So Mr. Prendergast is the person that laid off the
22 two remaining African-American employees.  Did this with
23 consultation with Mr. Lloyd and he was the person that forced
24 Mr. Mathis to quit his job and then just for good -- good
25 measure, he sent out a letter terminating him saying you're

terminated. So, in essence, I guess you can say he fired all three of them, but forcing somebody out, as I said, is the same as -- as firing them.

Now, if you -- the Judge is going to instruct you that to prevail on this claim, Mr. Watson must prove, number one, he was terminated; and number two, that race was a determinative factor in the decision to terminate his employment. So determinative factor means that if not for Mr. Watson's race, he would not have been terminated. Direct evidence is not required, as I said. We need to get inside the person's head. How do we do that? We do that with the evidence, what the evidence shows. And as I showed you, the evidence shows reason to doubt the proffered reason for termination. We have lies and we have trying -- things -- trying to -- to pull the wool over your eyes, a big smoke screen. Everything under the sun thrown -- thrown out. That he's drunk, he's a bad employee. He has bad per -- bad attendance.

And I'll tell you one thing about the attendance, I -- we calculated it at 33.8 hours or whatever it was. On Exhibit, was that P-19, I think? But if you take out the couple of weeks where he was working 16 hours, and a couple other hours, take out those weeks, maybe he was sick or, you know, there must have been some good reason why he wasn't in because he never wrote him up, then his average then goes up to

1  36-something, you'll see, if you want to do the math on it.

2          People that are required to come in 40 hours a week

3  are never going to average 40 hours on the nose.  If they're

4  sick one time, it's going to be 39.9.  So them saying, oh, a

5  person has to work 40 hours a week to be full time is not true.

6  You just have to be the guy -- you have to be a full-time

7  employee and your hours are whatever they are, 9 to 5, and

8  you're supposed to come in 40 hours a week.  It just doesn't

9  happen in reality.

10          THE COURT:  Mr. Dion, you're close to 30 minutes and

11  I know you want to save some time for --

12          MR. DION:  Okay.

13          THE COURT:  -- rebut.

14          MR. DION:  What's the time I have, Your Honor?

15          THE COURT:  Well, hang on.  Why don't you close up

16  and then --

17          MR. DION:  All right.  Okay.

18          THE COURT:  -- you can have five minutes for

19  rebuttal.

20          MR. DION:  Okay.  So if you find in favor of Mr.

21  Watson, there are three types of damages to award; there's

22  compensatory damages for pain -- emotional pain and suffering,

23  and then there's -- there's loss pay, and there is punitive

24  damages if you want to punish the defendant for their conduct.

25          As you saw Mr. Watson, when he testified, I think you

could see that  he was very proud of his work.  The -- he sat
here skirting out all the different machines that he worked on,
and the type of things that he did, and most especially when he
got his new job, he explained to you how much he likes it, and
how proud he is of it, and how well-liked he is over there.
And imagine being two and a half years not having that.

Thank you very much.

THE COURT:  Okay.  Okay, Mr. Cohen.

CLOSING ARGUMENT

MR. COHEN:  Thank you.  May it please the Court, Your
Honor, counsel, ladies and gentlemen of the jury.  I want to,
first, thank you for your attentiveness and your time to help
us resolve this dispute.

This case was filed in March of 2017.  It was a weak
case when it was filed.  It only got weaker as we went through
discovery.  Facts matter in this case.  This is the point in
the case where we tell you what we think the facts should show,
but only your recollection and your intuition will hold sway in
what facts are believed.

This case is a simple case.  It's about whether Mr.
Watson was discriminated against by my client, Lloyd
Industries.  It's not about whether he should have been
terminated because he showed up with alcohol on his breath.
It's not about seniority.  It's not about all this other stuff
that's been thrown at you.  That's not it at all.

1    Counsel has presented his version of the facts, which
2   we categorically deny was the evidence in this case.
3   References to lies without telling you -- this case really is
4   about how Mr. Watson was treated.  And if you listen to his
5   testimony, and I'm going to get -- cover the testimony, Mr.
6   Watson, when he testified, was upset more with the fact that he
7   was laid off than why he was laid off.  And let's face the
8   facts, it's never fun to be laid off from a job.  It's not a
9   pleasant experience.  Nobody walks away happy, neither the
10  employer, nor the employee.  And the sense that -- listening to
11  his testimony was that he was more upset about the process of
12  being laid off.

13    With respect to the evidence in this case, the
14  evidence that you've heard is from the witness stand and
15  documents that we've reviewed.  And let's go through the
16  witnesses.  Shaun Mathis.  Shaun Mathis, under oath, said --
17  and I asked him, did you ever feel that you were treated
18  wrongly or differently because of the color of your skin?  And
19  he's biracial.  His answer was no.  I'm not even sure why he
20  came in to testify because he didn't provide you with any of
21  evidence, whatsoever, of any racial mistreatment at Lloyd
22  Industries.  He said that he had a dispute with Mr. Prendergast
23  concerning his schedule.  This is not a trial about Mr. Mathis'
24  schedule.

25    Another witness in the case, Fred Braker, the union

representative.  Mr. Dion and the plaintiff subpoenaed him to be here to testify.  I've been practicing law for 33 years.  I have to say, I have never --

THE COURT:  No, you can't test -- you can't argue that.

MR. COHEN:  Okay.  I'll -- the bottom line is, Mr. Dion presented that evidence and then he just threw that evidence under the bus.  And what he said was, Fred Braker came in, he's the union rep.  Union reps are there for the employees and basically said that I did an investigation, basically three years ago, I found that there was a basis for Mr. Watson to be laid off and I told him take the layoff.  This issue about being drunk, there's no testimony that Mr. Watson showed up to work drunk.  They said he had alcohol on his breath.  And Mr. Lloyd stated, in his testimony, that if he showed up intoxicated and couldn't work, we'd send him home.  There's been no evidence about that.  I don't know what all this is about being drunk.  He had alcohol on his breath, okay.  He wasn't a great employee.  Mr. Braker said he wasn't a great employee, okay?  They laid him off because there was a lack of work, okay?  And he was allowed to get unemployment.

You hear a lot of argument and limited testimony about the policies of Lloyd Industries in terms of not writing people up.  There was testimony from both the Lloyd and if you recall there was some testimony from Braker that they don't

write people up because they don't want them sabotaging the
equipment.  They had a history of that happening.

        Now, does that make sense that they don't write them
up?  I think you can use your own experience and, yeah, that
probably does make sense.  Mr. Braker is not happy about them
doing that, but that's how -- that's their policy.  One of the
people we didn't hear about was referenced throughout this
trial, Shawn Broadnax (Phonetic).  Plaintiff had the
opportunity to subpoena him to testify.  They keep referring to
Shawn Broadnax; he never testified in this case.

