IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| RONALD WATSON | CIVIL ACTION |
|---|---|
| v. | NO. 17-1049 |
| LLOYD INDUSTRIES, INC. | |

MEMORANDUM RE: POST-TRIAL MOTIONS

**Baylson, J.**                                                                                            **March 19, 2019**

In this civil rights case, Plaintiff Ronald Watson asserts that his former employer, Lloyd Industries, Inc discriminated against him on the basis of his race when it laid him off in October 2015, in violation of Title VII and 42 U.S.C. § 1981. After a jury verdict in favor of Plaintiffs, Defendants moved for judgment as a matter of law, a new trial, or remittitur, alleging insufficient proof to sustain the verdict. This memorandum addresses Defendant's motion for judgment as a matter of law and for a new trial.

I.   **Background**

This two-day trial was held in November 2018 after a remarkably quiet pre-trial period where no motions were filed, at all. All evidence was presented on the first day of trial, and the second day of trial consisted of closing arguments, jury instructions, jury deliberation and verdict. The jury deliberated for approximately two hours.

Plaintiff called five witnesses: William Lloyd, Shaun Mathis, Ronald Watson, Fred Braker, and Zenetta Ruffin. Defendant called Thomas Prendergast and recalled William Lloyd. Defendant moved for a directed verdict after an offer of proof had been presented by Plaintiff regarding the subject of the testimony of Zenetta Ruffin. Defendant contended "that plaintiff has not met the burden of proof to establish any racial motivation for the dismissal of Mr. Watson."

(Tr. Day 1 171:5-8.) We summarize the nature of each witness's testimony below, reviewing the testimony in the light most favorable to the Plaintiff.

### a. William Lloyd

William Lloyd, the founder and CEO of Lloyd Industries, was first called as on cross by Plaintiff. Defendants also called Lloyd later in the trial as a defense witness. Lloyd provided background on the company which manufactures fire protective products for HVAC systems. (Tr. Day 1 21:18-22:7.) Lloyd discussed the union contract that Lloyd Industries has with its employees, including the provision ensuring plant-wide seniority. (Tr. Day 1 22:8-25:23.) He also addressed the difference between an assembler and a punch press operator, noting that Watson was categorized as both. (Tr. Day 1 27:9-29:2.)

Lloyd testified that the Lloyd Industries' Montgomeryville plant where Watson worked had few black employees because they did not apply for jobs there, but that in Lloyd Industries' Florida plant, about eighty percent of the employees were black. (Tr. Day 1 56:16-57:16.) Lloyd later admitted that only eight of the twenty-five employees at the Florida plant are black. (Tr. Day 1 208:19-209:2.)

Lloyd testified that he and Thomas Prendergast, the plant manager, made decisions to lay off two employees, including Watson, when business got slow. (Tr. Day 1 34:22-35:12.) He stated, however, that Prendergast was the one who decided to lay off Watson, as it was in the "discretion of the plant manager to lay off employees whose departments are lacking work." (Tr. Day 1 35:13-15; 37:11-23.) Lloyd reviewed employment documents confirming that the only three black employees in the factory—Shawn Broadnax, Shawn Mathis, and Watson—left the company between October 26, 2015 and October 30, 2015. (Tr. Day 1 39:1-25.) While Broadnax and Watson were laid off by Prendergast because of an alleged lack of work, Mathis "resign[ed]

on his own terms." (Tr. Day 1 39:16-19.) Lloyd stated that the company preferred to lay people off rather than fire them "so they go collect unemployment," and contended that the true reason for Watson's lay off was that he was a subpar employee and had an alcohol problem (Tr. Day 1 41:14-42:7.)

With regard to Watson's record at work, Lloyd testified that he performed assembly work "poorly." (Tr. Day 1 34:5-8.) He stated that Watson would come back from lunch with alcohol on his breath, but admitted that he would permit Watson to operate heavy machinery even when he had alcohol on his breath. (Tr. Day 1 42:8-44:22.) Lloyd never disciplined Watson for any of these alleged performance issues, but also testified that the company has a policy of not giving "writing up" employees. (Tr. Day 1 59:8-60:13.) Lloyd confirmed a statement from his deposition that he laid off Watson to make room for another white employee who needed to move into Watson's department because of medical reasons. (Tr. Day 1 51:3-22.) Like Watson, Broadnax, the other laid off black employee, had performance issues, according to Lloyd. (Tr. Day 1 50:18-24.)