        Now, why is that?  I think it's safe to say that he
probably wasn't supportive of their case and that's why they
had to bring him in because he didn't testify.  He was somebody
that worked closely with Ronald Watson throughout the time he
was at Lloyd Industries.  He doesn't testify in the case.  It's
kind of -- kind of confusing.

        Now, Zenetta Ruffin.  Zenetta Ruffin was asked, did -
- and I asked on cross examination, did Ronald -- did your
husband ever come home and complain that he was mistreated at
Lloyd Industries because of his race?  And her answer was no.
Very telling answer.  There was no racial discrimination in
this case and there never has been.  This case is really -- you
know, it's about your recollection.  We heard from the -- the
plant manager, Tom Prendergast, okay.  He testified that Ronald
Watson worked at the plant, that he was not a great employee

but that he would do his job and would work certain hours.  He
missed a ton of time from work.

His average weekly hours for 11 months was 33.87
hours, okay?  That's not missing a day here or an hour there,
that's missing a whole lot of time.  And the collective
bargaining agreement that plaintiff has presented to you
basically says, if you're not a full-time employee the
seniority issue doesn't even matter.  It's kind of a red
herring in this case.  And besides that if you read Section 10
it's at the discretion of the employer if they place someone in
another position.

Now, Ronald Watson was not a great employee, but he
wasn't terminated.  He was terminated because they gave him an
opportunity to improve.  Now, with regards to Bill Lloyd, Bill
Lloyd sat -- he was the first witness in this case, he answered
the questions, he told the truth, he was consistent.  There's
nothing that counsel did with any of the witnesses on behalf of
the defense in which he showed inconsistencies or inaccuracies.

One of the I believe the key pieces of evidence in
this case -- and, again, that's up to you to determine, was
when the grievance form -- and this is D9, the grievance form
-- the grievance form that Mr. Watson went to the union
representative and claimed that he had been wrongly treated at
Lloyd Industries.  And you're going to have an opportunity to
learn that he never mentioned one word about racial

discrimination. He signed the document after he reviewed it, and he was reluctant to answer that question but to his credit he did answer the question, yeah, I reviewed it and signed it. And he never mentioned one word about racial discrimination. Why is that? Because there was no racial discrimination. His color of his skin had absolutely nothing to do with him being laid off.

Now, you've seen the roster of employees that were terminated during that period of time or resigned. Mr. Dion never made one mention of the white employees or the -- or he Hispanic employees that were laid off. It's like they don't matter; he only focused on the African-American ones. Now, there's testimony and it's corroborated that at the Florida plant there are 25 employees: eight of them are African-American, okay? Is that discrimination? Now, there's an issue about only three African-Americans working at the Montgomeryville plant. Now, why is that?

Now, Mr. Watson -- I'm sorry, Mr. Lloyd and Mr. Prendergast told you the numbers are the numbers because those are -- we put out advertisements and those are the only people that apply for work. And we don't get African-Americans to apply for work. Is that the fault of Lloyd Industries; is that because of something they've done? No, they're just not getting applicants for the jobs and that's why the racial makeup is what it is. They -- if you look at the roster and

that's going to be -- you'll have an opportunity to review

that, that is D23, you'll see there's Hispanic, Vietnamese,

there's, you know, various different ethnic -- it's like the

United Nations, ladies and gentlemen.  It's -- there's no

discrimination there.

The evidence in this case is that Mr. Watson was laid

off because of a financial -- a business decision in running

Lloyd Industries.  It is not your role in this case to

determine whether that was a good business decision or not a

good business decision.  It's a decision they have to make.

They made that decision based on the economics.  You heard

testimony from Ronald Watson that he knew the amount of work

that they were always busy.  Now, think about that.  He doesn't

work in the business department, so he doesn't know what orders

are coming in for certain parts and certain materials that are

produced at Lloyd Industries.  How would he know what volume of

work is coming into the business when he has no access to it?

His testimony made no sense about that.  He doesn't know what

orders are coming in so how would he know when layoffs need to

be made?

The biggest complaint he had was he didn't like the

way he was laid off.  Really not sure why because they allowed

him to collect unemployment.  You know, did they -- they didn't

have a special meeting with him to say, we have to lay people

off because work is slow.  That's not the practice of Lloyd

1 Industries and that's not something that is on trial here.
2 We're not addressing their practices and procedures of how they
3 lay people off.

4      If you weigh all the evidence in this case, look at
5 all the testimony, it's clear that the burden -- that the
6 plaintiff has not met their burden of proof, that they have not
7 provided you with any evidence whatsoever to show that there
8 was a racial motivation to lay off Ronald Watson. Interesting
9 -- you know, the fact that Shawn Broadnax was laid off and he
10 was laid off for two reasons. He was laid off, number one,
11 because the work that Ronald Watson did was assembled by Shawn
12 Broadnax. So when Ron Watson was laid off there was no work
13 for Shawn Broadnax to do. And then there was an issue with
14 Shawn and his activities and they -- they had to let him go.

15      In terms of Shaun Mathis, he testified that he was
16 having some problems at home. That was his testimony in the
17 witness box and that he wanted -- he needed to adjust his
18 schedule. Mr. Prendergast came in and said, we were talking to
19 him about reworking his schedule. He never got back to us and
20 he stopped showing up for work. What are we supposed to do,
21 keep him on? They let him go because of that. It had nothing
22 to do with the color of his skin.

23      In closing you're going to have an opportunity to
24 hear the law from the judge and the judge is going to tell you
25 what you should apply to the facts. Was there a -- a

discriminatory motivation on the part of Lloyd Industries with
regard to the layoff of Ron Watson? I think the evidence shows
no. The damages that -- and I'll comment on the damages, Mr.
-- if you look at the resume of Mr. Watson, he's held countless
jobs for four months, six months, nine months, very frequently
left work.

Is it reasonable with his skill set and his
background that he's going to be out of work for two and a half
years? It just doesn't make any sense. He's claiming these
damages but he hasn't proven any damages. He hasn't proven --
you know, they brought up the issue of punitive damages.
There's been not one shred of evidence in this case that there
was any type of reckless or, you know, malice in how Lloyd
Industries acted in terms of his treatment. Zero, not one bit
of evidence in this. So to even consider these damages,
there's no basis for it.