Lloyd testified that a white employee Steve Malloy was hired as an assembler in June 2015, after Watson. (Tr. Day 1 32:5-7.) Despite Malloy having less seniority than Watson, Lloyd stated that Malloy was an assembler and that Watson could not perform Malloy's assembler job "[b]ecause he was a punch-press operator." (Tr. Day 1 46:16-25; 48:20-22.) He testified that the assembly work performed by Malloy was different than the assembly work performed by Watson, although some assembly duties are "easier to learn" than others. (Tr. Day 1 48:1-22.)

    b. **Shaun Mathis**

Shaun Mathis, a former Lloyd Industries employee, testified about the work that he did as an assembler. (Tr. Day 1 68:1-70:5; 75:10-77:1.) He testified that Prendergast was not friendly

3

with black employees: "being as though that there were only three African-American workers in the shop, from what I noticed, there wasn't much being done as far as conversation as far as those three gentlemen, including myself, and everyone else in the shop." (Tr. Day 1 71:4-8.) Mathis did say, however, that no one ever said anything to him "of a racial nature… that would make you uncomfortable" when he was working at Lloyd Industries. (Tr. Day 1 86:14-17.)

Mathis testified that he was written up once for being late and was unaware of any company policy prohibiting write-ups. (Tr. Day 1 72:25-73:14.) Mathis eventually resigned after he requested a more flexible schedule to allow him to look for a second job closer to home, and was in turn given a reduced schedule. (Tr. Day 1 77:8-78:3.) He testified that other employees had been given flexibility with their schedules in the past, though he admitted that there were part-time and full-time employees with varying schedules. (Tr. Day 1 83:18-85:6.)

Mathis testified that he worked in the same department as Steve Malloy, who started about a month or two after him. (Tr. Day 1 71:10-16.) He stated that Malloy's work was subpar: "a lot of [Malloy's] work had to be redone…. He would come in maybe two, three times a week late." (Tr. Day 1 72:3-14.) Mathis did not observe a relationship between Prendergast and Malloy. (Tr. Day 1 75:5-9.)

### c. Ronald Watson

Ronald Watson testified that he was hired by Lloyd to be a punch press operator in the Lloyd Industries Montgomeryville, Pennsylvania plant in December 2014. (Tr. Day 1 93:22-94:17.) In his eighth month at Lloyd Industries, he became a member of the union. (Tr. Day 1 96:5-21.) Watson stated that he did assembly work forty percent of the time. (Tr. Day 1 94:21-25.) When Watson left the job, he was making $13.50 an hour and was working an average of

33.87 hours per week. (Tr. Day 1 99:19-100:1.) Watson testified that he worked less than 40 hours per week because of health issues. (Tr. Day 1 146:14-24.)

When Watson was hired, he stated that the only other black employee was Broadnax, and that Mathis was hired after him. (Tr. Day 1 97:9-98:7; 99:5-7.) Watson testified that he never was written up and that he received compliments from the shop steward on his performance. (Tr. Day 1 131:1-18.) Watson testified that he had seniority over Steve Malloy and that when Malloy would come into his work area he had to be shown what to do. (Tr. Day 1 162:10-15.)

Like Mathis, Watson stated that he never received a comment about his race or background. (Tr. Day 1 152:18-22.) Watson testified that Prendergast "had an attitude that you can feel, and he never spoke to me" unless it was a scheduling issue. (Tr. Day 1 130:8-23.)

The day he was fired, Watson testified

> Tom Prendergast said Ron, can I speak with you, because all this was by the time clock. I said yes. I said what's up. He said I'm laying you off. I said what? He said I'm laying you off. I said what you laying me off for. He said because I can.

(Tr. Day 1 122:11-15.) After this interaction, Lloyd allegedly told Watson to "take the layoff, alright?" and Watson testified that "the way [Lloyd] said it, it was so offensive. And he got in my face. So I just left." (Tr. Day 1 132:13-15.) Watson admitted that he was "very, very angry" and that he said a curse word when he was laid off. (Tr. Day 1 148:13, 150:16-19.) Watson stated that he was upset about the way that he was laid off, and that he would have been fine with being laid off in a "kind and gentle way." (Tr. Day 1 151:15-23.)

After being laid off, Watson signed a grievance form with his union representative, Fred Braker, but he never heard back about Braker's investigation into the grievance. (Tr. Day 1 123:8-12.) He then filed a racial discrimination complaint with the Pennsylvania Human Rights Commission. (Tr. Day 1 134:24-10.)