We believe based on the evidence in this case and the
defendant Lloyd Industries believes that when you get to
question 1 of the verdict sheet you're going to say that there
was no racial motivation to lay off Mr. Watson. I can't help
but believe that if Mr. Lloyd was African-American, if Mr.
Prendergast was African-American, that this case never would
have been brought. The only facts that they presented to you
in this case is that it just happened to be that there was
layoffs involving three African-American employees for reasons

1 presented and that it had no racial motivation at all, there's

2 no -- there's been no proof because other people were laid off,

3 white, Hispanic, you know, they're never mentioned, it was a

4 business decision.

5 Again, thank you for your time and your focus in

6 helping us resolve this. And the plaintiff has not proven

7 their case. There's just no evidence to support the various

8 allegations and there's really only one allegation in this case

9 that Mr. Watson was laid off for a racial purpose and that's

10 not the case.

11 Thank you.

12 THE COURT: Okay. Mr. Dion, all right, you've got

13 five minutes for rebuttal.

14 CLOSING ARGUMENT (REBUTTAL)

15 MR. DION: Okay. Thanks, Your Honor.

16 All right. Let's bring up Exhibit P8 to the screen.

17 You had to look at Exhibit P8 and see when Mr. Prendergast was

18 hired and then look at the terminations and layoffs that

19 occurred after that time period. We're not talking about stuff

20 from 2013, people were fired for stealing. You should really

21 take a close look at this sheet and see if there's -- and

22 understand why we're claiming that the three only African-

23 American black employees were fired after Mr. Prendergast came

24 to the company.

25 Now, counsel wants you to believe his story that Mr.

1 Watson only was upset of the way he was terminated and there

2 was no -- I mean, he's trying to instill that in your mind, but

3 cannot a person be upset over the way that they're terminated

4 and also believe they're fired for racial discrimination?  He

5 went ahead and made a complaint of racial discrimination, PHRC

6 right away.  And sometimes you've got to sit back and think

7 about things, the way that things happened.  He may not realize

8 it right away but the bottom line is, he definitely believes it

9 now.  And that's why we're here today.

10          Thank you.

11          THE COURT:  Okay.  Ladies and gentlemen, that

12 completes the arguments.  Now, the charge will take about 30

13 minutes, I estimate.  Would any member of the jury like a

14 break?  We'll take a break, if you want.  Otherwise, I'll keep

15 going.

16          All right.  I don't see any hands so I'm going to

17 proceed.  Now, you're welcome to take notes but I would --

18 you're going to get a -- a typewritten version of 99 percent of

19 what I'm about to say, so I would prefer you listen and sort of

20 get the big picture and then you can consult the instructions

21 as you need to.

22          So you've heard the evidence and you've heard the

23 closing arguments of the lawyers and now it's my duty to

24 instruct you as to the law that is applicable in this case.

25 When I'm done that then you will retire to consider your

verdict.  You must determine the facts from all the testimony

that you have heard and the other evidence such as the exhibits

which has been received during this trial.  You are the sole

judges of the facts.  Noone, not even the Court, myself, may

infringe upon this responsibility.

You may entirely disregard any comments I may make as

to my recollection of the evidence during the trial if your

recollection of the evidence is different than mine.  Nothing I

say in these instructions is to be taken as an indication that

I have any opinion about the facts of this case.  On the other

hand and with equal emphasis, I instruct you that you must

accept the rules of law as I will give them to you in this

charge and you must apply that law to the facts that you have

found.  You're not to be concerned with the wisdom of any rule

of law and you're not to single out one instruction alone but

you must consider the instructions as a whole.

You must perform your duties as jurors without any

bias or prejudice to any party.  The law does not permit you to

be governed by sympathy, prejudice, or public opinion.  All

parties expect that you will carefully and impartially consider

all of the evidence following the law as it has now been given

to you and reach a just verdict regardless of the consequences.

In your deliberations you must not consider the facts

that Mr. Watson is an individual while Lloyd Industries is a

corporation.  A corporation is entitled to the same fair trial

as a private individual.  All persons, including corporations and other organizations, stand equal before the law and are to be treated as equals.  The evidence from which you find the facts consist of the testimony of the witnesses, documents, and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to, or that I instruct you to find.

The following are not evidence and must not be considered by you: statements, arguments and questions by the lawyers are not evidence; objections to questions are not evidence.  Lawyers have an obligation to their clients to make objections when they believe evidence that is being offered is improper under the Rules of Evidence.  You should not be influenced by the objection or by the Court's ruling on it.  If the objection was sustained, you should ignore the question.  If it was overruled, treat the answer like any other.  You should also not consider testimony that the Court has excluded or told you to disregard.  Anything you may have seen or heard outside of the courtroom, is not evidence and must be disregarded.  You are to decide the case solely upon the evidence presented here in the courtroom.

Now, this is a civil case.  Mr. Watson is the party who has brought this lawsuit, and as I told you before, is referred to as the plaintiff.  Lloyd Industries is the party against which the lawsuit was filed and is referred to as the

defendant.  Mr. Watson has the burden of proving his case by
what is called the preponderance of the evidence.  That means
Mr. Watson has to prove to you in light of all the evidence
that what he claims is more likely so than not so.  To say it
differently, if you were to put the evidence favorable to Mr.
Watson and the favorable -- and the evidence favorable to Lloyd
Industries on opposite sides of the scale, Mr. Watson would
have to make the scales tip somewhat on his side.  If Mr.
Watson fails to meet this burden, the verdict must be for Lloyd
Industries.  If you find after considering all the evidence
that a claim or fact is more likely so than not so, then the
claim or fact has been proved by a preponderance of the
evidence.  And if you find that the scales tip more on Mr.
Watson's side, then he has met his burden of proof.

In determining whether any fact has been proved by a
preponderance of the evidence in a case, you may unless
otherwise instructed, consider the testimony of all witnesses,
regardless of who may have called them, and all exhibit
received in evidence, regardless of who may have produced them.
You may have heard the term proof beyond a reasonable doubt.
That is a stricter standard of proof and it applies only in
criminal cases.  It does not apply in civil cases and you
should put it out of your mind.

Now, in this case Mr. Watson makes two claims under
two federal civil rights statutes which is called Title VII and

Section 1981, both of which prohibit discrimination against an African-American employee because of his race. Mr. Watson claims that he was terminated from his employment at Lloyd Industries because of his race and/or color, which is African-American and black. Defendant Lloyd Industries denies that plaintiff was discriminated against in any way and that plaintiff was terminated for legitimate business reasons.

I will now instruct you more fully on the issues which you must address to this case. You should know that the instructions provided below are applicable to both the Title VII and the 1981 claim. In this case Mr. Watson is alleging that Lloyd Industries intended to discriminate Mr. Watson based on his race and color. In order for Mr. Watson to recover on this discrimination claim against Lloyd Industries he must prove that Lloyd Industries intentionally discriminated against him. This means that Mr. Watson was -- must prove that his race and color was a determinative factor in Lloyd Industries decision to terminate his employment.