5

Watson denied drinking on the job, and stated that he usually clocked out at lunchtime and ate lunch in his car in the parking lot. (Tr. Day 1 126:10-127:14.) He also contended that he did not experience any evidence of a slowing down of work, though he admittedly did not have access to books showing how business was going. (Tr. Day 1 136:12-137:8; 147:9-12.)

Watson explained the way that the layoff affected his life: "I was distraught. I was heartbroken. I was very depressed. I went through a period of depression. I felt like I was a loser. I felt discriminated against. I had no—I wasn't treated fair. And I felt as though somebody did something to me that wasn't valid." (Tr. Day 1 137:22-138:1.) Watson testified that he collected unemployment and did temporary jobs for two and a half years until he began his current job as a punch press operator at Generation Metal in Trevose, Pennsylvania in April 2018. (Tr. Day 1 92:21-92:5; 138:12-15; 139:3-18.) He told the jury that the amount he lost was "$52,247 and some change." (Tr. Day 1 139:24-140:5.) Watson confirmed that he did not seek treatment for any of his alleged emotional damages. (Tr. Day 1 157:21-158:3.)

### d. Fred Braker

Fred Braker, the business representative of the Sheet Metal Workers' International Union, testified that the seniority policy in the union contract at Lloyd Industries is plant-wide. (Tr. Day 1 103:18-105:14.) Braker testified that he attempted to file a grievance on Watson's behalf after he was laid off, but then decided against filing it when he talked to a shop steward who told Braker that Watson "wasn't a very god worker, that he didn't show up a lot and, you know, came back from lunch smelling bad, I think alcohol" and that he "told Mr. Watson, I said, you know, maybe you want to take a layoff instead of, you know, getting terminated. At that point, he said okay." (Tr. Day 1 106:7-109:9.) The grievance mentioned nothing about race discrimination. (Tr. Day 1 119:2-8.)

6

Braker reviewed an email from nine months after the layoff where he told Prendergast that Watson was the "lowest seniority. Therefore, there was nothing we could do as to the Lloyd Industries firing." (Tr. Day 1 110:18-112:3.) Braker admitted, however, that based upon a separate document showing that there were four others with less seniority than Watson, (including Steve Malloy), Watson was not the lowest in seniority. (Tr. Day 1 112:24-113:12.)

### e. Zenetta Ruffin

Zenetta Ruffin, Watson's partner of forty years[1] testified that she only knew Watson to drink beer and wine socially ("at home, dinner, social events, parties"), and that he did not come back from work smelling of alcohol. (Tr. Day 1 175:19-176:20.) Ruffin also testified that the couple had just bought a house so she had to "rearrange everything to compensate for the job loss," including her working extra shifts. (Tr. Day 1 178:6-179:13.) After Watson was laid off, Ruffin stated he was "sad, depressed, the whole household, the mood was difficult during that time." (Id.)

### f. Thomas Prendergast

The defense called Thomas Prendergast, the plant manager at Lloyd Industries when Watson was laid off. Prendergast testified that he spoke with Watson when he asked for equipment or time off, and that occasionally the two would chat in the men's room (a claim that Watson denied on rebuttal). (Tr. Day 1 187:5-25.) Prendergast testified that Watson "wasn't the greatest employee, he wasn't a get up and goer, he was a little slow, and he just done his own thing more or less." (Tr. Day 1 188:13-15.)

---

[1] Ruffin was referred to as Watson's wife throughout trial although the two were never formally married. (Tr. Day 1 174:6-10.)

7

Prendergast's testimony conflicted with Lloyd's regarding write-ups; Prendergast stated that the company wrote employees up after they receive a verbal warning. (Tr. Day 1 188:16-189:10.) He also testified that he laid off Watson because of a "little lull" in work and because Watson had the least seniority in his department. (Tr. Day 1 190:22-191:2.) Although Prendergast recognized that the union contract included plant-wide seniority, he stated that it only applies "if he would put in for another job or deem that he could do the job, but this never happened in this case." (Tr. Day 197:25-198:4.)

With regard to the other two black employees, Prendergast stated that he had "trouble" with Broadnax and was not sure if Broadnax was laid off because he was low in seniority. (Try. Day 1 198:22-199:13.) He contended that he never took hours away from Mathis, but that Mathis himself cut down his hours. (Try. Day 1 200:10-12, 201:5-9.) Prendergast stated that he consulted with Lloyd when making the lay off decisions. (Tr. Day 1 203:18-24.)