To prevail in his claim Mr. Watson must prove the following by a preponderance of the evidence. One, first Lloyd Industries terminated Mr. Watson. I don't think there's any dispute about that. Second, Mr. Watson's race and/or color was a determinative factor in Lloyd Industries' decision. Although Mr. Watson must prove that Lloyd Industries acted with the intent to discriminate, Mr. Watson is not required to prove

that Lloyd Industries acted with a particular intent to violate his civil rights. Moreover, Mr. Watson is not required to produce direct evidence of intent, such as statements admitting discrimination. Intentional discrimination may be inferred from the evidence of other facts.

You should weigh all the evidence received in this case in deciding whether Lloyd Industries intentionally discriminated against Mr. Watson. For example, you have been shown statistics in this case. Statistics are one form of evidence that you may consider when deciding whether a defendant intentionally discriminated against the plaintiff. You should evaluate statistical evidence along with all the other evidence.

Lloyd Industries has given a nondiscriminatory reason for its termination of Mr. Watson's employment. If you believe Lloyd Industries stated reason and if you find that the termination would have occurred because of defendant's stated reason regardless of Mr. Watson's race and color, then you must find for Lloyd Industries. If you disbelieve Lloyd Industries' stated reason for its conduct, then you may, but need not, find that Mr. Watson has proved intentional discrimination.

In determining whether Lloyd Industries' stated reason for its action was a pretext or excuse for discrimination, you may not question Lloyd Industries' business judgment. You cannot find intentional discrimination simply

because you disagree with a business judgment of Lloyd
Industries or a belief that it was harsh or unreasonable.

You are not to consider Lloyd Industries' wisdom.
However, you may consider whether Mr. Watson has proven that
Lloyd Industries' reason is merely a coverup for
discrimination. All -- you must decide whether Mr. Watson has
proven that his race and/or color was a determinative factor in
Lloyd Industries' decision to terminate Mr. Watson.
Determinative factor means that if not for Mr. Watson's race
and/or color, the termination would not have occurred.

All right. I'm now going to -- now, that completes
my instructions on the substantive elements of the claims that
Mr. Watson has brought.

I'm now going to give you a charge on compensatory
damages. And then I'm going to discuss some other types of
damages.

Now, just because I'm instructing you on damages does
not mean I have any opinion as to whether or not Lloyd
Industries should be held liable. As you'll see when we get to
the verdict form, if you decide that Lloyd Industries -- that
Mr. Watson has not proved Lloyd Industries is liable then you
don't consider damages at all. On the other hand if you decide
that Mr. Watson has proved that Lloyd Industries is liable,
then you must consider the elements of damage, which I am now
about to explain to you.

1          The first type of damage I'm going to explain to you

2   is what's called -- what we call compensatory damages.  Now,

3   the first thing I want to say is that you -- when Mr. Dion

4   argued, and also Mr. Cohen, they talked about damages in

5   general.  They did not mention any specific figure.  Mr. Dion

6   did not say he was requesting any specific figure.  And that's

7   because the law in this court does not allow lawyers to name

8   specific damage figures.  It's completely up to the jury if you

9   decide Mr. Watson is entitled to damages, for you to decide the

10  amount of damages based on the instructions I am about to give

11  you.

12          If you find by a preponderance of the evidence that

13  Mr. -- of the evidence that Lloyd Industries intentionally

14  discriminated against Mr. Watson by terminating him based on

15  his race or color, then you must consider the issue of

16  compensatory damages.  You must award Mr. Watson an amount that

17  will fairly compensate him for any injury he actually sustained

18  as a result of Lloyd Industries conduct.  The damages that you

19  must award must be fair compensation, no more and no less.

20          The award of compensatory damages is meant to put Mr.

21  Watson in the position he would have occupied if the

22  discrimination had not occurred.  Mr. Watson has the burden of

23  proving damages by a preponderance of the evidence.  Mr. Watson

24  must show that the injury would not have occurred without Lloyd

25  Industries' act.  Mr. Watson must also show that Lloyd

1 Industries' act played a substantial part in bringing about the

2 injury and that -- and that the injury was either a direct

3 result or a reasonably probable consequence of Lloyd

4 Industries's acts.  This tests a substantial part in bringing

5 about the injury.  It is to be distinguished from the test you

6 must employee in determining whether Lloyd Industries' action

7 was motivated by discrimination.

8          In other words, even assuming that Lloyd Industries'

9 action was motivated by discrimination, Mr. Watson is not

10 entitled to damages for an injury unless Lloyd Industries'

11 discrimination -- discriminatory action actually played a

12 substantial part in bringing about that injury.

13          In determining the amount of any damages that you

14 decide to award, you should be guided by common sense.  You

15 must use sound judgment in making -- in fixing an award of

16 damages, drawing reasonable inferences from the acts -- facts

17 in evidence.  You may not award damages based on sympathy,

18 speculation, or guess work.  You may award damages for any

19 pain, suffering, inconvenience, mental anguish, or loss of

20 enjoyment of life that Mr. Watson experienced as a consequence

21 of Lloyd Industries' allegedly unlawful acts.

22          No evidence of the monetary value of such intangible

23 things as pain and suffering has been or need be introduced

24 into evidence.  There's no exact standard for fixing the

25 compensation to be awarded for these elements of damage.  Any

1  award you make should be fair in light of the evidence
2  presented at trial.  You may award damages for monetary losses
3  that Mr. Watson may suffer in the future as a result of
4  defendant's allegedly unlawful acts.

5  Where a victim of discrimination has been terminated
6  by an employer and has sued that employer for discrimination,
7  he may find it more difficult to be employed in the future, or
8  may have to take a job that pays less than if the
9  discrimination had not occurred.  That element of damage is
10  distinct from the amount of wages Mr. Watson would have earned
11  in the future from Lloyd Industries if he had retained the job.

12  As I instructed you previously, Mr. Watson has the
13  burden of proving damages by a preponderance of the evidence.
14  But the law does not required that Mr. Watson prove the amount
15  of his losses with mathematical precision and requires only has
16  much definiteness and accuracy as circumstances permit.

17  You are instructed under -- that Mr. Watson has a
18  duty under the law to mitigate his damages.  That means that
19  Mr. Watson must take advantage of any reasonable opportunity
20  that may have existed under the circumstances to reduce or
21  minimize the loss or damage caused by Lloyd Industries.  It is
22  Lloyd Industries' burden to prove that Mr. Watson has failed to
23  mitigate.  So if Lloyd Industries persuades you by a
24  preponderance of the evidence that Mr. Watson failed to take
25  advantage of an opportunity that was reasonably available to

him, then you must reduce the -- the amount of Mr. Watson's
damages by the amount that it could have been reasonably
obtained -- that he could have reasonably obtained if he had
taken advantage of such an opportunity.