Prendergast testified that he did not hire Steve Malloy, but that Malloy was hired after him as an assembler. (Tr. Day 1 201:20-202:5.) According to Prendergast, Malloy was rarely late and when he was, he would alert management. (Tr. Day 1 202:9-14.)

## II. Legal Standard

Defendants move for entry of judgment as a matter of law pursuant to Rule 50, for a new trial pursuant to Rule 59, or in the alternative, for remittitur. Each of these routes imposes a heavy burden on Defendants.

A post-trial motion for judgment as a matter of law under Rule 50(b) "may be granted 'only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" Mancini v. Northampton Cty., 836 F.3d 308, 314 (3d Cir. 2016) (quoting

Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)). "Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability." Lightning Lube, 4 F.3d at 1166. Where a jury returns a verdict in favor of the plaintiff, a court must "examine the record in a light most favorable to the plaintiff, giving her the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn." In re Lemington Home for the Aged, 777 F.3d 620, 626 (3d Cir. 2015) (quoting Dudley v. S. Jersey Metal, Inc., 555 F.2d 96, 101 (3d Cir.1977)).

Rule 59 allows a court, after conducting a jury trial, to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). However, a court, "should do so only when "the great weight of the evidence cuts against the verdict and ... [ ] a miscarriage of justice would result if the verdict were to stand." Leonard v. Stemtech Int'l Inc, 834 F.3d 376, 386 (3d Cir. 2016) (quoting Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006)) (alterations original).

### III. Defendant's Post-trial Motion

#### a. Judgment as a Matter of Law under Rule 50(b)

Defendant seeks judgment as a matter of law in its favor on the entire verdict. It asserts that this relief is appropriate "because there was no evidence of record showing that Defendant unlawfully discriminated against Plaintiff on the grounds of his race." (Mot. Memo. at 5.) Defendant argues initially that Plaintiff did not make out a prima facie case because Plaintiff did not show that he was treated less favorably than similarly situated employees of a different race. (Id. at 8.) Plaintiff responds that under the plant-wide seniority clause in the union contract (P-21, Article X(A)), Watson should have been retained because he could perform other work at the

plant. (Resp. at 14.) Plaintiff also asserts that Steve Malloy, a white employee with less seniority than him, was retained when he was laid off. (Resp. at 16-17.)

For discrimination lawsuits involving layoffs due to a reduction-in-force, as here, a prima facie case of discrimination is established by a demonstration that plaintiff "was in the protected class, he was qualified, he was laid off and other unprotected workers were retained." Marzano v. Computer Science Corp. Inc., 91 F.3d 497, 502 (citing Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994.) We are more than satisfied that Plaintiff met this standard and made out a prima facie case. Mancini, 836 F.3d at 314.

Defendant also contends that Plaintiff has not shown pretext in light of Lloyd and Prendergast's testimony that there was a lull in business and their testimony that Watson had performance issues. (Mot. Memo. at 11.) Plaintiff responds by pointing to the various portions of testimony where the credibility of the defense witnesses was questionable. (Resp. at 19-24.)

We must give the evidence all reasonable inferences in favor of Plaintiff. We conclude that there was ample evidence from which a reasonable jury could conclude that Lloyd Industries' proffered reason for laying off Watson—a lull in work—was pretext for racial discrimination. Mancini, 836 F.3d at 314. Most significantly among the possible reasons is the fact that there were only three black employees of the factory with over sixty employees and that all three of these employees were laid off or voluntarily left within the same week. Moreover, Defendant even notes Lloyd's testimony that "were Plaintiff a stellar employee, he would be working at the Montgomeryville plant this very day." (Id. at 14.)

The Court must also note that Mr. Prendergast had an aggressive, somewhat hostile, manner when he testified, which is not reflected in the transcript, that may have warranted the

jury to disbelieve his testimony and to make the verdict and award the amount of punitive damages that jury found.

Defendant's motion for judgment as a matter of law with regards to the damage award is reserved for additional briefing in accordance with the accompanying order.

### b. New trial under Rule 59(a)

Defendant next moves for a new trial under Rule 59(a). Our latitude with granting a new trial depends upon the basis for doing so. "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Klein v. Hollings, 992 F.2d 1285, 1290 (3d Cir. 1993) (quoting Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991)).

For the reasons discussed above, the jury's verdict was not against the weight of evidence or a miscarriage of justice.

## IV. Conclusion

In sum, we deny Defendant's motion for judgment as a matter of law or a new trial. We reserve for now our determination of Defendant's motion as to the damage award.

An appropriate order follows.