In assessing damages, you must not consider
attorneys' fees or the cost of litigating this case.
Attorneys' fees and costs, if relevant at all, are for the
Court and not for the jury to determine.  Therefore, attorneys'
fees and costs should play no part in your calculation of
damage.

All right.  I'm now going to charge you specifically
on what we call back pay damages.  I instruct you that in
awarding compensatory damages, you are not to included damages
for the amount of wages that Mr. Watson would have earned in
the past if he had continued employment with Lloyd Industries.
These elements of recovery of wages that Mr. Watson would have
received from Lloyd Industries are called back pay.  Back pay
is to be awarded separately under the instructions that I'm
about to give you.  And any amount of back pay is to be entered
separately on the verdict form.

You may award as back pay damages an amount that
reasonably compensates Mr. Wilson for any lost wages and
benefits, taking into consideration any increases in salary and
benefits, including pension, that Mr. Watson would have
received from Watson [sic] Industries had Mr. Watson not been

the subject of Lloyd Industries' intentional discrimination. Back pay damages, if any, apply from the time Mr. Watson was terminated, which was October 29th, 2015, until April 9th, 2018. Now, that's the date that counsel have agreed upon when Mr. Watson got another job.

You must reduce any award by the amount of the expenses that Mr. Watson would have incurred in making those earnings. If you award back pay, you're instructed to deduct from the back pay figure whatever wages Mr. Watson has obtained from other employment during this period. However, please note that you should not deduct Social Security benefits, unemployment compensation, and pension benefits from any award of back pay.

There's another form of damages that I'm going to instruct you on called nominal damages. If you return a verdict for Mr. Watson but Mr. Watson has failed to prove actual injury and therefore is not entitled to compensatory damages, then you must award nominal damages of one dollars. A person whose federal rights were violated is entitled to recognition of that violation even if he suffered no actual injury. Nominal damages of one dollar are designed to acknowledge the deprivation of a federal right even where no actual injury occurred. However, if you find actual injury you must award compensatory damages as I instructed you rather than nominal damages.

1    Now, I'm going to charge you on one other type of

2 damage called punitive damages but I'll come back to that in a

3 minute.

4    I'm now going to instruct you generally on the

5 principals of law that you should consider as you review the

6 evidence.  But once again, I repeat to you that I am not

7 commenting on the facts of the case.  Those are for you to

8 decide and I have no opinion as to what your verdict should be.

9    There are two types of evidence that the law allows

10 and that you may use in reaching your verdict.  One type of

11 evidence is called direct evidence.  An example of direct

12 evidence is when a witness testifies about something that the

13 witness knows through his own senses.  Something the witness

14 has seen, felt, touched, or heard or did.  If a witness

15 testifies that he saw it raining outside and you believed him,

16 that would be direct evidence that it was raining outside.

17 Now, we're in a closed courtroom, we can't see what's going on

18 outside.  But if somebody came in here and said, I was just

19 outside and it was raining and you believe that witness, you

20 may accept as a fact that it is raining outside.

21    Now, the other type of evidence is called

22 circumstantial evidence and that's proof of one or more facts

23 from which you could find another fact.  If someone walked into

24 the courtroom -- this courtroom -- wearing a raincoat, covered

25 with drops of water and carrying a wet umbrella, that would be

circumstantial evidence from which you conclude that it was raining outside. That is the direct evidence is when a person gets on the stand and said, I was just outside and it is raining. Circumstantial evidence is when that person doesn't come on the stand, they walk in the courtroom, and most people if they saw a wet raincoat and a dripping umbrella would conclude from that that it was raining outside even though there was no testimony to that effect. That's what we mean by circumstantial evidence.

You should consider both types of evidence that are presented to you. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. You are to decide how much -- you are to decide how much weight to give any evidence.

Now, as I said at the very beginning of the case, credibility is a very important issue here. Credibility is a fancy word for believability. In deciding what the facts are, you have to decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. Credibility means whether a witness is worthy of belief. You may believe everything a witness says or only part of it or none of it.

In deciding what to believe, you may consider a number of factors including the following: the opportunity and the ability of the witness to see or hear or know the things

the witness testifies to; the quality of the witness'
understanding and memory; the witness' manner while testifying;
whether the witness has an interest in the outcome of the case,
and any motive bias or prejudice; whether the witness is
contradicted by anything the witness said or wrote before trial
or by other evidence; how reasonable a witness' testimony is
when considered in the light of other evidence you believe; and
any other factors that bear on believability.

The weight of the evidence to prove a fact does not
necessarily depend on the number of witnesses who testify.
What is more important is how believable the witnesses are and
how much weight you think their testimony deserves.  A witness
may be discredited or impeached by contradictory evidence or by
evidence that at some other time the witness has said or done
something or has failed to say or do something that is
inconsistent with the witness' present testimony.  If you
believe any witness has been impeached and thus discredited,
you may give the testimony of that witness such credibility if
any you think it deserves.  If a witness is shown knowingly to
have testified falsely about any material matter, you have the
right to distrust such witness' other testimony, and you may
reject all the testimony of that witness, or give it such
credibility as you think it may deserve.  An act or omission is
knowingly done if the act is done voluntarily and intentionally
and not because of mistake or accident or other innocent

1  reason.

2         I'm now going to charge you with the last type of

3  damages which we call punitive damages.  Mr. Watson claims that

4  the acts of Lloyd Industries were done with malice or reckless

5  indifference to Mr. Watson's federally protected rights and

6  that as a result there should be an award of what are called

7  punitive damages.  A jury may award punitive damages to punish

8  the defendant or to deter the defendant and others like the

9  defendant from committing such conduct in the future.

10         An award of punitive damages is permissible in this

11  case, only if you find by the preponderance of the evidence

12  that a management official of Lloyd Industries personally acted

13  with malice or reckless indifference to Mr. Lloyd -- to Mr.

14  Watson -- to Mr. Watson's federally protected rights.  An

15  action is with malice if a person knows that it violates the

16  federal law prohibiting discrimination and does it anyway.  An

17  action is with reckless indifference if taken with knowledge

18  that it may violate the law.

19         An award of punitive damages is discretionary.  That

20  is if you find that the legal requirements for punitive damages

21  are satisfied, then you may decide there were punitive damages

22  but you decide not to award them.  I will now discuss some

23  considerations that should guide your exercise of this

24  discretion.  If you have found the elements permitting punitive

25  damages as discussed in this instruction, then you should

consider the purposes of punitive damages.  The purposes of
punitive damages are to punish a defendant for a malicious or
reckless disregard of federal rights or to deter a defendant
and others like the defendant from doing similar things in the
future, or both.  Thus you may consider whether to award
punitive damages to punish Lloyd Industries.

You should also consider whether actual damages,
standing alone, are sufficient to deter or prevent Lloyd
Industries from again performing any wrongful acts it may have
performed.  Finally, you should consider whether an award of
punitive damages in this case is likely to deter others from
performing wrongful acts similar to those Lloyd Industries may
have committed.

If you decide to award punitive damages you should
also consider the purposes of punitive damages in deciding the
amount of punitive damages to award.  In deciding the amount of
punitive damages you should consider the degree to which Lloyd
Industries should be punished for its wrongful conduct and the
degree to which an award of one sum or another will deter Lloyd
Industries or others from committing wrongful acts in the
future.  You should also consider if you are to award punitive
damages, it's relationship to the amount of compensatory
damages or back pay that you may have already awarded.

That completes my instructions on the law -- rules of
law applicable to this case.  Shortly you're going to retire to

1  consider your verdict.  Your verdict must be unanimous.  The

2  attitude and conduct of the jurors at the outset of their

3  deliberations are matters of considerable importance.  Upon

4  retiring to the jury room your deliberations should being and

5  proceed in a orderly fashion.  Your first order of business in

6  the jury room, being select one of you as foreperson to preside

7  over your deliberations.

8        The foreperson's vote is entitled to no greater

9  weight than of that of any other juror.  If in the course of

10 your deliberations you should find yourself in serious doubt

11 concerning one portion of my instructions to you on the law,

12 then it's your privilege to return to the courtroom for further

13 instructions.  In the event you would transmit a note -- in

14 that event you should transmit a note to me through the court

15 deputy signed by your foreperson.  No juror should attempt to

16 communicate with the Court by any means other than a signed

17 writing and the Court will not communicate with the Court --

18 and the Court will not communicate with any juror on any

19 subject touching the merits of the case or otherwise, than in

20 writing, or orally here in open court.

21       You should not at any time reveal, even to the Court,

22 how the jury stands until you've reached a verdict.  Your

23 function is to reach a fair conclusion from the evidence and

24 the applicable law.  And this is an important function.  Your

25 verdict should be reached only after a careful and thorough

1  deliberation.  In the course of which you should consult with

2  each other and discuss the evidence and reasonable inferences

3  to be drawn therefrom, freely and fairly in a sincere effort to

4  arrive at a just verdict.

5         It is your duty to consider the issues with a view

6  towards reaching an agreement on a verdict, if you can without

7  -- and if you can do so without violating your individual

8  judgment and your conscience.  You must each decide the case

9  for yourself examining the issues and the evidence with candor

10  and frankness and with proper deference to and regard for the

11  opinions of each other.  Your consideration requires that you

12  be willing to reexamine your own views and change your opinion

13  if convinced that it lacks merit or validity.  While

14  maintaining this flexibility, you are not required to surrender

15  your honest conviction as to the weight or effect of evidence

16  solely because of another juror's opinion or for the mere

17  purpose of returning a verdict.

18         Your verdict must represent the jury's considered

19  final judgment.  Once you reach a verdict, you will then inform

20  the bailiff or the deputy that the jury has reached a verdict

21  so that you can be returned to the courtroom to render your

22  verdict.

23         I'm going to go over with you a form of verdict very

24  shortly and it has a series of questions for you to answer.

25  You'll take this verdict form to the jury room and when you've

1  reached a unanimous agreement as to your verdict, the

2  foreperson will fill it in and sign and date the form.  You

3  will then return to the courtroom and a foreperson will give

4  your verdict.  Unless I instruct you otherwise, do not reveal

5  your answers to the verdict until you're discharged.

6  　　　　Keep in mind that the dispute the parties is for them

7  a most serious matter.  They and the Court rely on you to give

8  full consideration and conscientious deliberation to the issues

9  and the evidence before you.  You should not -- not allow

10  sympathy or prejudice to influence your deliberations.  You

11  should not be influenced by anything other than the law and the

12  evidence of the case.  All the parties stand equally before the

13  Court and each is entitled to the same fair and impartial

14  treatment at your hands.

15  　　　　All right.  Now, Ms. Lutz will hand out -- I have

16  four copies of the verdict form, so you'll share one among

17  yourselves.  Just share it with your neighbor; it's not very

18  long.

19  　　　　All right.  So question number 1, has plaintiff

20  proven by a preponderance of the evidence that his race and/or

21  color was a determinative factor in defendant's decision to

22  terminate his employment.  And then you check yes or no.  If,

23  yes, you'll proceed to number 2.  If an answer is no, then

24  you've decided the case for the defendant Lloyd Industries and

25  you need not go any further.

1          Then number 2, what amount, if any, do you assess
2    against the defendant to compensate plaintiff for compensatory
3    damages to fairly compensate him for any injury he actually
4    sustained as a result of defendant's conduct, not including
5    back pay, which is requested separately below.  So if you find
6    compensatory damages for the plaintiff, you would just put the
7    -- put a dollar sign and the amount of damages.

8          Question 3, what amount, if any, do you assess
9    against the defendant to compensate plaintiff for back pay from
10   the time of his termination on October 29th, 2015 through April
11   9th, 2018.  So if you decide to award back pay, you would then
12   put a dollar sign and the amount you find right in there.

13         Then question number 4 -- question number 4 is, has
14   plaintiff proven by a preponderance of the evidence that a
15   management official of defendant personally acted with malice
16   or reckless indifference to his federally protected rights?
17   And you answer that yes or no, if you -- if you consider that.
18   And if it's yes, then you proceed to number 5 where you once
19   again put the dollar sign and the amount if you find punitive
20   damages.  If the answer is no then -- whatever -- once you've
21   completed this, then the foreperson should sign it and date it.

22         Now, if you find nominal damages as I said, one
23   dollar, you could put that on any of the item of damages.
24   Okay?  But if you find actual damages, then you have -- you
25   should not award nominal damages.

1          All right.  Do counsel want to see me at sidebar?

2   Mr. Dion?

3          MR. DION:  (No Verbal Response)

4          THE COURT:  Yes?

5          MR. DION:  Yes, Your Honor.

6          THE COURT:  All right.  Just give me a minute,

7   please.

8       (The following conference was held at the bench.)

9          THE COURT:  Anything you want me to say in addition?

10         MR. DION:  No, Your Honor.  We do have the exhibits

11  for the --

12         THE COURT:  Yeah.  Are you agreed on what exhibits go

13  to the jury?

14         MR. COHEN:  I do.  We -- that's to go to the jury as

15  well.

16         THE COURT:  All right.  Well, just show each other.

17         MR. COHEN:  I did.

18         THE COURT:  Any corrections you have?

19         MR. DION:  No, I -- did you make the charge on

20  statistical evidence?

21         THE COURT:  What?

22         MR. DION:  Statistical evidence, the statistical

23  evidence?

24         THE COURT:  Yeah, I said that.

25         MR. COHEN:  Okay.  Yeah, yeah.  I just -- this is to

1 go to the jury.

2      MR. DION:  These other ones, I had given you some

3 exhibits that I didn't use in my case.

4      THE COURT:  Well, the jury should just get the actual

5 exhibits that you -- that were introduced.

6      MR. DION:  All of them?

7      THE COURT:  They only get -- the jury should only get

8 the exhibits --

9      MR. DION:  Correct.

10      THE COURT:  -- that were shown to the jury.

11      MR. DION:  Right.

12      THE COURT:  See, you should go over that with each

13 other.

14      MR. DION:  We did.

15      THE COURT:  All right.  Well, then just get me -- I

16 don't want to give them a list.  They'll get the exhibits not a

17 list.

18      MR. DION:  Okay.  I can do that, Your Honor.

19      MR. COHEN:  Okay.

20      THE COURT:  Just look at each other's.

21      MR. COHEN:  Okay.

22      (End bench conference.)

23      THE COURT:  Okay.  All right.  Ladies and gentlemen,

24 the lawyers will prepare the exhibits -- all of the exhibits

25 that were shown to the witnesses during the trial will be sent

1 out to you shortly. Okay? Along with a copy of the charge.

2 And give them whatever consideration you think.

3        Now, let me just say something. I understand --

4 lunch is due at noon --

5        THE CLERK: Eleven-thirty.

6        THE COURT: Eleven-thirty, okay. So you'll start

7 your deliberations and then -- and elect a foreperson as I

8 said, and then you can take a break when your lunch comes.

9 Now, I have to be out of the building here from approximately

10 1:30 till about three o'clock. All right. So if you have any

11 questions, I urge you to write them down and -- but you should

12 continue and then give them to Ms. Lutz or whoever is waiting

13 outside the courtroom and they'll give them to me.

14        And if you can do that before 1:30, that would be a

15 good idea because I don't -- I don't want to delay your verdict

16 while I'm out of the building. Okay. And if you -- now if you

17 have any questions, you should continue your deliberations on

18 something else, because I have to go over the questions with

19 counsel before I call you into the courtroom to answer them.

20 So if you -- if you raise -- any questions I have to call you

21 back into the courtroom and I have to discuss the questions

22 with the lawyers first, what my answer should be, and then call

23 you back in and I'll give you the answer. That's how that

24 works so we may need a little bit of time to get that

25 organized, so if there are any questions -- I'm not -- I'm not

saying there has to be questions but if there are any questions you have the privilege -- but they must be in writing and signed by the foreperson.

Now, if you reach a verdict before I get back which will be around three o'clock, you should advise Ms. Lutz of that and she will seal the verdict and you can then take a recent -- if you want to go outside or something like that, you can do that, but then you should be back here at three o'clock, because you have to come into court and announce the verdict in open court.

Okay. So with that, the jury is excused. Thank you very much and begin your deliberations. And the exhibits should come out shortly. And here's the charge. Okay. And just take the verdict form. And whoever is elected the foreperson, would then use that verdict form to record the verdict.

(The jury exited the courtroom to begin deliberations.)

THE COURT: Okay. You'll go over the exhibits with each other. Let Ms. Lutz know if there's any dispute.

MR. COHEN: We already did.

THE COURT: What?

MR. COHEN: All done.

THE COURT: Okay.

MR. COHEN: We took care of it. Your Honor, did I hear you correctly you're going to leave till three o'clock or

1 you're not -- you're --

2          THE COURT:  Well, I don't -- I want you to be readily

3 available between now and 1:30.

4          Oh, you're going to --

5          MR. COHEN:  Well, I was just going to stay here.

6          THE COURT:  You're going to stay here?

7          MR. COHEN:  Yeah.

8          THE COURT:  Mr. Dion, where are you going to be?

9          MR. DION:  Your Honor, we will take our stuff back to

10 the office and then --

11          THE COURT:  Well, where is your office?

12          MR. DION:  Downtown, Rittenhouse Square --

13 Rittenhouse Square.

14          THE COURT:  Well, that's pretty far away.

15          MR. DION:  Yeah.

16          THE COURT:  Why don't you stay here till -- for a

17 half hour.

18          MR. DION:  Okay.

19          THE COURT:  Just in case there are any questions

20 before lunch comes.

21          MR. DION:  Okay.

22          THE COURT:  All right?  And then if you want to go,

23 make sure Ms. Lutz has the cell phone --

24          MR. DION:  All right.

25          THE COURT:  -- before you leave.  And make sure you

1  -- if we call you, we don't get voice mail, okay?

2         MR. DION:  Your Honor, there is one evidence I showed

3  to the jury --

4         THE COURT:  Yeah, pull the microphone --

5         MR. DION:  -- a Defense exhibit.

6         THE COURT:  -- closer to you.

7         MR. DION:  Oh, okay.  Yeah, there was a defense

8  exhibit that I showed to the jury.  It was -- do you know which

9  one it was?

10         UNIDENTIFIED SPEAKER:  D19, the letter.

11         MR. DION:  D19 and defendants didn't put it in their

12  packet.

13         THE COURT:  Well, if it was shown to the jury, the

14  jury is entitled to have it.

15         Do you agree with that, Mr. Cohen?

16         MR. COHEN:  I don't know that the jury saw it.

17         THE COURT:  Well, P19 is --

18         MR. COHEN:  It was D19?

19         MR. DION:  D19.  D19, Your Honor.

20         MR. COHEN:  It had to do with Mathis.

21         THE COURT:  You know, the jury was shown -- I

22  remember the jury looked at this.  All right.  D19 should go to

23  the jury.

24         MR. COHEN:  Okay.

25         THE COURT:  All right.  Thank you.

1          MR. COHEN:  That's fine.

2          MR. DION:  Thank you, Your Honor.

3          MR. COHEN:  We'll put it in there.

4          THE COURT:  All right.

5          MR. DION:  Do you want me to put it in?

6          MR. COHEN:  I --

7          THE COURT:  All right.  Just -- you should agree with

8     each other what's going in.

9          MR. COHEN:  Okay.  It doesn't matter.

10          THE COURT:  All right.  So D19.

11          MR. COHEN:  It's just one page.  It's one letter.

12          THE COURT:  All right.  Just look at the folder so

13     you're in agreement.

14          All right.  Thank you.

15          (Recess from 11:00 a.m. to 1:08 p.m.)

16          THE COURT:  Okay.  Good afternoon.  Counsel are here,

17     and the parties.  I'm told we have a verdict.

18          Bring the jury in, please.

19          (The jury enters the courtroom.)

20          THE COURT:  All right.  Everyone remain seated except

21     the foreperson remain standing, please.

22          All right.  Juror Number 2, good afternoon.  You're

23     the foreperson?

24          THE JURY FOREPERSON:  I am.

25          THE COURT:  All right.  I'm told the jury has reached

1  a verdict, is that correct?

2          THE JURY FOREPERSON:  We have.

3          THE COURT:  Is the jury unanimous?

4          THE JURY FOREPERSON:  Yes.

5          THE COURT:  All right.  I will now read the questions

6  and then you'll give the answers and then I'm going to ask each

7  juror if they agree.

8          You may be seated.

9          Now, question number 1, has plaintiff proven by a

10  preponderance of the evidence that his race and/or color was a

11  determinative factor in defendant's decision to terminate his

12  employment?

13          THE JURY FOREPERSON:  Yes.

14          THE COURT:  Two, what amount, if any, do you assess

15  against the defendant to compensate plaintiff for compensatory

16  damages to fairly compensate him for any injury he actually

17  sustained as a result of defendant's conduct, not including

18  back pay which is requested separately below?

19          THE JURY FOREPERSON:  Fifty thousand dollars.

20          THE COURT:  Paragraph 3, what amount, if any, do you

21  assess against the defendant to compensate plaintiff for back

22  pay from the time of his termination on October 29th, 2015

23  through April 9th, 2018?

24          THE JURY FOREPERSON:  Forty-nine thousand, nine

25  hundred and sixty dollars.

1          THE COURT:  Four, has plaintiff proven by a

2 preponderance of the evidence that a management official of

3 defendant personally acted with malice or reckless indifference

4 to his federally protected rights?

5          THE JURY FOREPERSON:  Yes.

6          THE COURT:  Number 5, if any, do you assess against

7 the defendant for punitive damages in order to punish the

8 defendant for malicious or reckless disregard of federal rights

9 or to defer defendant and others like the defendant from doing

10 similar things in the future or both?

11          THE JURY FOREPERSON:  Seven hundred and fifty

12 thousand dollars.

13          THE COURT:  Okay.  Thank you.  Please be seated.

14 And you signed that?

15          THE JURY FOREPERSON:  I did.

16          THE COURT:  All right.

17          All right.  Juror Number 1, do you agree with the

18 verdict as just been announced?

19          JUROR NUMBER 1:  Yes.

20          THE COURT:  All right.  Juror Number 2, do you agree

21 with the verdicts just been announced?

22          JUROR NUMBER 2:  (No Verbal Response)

23          THE COURT:  Juror Number -- repeat your -- now,

24 you're answering as an individual juror?

25          JUROR NUMBER 2:  Yes.

1          THE COURT:  All right.

2          Juror Number 3, do you agree with the verdict as just

3 been announced by the foreperson?

4          JUROR NUMBER 3:  Yes.

5          THE COURT:  You have to answer verbally.

6          JUROR NUMBER 3:  Yes.

7          THE COURT:  All right.

8          Juror Number 4, do you agree with the verdict that's

9 just been announced by the foreperson?

10         JUROR NUMBER 4:  Yes.

11         THE COURT:  All right.

12         Juror Number 6, do you agree with the verdict that

13 has just been announced by the foreperson?

14         JUROR NUMBER 6:  Yes.

15         THE COURT:  Juror Number 7, do you agree with the

16 verdict that's just been announced by the foreperson?

17         JUROR NUMBER 7:  Yes.

18         THE COURT:  Juror Number 8, do you agree with the

19 verdict that has just been announced by the foreperson?

20         JUROR NUMBER 8:  Yes.

21         THE COURT:  Okay.  All right.  The verdict will be

22 recorded.

23         Ladies and gentlemen of the jury, I want to thank you

24 very much for your service and I appreciate and our entire

25 court appreciates your giving up time from your daily

1  activities to participate in our justice system.  I'll come in

2  the jury room very shortly to give each of you a personal thank

3  you but so the jury is excused with the thanks of the court.

4  Thank you very much.

5  　　　　By the way, sometimes lawyers want to talk to jurors

6  after the verdict, okay?  And although you not -- you can't

7  discuss the case with anybody while you're deliberating, now

8  that the case is over you can talk to anybody you want.  And if

9  you want to talk to the lawyers about the case, you're welcome

10  to.  But you don't have to and if you don't want to, just go on

11  your way down the elevator.  And -- because that's completely

12  up to you.  The only thing I suggest that if you do want to

13  talk to lawyers about the case that you give them your own

14  personal views and not characterize the deliberations, you

15  know, in any way or point out any specific statements that one

16  juror made or the other.  But if you want to talk about your

17  own views, there's certainly no reason you can't do it, but you

18  don't have to do it.

19  　　　　All right.  Thank you very much.  I'll be back there

20  shortly.

21  　　　　(The jury exited the courtroom.)

22  　　　　THE COURT:  All right.  The verdict will be recorded

23  and judgment will be entered.  And if there's an appeal, then

24  you'll -- you'll have to post a surety bond.  All right.

25  Anything further from counsel?  Get your exhibits back.

1    MR. COHEN:  Yeah.

2    MR. DION:  Yeah.

3    THE COURT:  All right.  Okay.

4    MR. COHEN:  I don't have the exhibits, you -- you

5  have them.

6    THE COURT:  All right.  Court is adjourned.  Thank

7  you very much.

8    MR. DION:  Okay.  Thank you.

9    MR. COHEN:  Thank you, Your Honor.

10    (The trial adjourned at 1:14 p.m.)

11                    * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T I O N**

2         I, Erin Perkins, court approved transcriber, certify

3    that the foregoing 1 to 29 is a correct transcript from the

4    official electronic sound recording of the proceedings in the

5    above-entitled matter, and to the best of my ability.

6

7

8    _____

9    Erin Perkins, CET-601              Date: November 27, 2018

10   **C E R T I F I C A T I O N**

11        I, Gillian Lawrence, court approved transcriber,

12   certify that the foregoing pages 30 to 65 is a correct

13   transcript from the official electronic sound recording of the

14   proceedings in the above-entitled matter, and to the best of my

15   ability.

16

17

18   _____

19   Gillian Lawrence, CER-255, CET-255      Date: November 27, 2018

20

21

22

23

24

25